1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OSCAR GATES,

        Petitioner,

  v.

KEVIN CHAPPELL, Warden,

        Respondent.

_____/

No. C 88-2779 WHA

**ORDER DENYING CERTAIN
RECORD-BASED CLAIMS**

     Petitioner Oscar Gates, a California state prisoner sentenced to death, seeks a writ of

habeas corpus under 28 U.S.C. Section 2254.  The parties have filed merits briefing on certain

stipulated claims that they agree can be considered without the input of petitioner, who has

previously been adjudicated incompetent.  In addition, petitioner has filed two motions to

expand the record (Dkt Nos. 667 and 698).   For the following reasons, all of petitioner's claims

at issue on this motion are **DENIED.**  In addition, petitioner's motions to expand the record are

**DENIED**.

**United States District Court**
For the Northern District of California

# FACTUAL BACKGROUND

On December 10, 1979, Maurice Stevenson and his uncle, Lonnie Stevenson, were waxing his car in front of his grandfather's house in Oakland at about 3:30p.m.  Petitioner appeared, holding a gun with the hammer cocked.  Petitioner herded Maurice and Lonnie to the side of the house and ordered them to put their hands on the wall, empty their pockets, and remove their jewelry.  After Maurice and Lonnie complied with petitioner's directives, petitioner frisked them and asked Maurice as to the whereabouts of Maurice's father, James Stevenson.  Maurice replied that he did not know and petitioner told them that he was going to kill them. Petitioner first shot Lonnie, who yelled for his father and started running toward the back of the house, then shot Maurice, picked up the money and some of the jewelry, and fled. Lonnie died but Maurice survived. Some time after the shooting, petitioner called Jimmy Stevenson, Maurice's grandfather, and said that he had killed Lonnie and shot Maurice, that he was going to Los Angeles to kill members of another family, and that when he returned he would finish killing off the Stevenson family.  On December 29, 1979, petitioner was arrested in Vallejo, and the gun later determined to be the one that killed Lonnie Stevenson was found on him. *See People v. Gates,* 43 Cal.3d 1168, 1176-78 (1987).

On January 4, 1980, an indictment was filed in Alameda County.  It charged petitioner with murder (Cal. Penal Code § 187(a)), accompanied by the robbery-murder special circumstance (§ 190.2 (a)(17)(A)), two counts of robbery (§ 211), assault with a deadly weapon (§ 245(a)), possession of a firearm by an ex-felon (§ 12021), and escape (§ 4532(b)), among other things.  Petitioner pled not guilty to all charges.  The trial began on March 16, 1981. At trial, petitioner asserted a claim-of-right defense.  He testified about a so-called "Stevenson family forgery ring," purportedly headed by James Stevenson and Donald "Duck" Taylor, and of which, Lonnie and Maurice Stevenson, Melvin Hines and petitioner were all members.  A dispute arose when petitioner did not receive his "big cut" of $25,000 allegedly promised to him.

In September 1979, a heated argument between petitioner and other members

United States District Court

For the Northern District of California

of the forgery ring led to petitioner being fired upon by Maurice and James Stevenson, which resulted in a gunshot wound to petitioner's leg.  Thereafter, petitioner learned through intermediaries that he would have to give up his claim to the money or he would be shot.  On December 10, 1979, petitioner allegedly spoke with Lonnie Stevenson by phone and made arrangements to pick up the money at Jimmy Stevenson's house at about 3:00p.m.  Petitioner went to Jimmy Stevenson's house as had been arranged.  Petitioner saw

Maurice and Lonnie outside waxing a car. Petitioner allegedly told Maurice and Lonnie that he was there to pick up his money and did not want any trouble, but that he had a gun and could take care of himself.  As the three men made their way around the side of the house, petitioner's suspicion was allegedly aroused by some of Maurice and Lonnie's actions, so he patted them down for weapons.  After finding none, the three men continued toward the back of the house when petitioner saw Jimmy Stevenson holding a gun.  Gunfire erupted.  Lonnie and Maurice were shot, and petitioner fled.  On May 6, 1981, the jury convicted petitioner of all charges and found the special circumstance allegation to be true.

At the penalty phase, the prosecution presented, as evidence in aggravation, evidence of petitioner's convictions for robbery and for two assaults in connection with a 1978 robbery of a McDonald's restaurant, a 1973 conviction for rape, and a 1973 conviction for kidnapping. The prosecution also presented evidence that petitioner was involved in a 1978 assault and robbery of two women at a Los Angeles mortuary, which had resulted in the death of one of the women. (Petitioner was later convicted of the Los Angeles mortuary crimes in a separate trial.) The case in mitigation consisted of testimony by several of petitioner's family members, several apartment neighbors, and a clinical psychologist. Petitioner's family members described the racially-segregated environment in which petitioner grew up in Belzoni, Mississippi. They testified that petitioner was never in any trouble until an incident at a Western Auto Store when he was approximately 14 to 16 years old; the incident, which apparently involved petitioner, an African-American, striking a white woman who had struck him first, resulted in petitioner spending six months in jail and becoming a target of police harassment and suspicion for any problem that arose thereafter. Petitioner's mother also testified that she visited petitioner in

United States District Court

For the Northern District of California

California in 1973 at a jail hospital after he had been beaten by the police. Petitioner's neighbors described petitioner as a friendly, sweet, considerate, good-hearted, good-natured person who never got angry and got along well with people. Dr. Paul Berg, a clinical psychologist, testified that petitioner was "an unusually well-adjusted prisoner" and most likely would not present a problem in prison. *See Gates,* 43 Ca1.3d at 1193-97. On May 28, 1981, the jury returned with a verdict of death for petitioner.

## PROCEDURAL BACKGROUND

The California Supreme Court affirmed petitioner's conviction and sentence on direct appeal on October 15, 1987. *People v. Gates,* 43 Ca1.3d 1168 (1987). On May 23, 1988, the United States Supreme Court denied a petition for certiorari. *Gates v. California,* 486 U.S. 1027 (1988).

Subsequent state and federal habeas proceedings ensued, with a focus on, *inter alia,* petitioner's competency.[1] After much litigation, this matter was stayed in 2004 following an adjudication of petitioner's mental incompetency, as required by *Rohan ex. rel. Gates v. Woodford ("Gates"),* 334 F.3d 803 (9th Cir. 2003).[2] At that time, attorneys for petitioner and respondent agreed that petitioner was then incompetent to assist counsel. On January 8, 2013, the Supreme Court decided *Ryan v. Gonzales,* abrogating *Gates* and holding that an incompetent capital prisoner has no right to an indefinite stay of habeas proceedings. The Supreme Court further held that while the decision to grant a temporary stay is within the discretion of the district court, an indefinite stay is inappropriate if there is no reasonable hope the petitioner will regain competence in the foreseeable future. *Ryan,* 133 S. Ct. 696, 706-709.

Pursuant to *Ryan,* this Court lifted the stay. The parties were referred to settlement proceedings with Magistrate Judge Beeler. In addition, the Court ordered proceedings on the merits of petitioner's federal habeas proceedings to re-commence. Recognizing that petitioner's

---

[1] For a detailed description of the state habeas proceedings, *see* Order Re Motion For Summary Judgment on Claim 1 and 1292(b) Certification, filed August 23, 2001.

[2] Petitioner was also adjudicated to be mentally incompetent in 1994, as part of the proceedings in this habeas matter, and in 1973, in a prior state criminal matter.

4

1    competency remains an issue, the Court ordered the parties to brief the merits of certain

2    stipulated claims that did not need the input of petitioner to be addressed.  Those stipulated

3    claims are the subject of this order.

**LEGAL STANDARDS**

**1.    HABEAS REVIEW**

6          The habeas statute authorizes this Court to review a state court criminal conviction "on

7    the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties

8    of the United States."  28 U.S.C. § 2254(a).[3]  The purpose of the writ of habeas corpus is to

9    "protect[] individuals from unconstitutional convictions and . . . to guarantee the integrity of the

10   criminal process by assuring that trials are fundamentally fair."  *O'Neal v. McAninch*, 513 U.S.

11   432, 441 (1995); *see also Brecht v. Abrahmson*, 507 U.S. 619, 632-33 (1993).  Because federal

12   habeas review delays finality and burdens state-federal relations, habeas doctrines must balance

13   the protection from unlawful custody the writ offers against the "presumption of finality and

14   legality" that attaches to a state-court conviction after direct review.  *See Brecht*, 507 U.S. at

15   635-38; *McCleskey v. Zant*, 499 U.S. 467, 490-91 (1991).  Accordingly, a federal habeas court

16   must in most cases presume that state court findings of fact are correct.  28 U.S.C. § 2254(d).

17   In contrast, purely legal questions and mixed questions of law and fact are reviewed *de novo*.

18   *See Swan v. Peterson*, 6 F.3d 1373, 1379 (9th Cir. 1993), *cert. denied*, 513 U.S. 985 (1994).  In

19   such circumstances, and when the state court has made no factual findings regarding the claim

20   at issue, petitioner bears the burden of proving, by a preponderance of the evidence, the facts

21   necessary to support his claims.  *See, e.g.*, *Garlotte v. Fordice*, 515 U.S. 39, 46-47 (1995).

22         Even if a petitioner meets the requirements of Section 2254(d), habeas relief is

23   warranted only if the constitutional error at issue had a substantial and injurious effect or

24   influence in determining the jury's verdict.  *Brecht*, 507 U.S. at 638.  Under this standard,

25   petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to

26   habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"

27

28         [3]  This case predates the effective date of the Antiterrorism and Effective Death Penalty Act of 1996
     ("AEDPA"), and thus AEDPA's standard of review does not apply.

5

United States District Court

For the Northern District of California

1  *Brecht*, 507 U.S. at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)).

2  **2.    *TEAGUE* DOCTRINE**

3      *Teague* prevents a federal court from granting habeas relief to a state prisoner based on

4  a constitutional rule of criminal procedure announced after his conviction and sentence became

5  final.  *Teague v. Lane*, 489 U.S. 288, 310–16 (1989); *see also Penry v. Lynaugh*, 492 U.S. 302,

6  313–14 (1989) (the non-retroactivity principle is applicable in a capital sentencing context).  It

7  prohibits federal courts from either creating or applying new rules on collateral review.  *See*

8  *Butler v. McKellar*, 494 U.S. 407, 412 (1990).

9      *Teague* instructs that "[a] case announces a new rule if the result was not dictated by

10  precedent existing at the time the defendant's conviction became final."  489 U.S. at 301.  Put

11  differently, a decision sets forth a new rule when it "breaks new ground or imposes a new

12  obligation on the States or the Federal Government."  *Butler*, 494 U.S. at 412.  The new rule

13  does not, however, foreclose the specific application of a previously established rule.   The

14  Supreme Court has explained that "if the rule in question is one which of necessity requires a

15  case-by-case examination of the evidence, then we can tolerate a number of specific

16  applications without saying that those applications themselves create a new rule."  *Williams*, 529

17  U.S. at 383 (quoting *Wright v. West*, 505 U.S. 277, 308–09 (1992)).[4]

18                          **ANALYSIS**

19  **1.    CLAIM 10**

20      In Claim 10, petitioner maintains that the trial court erred in failing to instruct the jury

21  that the charged robbery-murder special circumstance required a specific intent to kill under

22  *Carlos v. Superior Court*, 35 Cal. 3d 131, 153-154 (1983).  According to petitioner, this failure

23  violated petitioner's constitutional rights and mandates reversal of his death sentence.

24      Under California law, "intent to kill is not an element of the felony-murder special

25

26

27

28      [4] In an earlier order, the Court addressed the application of *Teague* to several of the claims at issue in this Order.  *See* Order Denying in Part and Granting in Part Respondent's Motion for Summary Judgment Based on Affirmative Defenses (filed August 23, 2001) (hereinafter "*Teague* Order").

United States District Court
For the Northern District of California

circumstance when the defendant is the actual killer."[5]  *James v. Borg*, 24 F.3d 20, 25 (9th Cir. 1994).  "Intent to kill was an element of felony-murder special circumstance between 1983 and 1987, however."  *Ibid.* (citing *Carlos v. Superior Court,* 35 Cal. 3d 131, 153-154 (1983), *overruled by People v. Anderson*, 43 Cal. 3d 1104, 1147 (1987)).  Prior to the *Anderson* decision overturning *Carlos*, however, the California Supreme Court had determined that *Carlos's* holding that intent to kill was an element of felony-murder special circumstance applied retroactively.  *People v. Garcia*, 36 Cal. 3d 539, 549 (1984).  Because of that decision, "confusion arose in the courts over whether *Carlos* or *Anderson* controlled."  *James*, 24 F.3d at 25.  The issue was resolved by *People v. Poggi*, 45 Cal. 3d 306, 326-327 (1988), where the California Supreme Court held that the *Carlos* rule applies only when the felony-murder special circumstance is alleged to have occurred after *Carlos* and before *Anderson.*[6]

Petitioner's robbery and murder of Lonnie Stevenson occurred on December 10, 1979 and he was tried for his crimes in 1981, well before the *Carlos* decision.  The Ninth Circuit has squarely addressed this issue, and confirmed that in cases like petitioner's, where the charged felony-murder special circumstance occurred before *Carlos*, *Anderson* governs, and "intent to kill was not an element of the felony-murder special circumstance."  *James*, 24 F.3d at 26.  Accordingly, petitioner was not entitled to an instruction that the charged robbery-murder special circumstance required a specific intent to kill.

In a separate decision, the Ninth Circuit addressed the issue of whether changing California law regarding specific intent for felony-murder special circumstances, specifically those decisions such as *Poggi* that mandated retroactive application of the *Anderson* decision and limited the requirement of a specific intent element to the time period of 1983-1987, violated a petitioner's due process rights under the ex post facto clause.  *Hunt v. Vasquez*, 899 F.2d 878, 881 (9th Cir. 1990) (citing *Bouie v. City of Columbia*, 378 U.S. 347 (1964)).

---

[5] This includes cases such as petitioner's, where the felony is a robbery.  Cal. Penal Code § 190.2 (a).

[6] *Poggi* also held that an instruction regarding specific intent was only required "when there was evidence from which the jury could find that the defendant was an accomplice rather than the actual killer."  45 Cal. 3d at 326.

United States District Court

For the Northern District of California

1   Petitioner here also makes a *Bouie* argument, but his argument is without merit under the

2   controlling authority of *Hunt*.  The Ninth Circuit dismissed petitioner Hunt's argument, holding

3   that "[t]he defect in his argument is that the current law is identical to the law that was in effect

4   at the time of his offense.  There is no ex post facto problem. [Petitioner] was on notice as to the

5   punishment he could receive.  No *ex post facto* change in the law occurred."  899 F. 2d at 881.

6   So too here.  At the time of petitioner's crimes and trial, California law did not require specific

7   intent for felony-murder special circumstances.  or is specific intent currently required.  Thus,

8   petitioner can show no error under *Bouie*.

9        Under both California and federal law, a specific intent to kill was not an element of the

10   charged robbery-murder special circumstance at the time of petitioner's trial, and thus the trial

11   court was under no obligation to give an instruction regarding specific intent.  Based on the

12   controlling authority of *James* and *Hunt*, petitioner's claim must be denied.

13   **2.    CLAIM 11**

14        In Claim 11, petitioner maintains that the trial court committed constitutional error by

15   failing to instruct the jury that, in order to find true the robbery–murder special circumstance, it

16   was required to find beyond a reasonable doubt that the murder was committed to advance the

17   commission of the robbery.

18        While in this pre-AEDPA case the Court must consider petitioner's claim *de novo*, the

19   California Supreme Court's resolution of this issue - - which concerns an issue of California law

20   - - is nonetheless instructive.  The California Supreme Court addressed this claim on the merits

21   as follows:

22                2.    *Green Instruction*

23        The court gave the 1980 revision of CALJIC No. 8.81.17, which
     incorporates the holding of *People v. Green*, supra, 27 Cal. 3d 1, 59-62 [parallel
24   citations omitted], which requires the jury to find, in a robbery-murder special
     circumstance, the killing was committed in order to carry out or advance the
25   commission of the robbery or to facilitate the escape therefrom or to avoid
     detection thereof.  Defendant contends that the court erroneously gave the
26   instruction by substituting the word "or" for "and" as italicized in the following
     passage: "Now, to find that the special circumstance, which is murder in the
27   commission of a robbery, is true, it must be proved beyond a reasonable doubt:
     (1) That the murder was committed while the defendant was engaged in the
28   commission or attempted commission of a robbery, or that the murder was

8

committed during the immediate flight after the commission of a robbery, *or that the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. . . .*"

> If the judge misspoke, as the reporter's transcript appears to indicate, his mistake was cured by the further instruction and illustrations he gave on this issue. We believe the jury could not reasonably have been misled when all instructions and illustrations on this subject are considered.

*Gates*, 43 Cal. 3d at 1193.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction is undesirable, erroneous or even universally condemned, but that it violated some [constitutional right].") The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In other words, a court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir.1988); *see, e.g., Middleton v. McNeil*, 541 U.S. 433, 434-35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law). If an error is found, a court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht*, 507 U.S. at 637, before granting relief in habeas proceedings. *See Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998).

The Court assumes, as did the California Supreme Court, that the instruction read was in error under California law. *Gates*, 43 Cal. 3d at 1193. Even assuming error, however, petitioner cannot demonstrate by a preponderance of the evidence that the instructions of the trial court, taken in their entirety, would have allowed the jury to find true the special circumstance if it found that the robbery was merely incidental to the murder. *See, e.g.,*

9

United States District Court
For the Northern District of California

1   *Donnelly* , 416 U.S. at 643 (holding that even a clearly erroneous instruction does not

2   necessarily violate a defendant's constitutional rights).  In this case, while the trial court

3   misread the instruction by using the disjunctive "or", instead of the conjunctive "and", a review

4   of the record confirms that the trial court gave numerous other instructions which served to

5   properly instruct the jury as to the requirement under *Green*.  For example, in explaining the

6   charged special circumstance, the trial court informed the jurors more than once that they were

7   required to find "that the murder was committed while the defendant was engaged in the

8   commission of a robbery" (RT 957-958).  In addition, the trial court instructed the jury that "the

9   special circumstance referred to in my instructions is not established if the robbery or attempted

10  robbery was merely incidental to the commission of the murder" (RT 957-958).

11        This order finds after review of the record and applicable law that petitioner cannot

12  demonstrate that even with the trial court's error, the instructions of the trial court, taken in their

13  entirety, would have allowed the jury to find true the special circumstance if it found that the

14  robbery was merely incidental to the murder.  As the Supreme Court has confirmed, we must

15  evaluate the jury instructions in the context of the overall charge to the jury as a component of

16  the entire trial process.  *See Frady*, 456 U.S. at 169.  While the trial court did make an error by

17  using "or" instead of "and", any error was corrected by the additional instructions regarding

18  how the jury was required to evaluate the charged special circumstance.  Indeed, the trial court

19  specified that the robbery could not be incidental to the murder, and gave numerous relevant

20  examples to clarify the proper standard.  RT 960-962; *see, e.g., Middleton* 541 U.S. at 434-35

21  (finding no reasonable likelihood that a jury was misled by a single contrary instruction where

22  other instructions correctly stated the law).  Accordingly, any error in the reading of CALJIC

23  No. 8.81.17 was cured by the remainder of the trial court's instructions and statements.

24        Moreover, petitioner is unable to establish that any error was prejudicial to him under

25  *Brecht*, 507 U.S. at 637.   There was ample evidence at trial for a reasonable jury to conclude

26  beyond a reasonable doubt that the murder was committed to advance the commission of the

27  robbery.  For example, the evidence established that petitioner had demanded money from the

28  victims earlier on the day of the shooting, and he later arrived at the victims' home with a

United States District Court

For the Northern District of California

1    loaded gun.  He herded Maurice and Lonnie to the side of the house and ordered them to put

2    their hands on the wall, empty their pockets, and remove their jewelry. Soon after, petitioner

3    threatened to kill Maurice and Lonnie; petitioner first shot Lonnie, who yelled for his father and

4    started running toward the back of the house, then shot Maurice, picked up the money and some

5    of the jewelry, and fled.  As such, the instructional error alleged here did not have a substantial

6    and injurious effect or influence in determining the jury's verdict.  *Brecht*, 507 U.S. at 638.

7    This claim must be denied.

8    **3.    CLAIM 17**

9          In Claim 17, petitioner maintains generally that California's death penalty statute fails to

10   adequately narrow the class of death-eligible defendants, in violation of the Fifth, Eighth and

11   Fourteenth Amendments.  He also specifically argues that the statute does not appropriately

12   narrow defendants charged under felony-murder provisions, as he was.

13         The Supreme Court has held that states that choose to authorize capital punishment must

14   "define the crimes for which death may be the sentence is a way that obviates 'standardless

15   [sentencing] discretion.'" *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).  To find a defendant

16   eligible for the death penalty, a jury must both convict the defendant of murder and find true at

17   least one special circumstance.[7] *Tuilaepa v. California*, 512 U.S. 967, 971-972 (1994)

18   (upholding California's death penalty statute against multiple challenges).  The special

19   circumstance may be contained "in the definition of the crime or in a separate sentencing factor

20   or in both." *Id*. at 972.  Furthermore, in order to pass constitutional muster, the circumstance

21   "may not apply to every defendant convicted of a murder; it must apply only to a subclass of

22   defendants convicted of murder." *Ibid.*; *see also, Arave v. Creech*, 507 U.S. 463, 474 (1993).

23   In addition, the circumstance "may not be unconstitutionally vague." *Ibid.*; *see also, Godfrey v.

24   Georgia*, 446 U.S. 420, 428 (1980).

25   _____

26         [7] In other jurisdictions, what California defines as "special circumstances" are referred to as
     "aggravating circumstances."  These special circumstances are considered at the guilt phase.  Cal. Penal Code §

27   § 190.1, 190.2, 190.4.  At the separate penalty phase, the jury considers whether a death-eligible defendant
     should actually be sentenced to death, by taking into account numerous factors.  Cal. Penal Code § 190.3.  If the

28   jury finds that "the aggravating circumstances outweigh the mitigating circumstances", it may impose the death
     penalty.  *Ibid.*; *see also, Tuilaepa*, 512 U.S. at 969.

**United States District Court**
For the Northern District of California

The Supreme Court has repeatedly upheld California's death penalty statute.  *See, e.g., Tuilaepa*, 512 U.S. at 977-980; *Boyde v. California*, 494 U.S. 370 (1990); *California v. Brown*, 479 U.S. 538 (1987).  In addition, the Ninth Circuit has repeatedly rejected narrowing challenges such as petitioner's.   In *Mayfield*, for example, the Ninth Circuit considered and rejected an argument that California's statute was unconstitutional because it did not adequately narrow the class of persons eligible for the death penalty.  *Mayfield v. Woodford*, 270 F. 3d 915, 924 (9th Cir. 2001).  The Court held that California law served to constitutionally "narrow the class of persons eligible for the death penalty at both the guilt and penalty phases."  *Ibid.* Specifically, at the guilt phase, a "defendant is eligible for the death penalty [] only if . . ., the jury finds him guilty of first degree murder and finds to be true a statutorily defined special circumstance."  *Ibid.* (citing *Jurek v. Texas*, 428 U.S. 262, 270-271 (1976).  And "[a]t the penalty phase, the class of defendants eligible for death is again narrowed by the jury's application of a series of statutorily enumerated aggravating or mitigating factors."  *Mayfield,* 270 F. 3d at 924.; *see also Blystone v. Pennsylvania*, 494 U.S. 299, 207 (1990).  The Court concluded that "[a] reasonable jurist could not debate, therefore, that the [] California statute, which narrowed the class of death-eligible defendants at both the guilt and penalty phases, was constitutional."  *Mayfield,* 270 F. 3d at 924.

In *Karis*, the Ninth Circuit again rejected the argument "that the [death penalty] scheme does not adequately narrow the class of person eligible for the death penalty."  *Karis v. Calderon*, 283 F.3d 1117, 1141 n. 11 (9th Cir. 2002).  To the contrary, "[t]he special circumstances in California apply to a subclass of defendants convicted of murder and are not unconstitutionally vague."  *Id.*  Thus, "California has identified a subclass of defendants deserving of death and by doing so, it has 'narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed.'"  *Id.* (citing *Arave*, 507 U.S. at 476).

Given the controlling caselaw, petitioner's general narrowing claim is without merit.  Petitioner also cannot demonstrate that the portion of his claim specifically regarding felony-murder in his case is meritorious.  Petitioner argues that the robbery of Lonnie Stevenson was

United States District Court

For the Northern District of California

1   used: (1) as the basis for petitioner's felony-murder conviction; (2) to find true the charged

2   special circumstance of robbery-murder, and; (3) as part of the "circumstances" that could be

3   considered  aggravating under California Penal Code Section 190.3.  According to petitioner,

4   this "double counting" of the robbery at the guilt and penalty phases is unconstitutional because

5   it does not serve to narrow the class of death-eligible defendants.[8]

6          While there is no Supreme Court law squarely addressing California's "double

7   counting", the Supreme Court has considered a similar issue in Louisiana's death penalty

8   statute.  In *Lowenfield v. Phelps*, the Court addressed whether or not the fact that Louisiana's

9   capital punishment statute allowed an element of the capital crime for which petitioner was

10  convicted to also serve as the sole aggravating factor at sentencing rendered the statute

11  unconstitutional.  484 U.S. 231 (1988).  The petitioner argued that this double-counting was

12  impermissible because it did not serve to further narrow the class of death-eligible defendants at

13  the penalty phase.  *Id.* at 241.

14         The Supreme Court disagreed, holding that the constitutionally-required "'narrowing

15  function' was performed by the jury at the guilt phase when it found defendant guilty of three

16  counts of murder" along with the special circumstance that "the offender has a specific intent to

17  kill or to inflict great bodily harm upon more than one person." *Id.* at 246 (citations omitted).

18  Furthermore, "the fact that the sentencing jury is also required to find the existence of an

19  aggravating circumstance in addition is no part of the constitutionally required narrowing

20  process, and so the fact that the aggravating circumstance duplicated one of the elements of the

21  crime does not make this sentence constitutionally infirm."  *Ibid.*  Accordingly, the Court held,

22  the "Louisiana scheme narrows the class of death-eligible murders and then at the sentencing

23  phase allows for consideration of mitigating circumstances and the exercise of discretion.  The

24  Constitution requires no more."  *Ibid.*

25         *Lowenfield* is controlling law here.  The fact that petitioner's felony of robbery was

26  "counted" at both the guilt and penalty phases of his trial does not render his death sentence

27

28         [8] The Court has already found in its *Teague* Order that this portion of petitioner's claim is *Teague*-barred (*Teague* Order 33-34).

13

unconstitutional.  As discussed California's statute appropriately narrows the class of death-eligible defendants at the guilt phase.  In petitioner's particular case, the special circumstance of robbery-murder, which was found true by the jury, provided constitutionally-required narrowing.  The fact that the robbery was later introduced in the penalty phase as a potential aggravating circumstance "does not make this sentence constitutionally infirm." *Lowenfield*, 484 U.S. at 246.  Additionally, the Supreme Court has held that a "sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty." *Tuilaepa*, 512 U.S. at 976.  As such, it was "a constitutionally indispensible part of the process of inflicting the penalty of death," *Tuilaepa*, 512 U.S. at 976 (citations omitted), for the jury to consider the circumstances of petitioner's crimes, including the robbery, during the penalty phase of his trial.  For the above reasons, this claim is denied on the merits in its entirely.

For this claim, petitioner has also moved expand the record to include, *inter alia*, documents and testimony from *Ashmus v. Martel*, C 93-594 TEH (N.D. Cal.) and *Webster v. Ornoski*, CV-93-00306 LKK-DAD (E.D. Cal.), cases which address similar claims regarding the constitutionality of California's capital punishment system.  Petitioner relies on these documents and testimony to support his argument that California's death penalty statute fails to adequately narrow the class of death-eligible defendants.  Neither the *Ashmus* Court nor the *Webster* Court have issued a decision on the merits, however, and thus neither matter currently calls into question the controlling caselaw cited *supra.*  Petitioner has not established that he is entitled to have these materials, developed in evidentiary hearings in different pending cases, considered by the Court.  Accordingly, this Court DENIES petitioner's motions to expand the record (Dkt. Nos. 667 and 698).[9]

### 4.    CLAIM 19

In Claim 19, petitioner alleges that CALJIC No. 8.84.2, in conjunction with the verdict forms and other instructions, misled the jury and violated petitioner's constitutional rights under

---

[9] Petitioner also invites the Court to defer ruling on this claim until decisions have been rendered in *Ashmus* and/or *Webster*.  Because the Court finds that this claim is currently suitable for disposition on the merits, it declines petitioner's invitation to defer ruling.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

the Fifth, Eighth and Fourteenth Amendments. This claim was previously held by the Court to be *Teague*-barred (*Teague* Order 39-40). Petitioner invites the Court to reconsider that holding; the Court declines and finds that this claim should also be denied on the merits.

As the Court has previously found, the gravamen of Claim 19 is that the factors mentioned above (CALJIC No. 8.84.2, in conjunction with the verdict forms and other instructions) caused the jurors to erroneously believe that their determination of the appropriate penalty for petitioner was to be based solely on whether the aggravating circumstances outweighed the mitigating circumstances, and that they did not have discretion to determine whether death was the appropriate penalty in light of the evidence. Petitioner's claim is without merit under *Boyde,* 494 U.S. 376-77, and must be denied.

In *Boyde*, the Supreme Court squarely addressed and upheld CALJIC No. 8.84.2, which stated: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole." *Ibid.* The Court rejected the argument that the mandatory "shall" language in CALJIC No. 8.84.2 prevented the jury from making an individual assessment of the appropriateness of the death penalty. *Ibid.* The Court explained:

> Petitioner suggests that the jury must have the freedom to decline to impose the death penalty even if the jury decided that the aggravating circumstances "outweigh" the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty." Petitioner's claim that the "shall impose" language of CALJIC 8.84.2 unconstitutionally prevents "individualized assessment" is without merit.

*Id.* at 377.

In petitioner's case, the trial court substituted "may" for "shall" in its reading of CALJIC 8.84.2, but the mandatory language at issue in *Boyde* was utilized in the verdict forms and in the supplemental instructions to the jury. According to petitioner, these instructions and verdict forms, taken together, were unconstitutional because they did not inform the jury that

regardless of whether evidence in aggravation outweighed that in mitigation, the jury retained the discretion to exercise leniency.  Thus, despite the factual variance in the reading of CALJIC 8.84.2, petitioner's argument is effectively the same as the argument in *Boyde* and is without merit for the same reasons.  Despite what petitioner alleges, "there is no such constitutional requirement of unfettered sentencing discretion in the jury."  *Boyde*, 494 U.S. at 377.  In addition, there is no constitutional requirement that, as petitioner claims, the jury be instructed that it need not impose the death penalty even if the aggravating circumstances outweigh the mitigating factors.  *Ibid.*  Accordingly, petitioner's argument is without merit and must be denied.

**5.    CLAIM 20**

In Claim 20, petitioner maintains that California's capital punishment system is unconstitutional.  Specifically, he maintains that California Penal Code Sections 190-190.9, and related CALJIC instructions, are unconstitutional and deprived petitioner of his rights under the Fifth, Eighth and Fourteenth Amendments.

The gravamen of petitioner's argument is that death penalty law is unconstitutional because it fails to narrow rationally the class of murderers eligible for the death sentence.  This claim is related to Claim 17, discussed *supra*, but includes different challenges to the California death penalty statute.  Petitioner here alleges that: (1) the statutory factors listed in Penal Code § 190.3, and in CALJIC No. 8.84.1 are unconstitutionally vague; (2) Penal Code §§ 190.1-190.3 permits unbridled prosecutorial discretion in charging and prosecuting capital crimes; (3) California's death penalty system fails to require that the jury be read instructions defining aggravation and mitigation, or explain in any meaningful way how the jury was to arrive at its decision; (4) the use of a unitary list of factors which fails to specify whether any particular factor may be regarded as aggravating and mitigating is confusing and arbitrary; (5) the failure to require jury unanimity, written jury findings in support of any death verdict, and utilization of proof beyond a reasonable doubt standard for all penalty phase determinations, is unconstitutional; and (6) the failure to contain a provision requiring comparative or inter-case proportionality review renders the California system unconstitutional (Second Amended Pet. at

259-72).

The Court has already ruled that most portions of this claim are *Teague*-barred (Dkt. No. 507). Petitioner requests that we revisit this holding, which this order declines to do. Furthermore, the Court finds that all portions of this claim are suitable for disposition on the merits.

### A.    Vagueness Challenge

As respondent correctly points out, California's death penalty system has been repeatedly upheld by reviewing courts, and petitioner has offered no compelling reason for this Court to reject that caselaw and conclude that California's death penalty system is unconstitutional. In *Tuilaepa,* the Court considered numerous vagueness challenges to California's death penalty statute, and held that none of the aspects of California's death penalty statute it considered, including those challenged by petitioner here, were void for vagueness. 512 U.S. at 976-979.  As such, *Tuilaepa* effectively forecloses petitioner's arguments that the statute is unconstitutionally vague.

### B.    Prosecutorial Discretion

Petitioner's allegation that Sections 190-1-190.3 unconstitutionally allowed for "unbridled" prosecutorial discretion to charge and prosecute capital murder is also without merit.  In *Gregg v. Georgia*, the United States Supreme Court rejected the argument that prosecutorial "opportunities for discretionary action" render a death penalty statute unconstitutional.  428 U.S. 153, 199 (1976).  In considering a similar challenge to Washington's death penalty system, the Ninth Circuit found that the argument that a "capital punishment statute is unconstitutional because it vests unbridled discretion in the prosecutor to decide when to seek the death penalty . . . has been explicitly rejected by the Supreme Court." *Campbell v. Kincheloe*, 829 F. 2d 1453, 1465 (9th Cir. 1987).

### C.    Instructions to the Jury

*Tuilaepa* also effectively forecloses petitioner's argument that the California death penalty statute is unconstitutional because it neither requires instructions of aggravation and mitigation for the jury, nor instructions regarding how the jury ought to arrive at its sentencing

United States District Court

For the Northern District of California

decision.  512 U.S. at 979.  The *Tuilaepa* Court considered and rejected the argument that the jury must be instructed as to how to weigh the factors in order to come to a decision regarding whether or not to impose the death penalty.  512 U.S. at 978-979.  As the Court held, "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."  *Tuilaepa*, 512 U.S. at 979; *see also*, *California v. Ramos*, 463 U.S. 992, 1008 (1983) (finding that "[o]nce the jury finds that the defendant falls within the legislatively defined category of person eligible for the death penalty . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment").  Accordingly, this subclaim is without merit.

### D.    Unitary List of Factors

In *Tuilaepa*, the United States Supreme Court held that giving a penalty phase jury a unitary list of sentencing factors that does not designate which factors are mitigating and which are aggravating does not violate the Constitution.  512 U.S. at 978-979.  Moreover, the Ninth Circuit has found that California's "death penalty statute's failure to label aggravating and mitigating factors is constitutional."  *Williams v. Calderon*, 52 F.3d 1465, 1484 (9th Cir. 1995). (citations omitted).  In light of this controlling authority, petitioner's claim is without merit and must be denied.

### E.    Jury Findings

*Tuilaepa* holds that there is no constitutional requirement for California's capital sentencing statute to include the specific provisions petitioner identifies regarding jury findings.  512 U.S. at 971-973 (rejecting claim that California statute is constitutionally infirm because, *inter alia*, the sentencing factors in Section 190.3 of the California Penal Code are open-ended and the jury is not instructed to weigh the facts in deciding the appropriate penalty to be imposed).  In addition, written jury findings are not constitutionally required nor is there any constitutional requirement that jury must find beyond a reasonable doubt that death is the appropriate punishment.  *Williams*, 52 F.3d at 1485.

### F.    Proportionality Review

Petitioner argues that his death sentence is constitutionally infirm because the California

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

statute includes no provision for proportionality review, that is a review of whether there was a

meaningful basis for distinguishing petitioner's case from those cases where the death penalty

was not imposed, and whether imposing the death penalty in his case was a proportional

punishment in comparison to other California cases where the death penalty was not imposed.

This argument is without merit.  The Ninth Circuit has repeatedly held that "there is no federal

constitutional requirement of inter-case proportionality analysis of death sentences."  *Martinez-*

*Villareal v. Lewis*, 80 F.3d 1301, 1309 (9th Cir. 1996) (citing *Pulley v. Harris,* 465 U.S. 37, 43,

50-51 (1984)); *Allen v. Woodford*, 395 F.3d 979, 1018-1019 (9th Cir. 2005) (holding that neither

due process, the Eighth Amendment nor equal protection mandate proportionality review).

### G.    Additional Materials

In conjunction with this claim, as with other claims, petitioner has also filed motions to

expand the record to include, *inter alia*, documents and testimony from *Ashmus v. Martel*, C 93-

594 TEH (N.D. Cal.) and *Webster v. Ornoski*, CV-93-00306 LKK-DAD (E.D. Cal.), cases

which address similar issues regarding the constitutionality of California's capital punishment

system.  Petitioner relies heavily on these documents and testimony to support his argument that

California's death penalty system is unconstitutional.  Neither the *Ashmus* Court nor the *Webster*

Court have issued a decision on the merits, however, and thus neither matter currently calls into

question the controlling caselaw.  Petitioner has not established that he is entitled to have these

materials, developed in evidentiary hearings in different pending cases, considered by the

Court.  Accordingly, this order DENIES petitioner's motion to expand the record (Docket Nos.

667 and 698).[10]

### 6.    CLAIM 23

In Claim 23 , petitioner maintains that the trial court erred in failing to *sua sponte*

instruct the jury against adversely considering petitioner's failure to testify at the penalty phase.

This claim may be quickly denied, because petitioner concedes that it is without merit under the

---

[10] Petitioner also invites the Court to defer ruling on this claim until decisions have been rendered in *Ashmus* and/or *Webster*.  Because the Court finds that this claim is currently suitable for disposition on the merits, it declines petitioner's invitation to defer ruling.

facts of his case.  Such an instruction is required when requested, *Carter v. Kentucky*, 450 U.S. 288, 300 (1981), but there was no such request at petitioner's trial, and there is no caselaw establishing that such an instruction must be given *sua sponte* by the trial court.  As such, as petitioner does and must concede, this claim is without merit and must be denied.

### 7.   CLAIM 24

In Claim 24, petitioner maintains that the trial court erred in failing to *sua sponte* instruct the jury as to the applicability or inapplicability of the guilt phase instructions to the penalty phase.  Specifically, petitioner argues that jury should have been instructed that: (1) the standards for assessing witness credibility continued to apply at the penalty phase; and (2) the jury should have been instructed that it was not prohibited from considering sentiment, mercy or sympathy at the penalty phase.[11]  According to petitioner, this failure violated his Fifth, Eighth and Fourteenth Amendment rights.

The Court has already found that this claim is *Teague*-barred in its entirety.  In addition, petitioner can cite to no caselaw that requires such instructions, and thus even if his claim was not *Teague*-barred, he is not able to demonstrate that he is entitled to relief on the merits.

A trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding.  *See Dunckhurst*, 859 F.2d at 114.  Rather, to obtain federal collateral relief for instructional error, a petitioner must show that the challenged instruction, or lack of instruction, by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle*, 502 U.S. at 72; *Cupp*, 414 U.S. at 147; *see also Donnelly*, 416 U.S. at 643 ("[I]t must be established not merely that the instruction is undesirable, erroneous or even universally condemned, but that it violated some [constitutional right]." )  Alleged instructional error may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a

---

[11] Instructions regarding evaluation of witness credibility were read to the jury at the guilt phase, as were instructions that cautioned the jury to avoid making a decision regarding guilt based on "sentiment, conjecture, sympathy, passion, prejudice, or public opinion or public feeling" (RT 937-939).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    component of the entire trial process. *Frady*, 456 U.S. (1982).  If an error is found, the court

2    also must determine that the error had a substantial and injurious effect or influence in

3    determining the jury's verdict, *see Brecht*, 507 U.S. at 637, before granting relief in habeas

4    proceedings.  *See Calderon*, 525 U.S. at 146-47.

5         Petitioner's argument that it was error for the trial court to fail to tell the jury that it

6    could consider sentiment, mercy or sympathy at the penalty phase is without merit.  As the

7    California Supreme Court reasonably found, "[t]he language of the no-sympathy instruction

8    specifically referred to deciding a defendant's guilt or innocence and would not be necessarily

9    understood as applying to the penalty phase." *Gates*, 43 Cal. 3d at 1209.  More importantly, the

10   United States Supreme Court has held that even a penalty phase instruction specifically

11   informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy,

12   passion, prejudice, public opinion or public feeling" during the penalty phase of a capital trial

13   does not violate the Constitution. *California v. Brown*, 479 U.S. 538, 539-540 (1987).

14        *Brown* held that such an instruction would not interfere with the jury's consideration of

15   mitigation evidence at the penalty phase.  *Id.* at 541.  Rather, the instruction "serves the useful

16   purpose of confining the jury's imposition of the death sentence by cautioning it against

17   reliance on extraneous emotional factors, which, we think, would be far more likely to turn the

18   jury against a capital defendant than for him." *Id.* at 543.  In this case, petitioner alleges that the

19   mere purported carryover of the sympathy instruction from the guilt phase to the penalty phase

20   somehow led the jury to improperly consider the mitigation evidence.  Because the Supreme

21   Court has held that even the reading of a similar instruction at the penalty phase itself did not

22   interfere with the jury's consideration of mitigation evidence -- and indeed, could even assist a

23   capital defendant -- petitioner cannot demonstrate any constitutional error and this portion of his

24   claim must be denied.

25        Petitioner's claim that the lack of a *sua sponte* instruction regarding the standards of

26   witness credibility at the penalty phase was constitutional error is also without merit.  Petitioner

27   can cite to no state or federal case requiring that a jury be so reinstructed.  Because "the witness

28   credibility instructions . . . were not specifically limited to the issue of guilt or innocence",

21

United States District Court

For the Northern District of California

1     *Gates*, 43 Cal. 3d at 1209, there is no indication that jurors disregarded them at the penalty

2     phase and improperly assessed the credibility of either the defense or prosecution witnesses.  If

3     there is only a "possibility" that the jury misunderstood an instruction, there is no constitutional

4     violation.  *See Boyde*, 494 U.S. at 380-381.  Rather, a successful challenge to an instruction

5     must demonstrate a "reasonable likelihood" that the jury applied the instruction in an

6     impermissible way.  *Ibid.*  This petitioner cannot do and thus this portion of his claim must also

7     be denied.[12]

8          Even if petitioner had been able to demonstrate error, he would not be able to

9     demonstrate prejudice requiring reversal.  Petitioner cannot show that these alleged errors, taken

10     in context of the instructions and trial record as a whole, had a substantial and injurious effect or

11     influence in determining the jury's verdict.  *See Brecht*, 507 U.S. at 637.  There is no adequate

12     showing from petitioner that, had these instructions been read *sua sponte*, the jury would have

13     been more likely to have returned a sentence other than death.  Thus, this claim is denied on the

14     merits.

15     **8.**     **CLAIM 29**

16          In Claim 29, petitioner challenges the review process of the California Supreme Court.

17     Specifically, petitioner alleges that the California Supreme Court failed to conduct a

18     constitutionally adequate review of petitioner's case, and institutionally does not conduct such

19     review in capital cases; in so doing, according to petitioner, the California Supreme Court

20     violated petitioner's rights under the Fifth, Eighth and Fourteenth Amendments.

21          As a threshold matter, petitioner has not demonstrated that these claims are even

22     cognizable on federal habeas review.  To the extent petitioner is challenging the manner in

23     which the state court conducted a habeas review of his claims, such challenge fails for the

24     reason that petitioner cannot demonstrate there is any federal constitutional right to state habeas

25     _____

26          [12] *Boyde* also instructed that "[j]urors do not sit in solitary isolation booths parsing instructions for

27     subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of
instructions may be thrashed out in the deliberative process, with commonsense understanding of the
instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting."  494

28     U.S. at 380-381.

United States District Court
For the Northern District of California

1    proceedings.  As a result, a claim "alleging errors in the state post-conviction review process is

2    not addressable through habeas corpus proceedings." *Franzen v. Brinkman*, 877 F.2d 26. 26 (9th

3    Cir. 1989).

4            Moreover, there is nothing in the California Supreme Court's lengthy and exhaustive

5    opinion on direct review indicating that it did not meaningfully consider petitioner's claims.

6    *See People v. Gates*, 43 Cal. 3d 1168-1214 (1987).  Further, the Ninth Circuit has confirmed

7    that the California death penalty statute "ensures meaningful appellate review." *Williams,* 52

8    F.3d at 1484.

9            Nonetheless, petitioner maintains he was denied meaningful appellate review because of

10   political pressures on the California Supreme Court regarding decisions on death penalty cases,

11   and an "internal agenda of affirming capital cases."  Such argument is wholly lacking in

12   support.

13           There is a "general presumption that judges are unbiased and honest." *Ortiz v. Stewart*,

14   149 F.3d 923, 938 (1998) (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).  Nothing in

15   petitioner's argument suffices to overcome said general presumption.  Petitioner identifies

16   nothing in the record of his own case that might suggest, let alone demonstrate, any bias, and

17   petitioner cannot deny that although in many instances capital sentences have been upheld, the

18   California Supreme Court also has issued decisions in which capital sentences have been

19   reversed.

20           Petitioner notes that, after the California Supreme Court heard oral argument on his

21   direct appeal, three justices were removed from office in a 1986 retention election where those

22   justices' death penalty decisions were criticized.  After those justices were replaced, petitioner's

23   direct appeal case was then re-argued in front of the California Supreme Court, and an opinion

24   issued affirming petitioner's conviction and sentence.  Petitioner states that he is informed and

25   believes that the earlier court had reached a tentative decision in petitioner's favor.  Petitioner

26   submits no evidence of this, and thus at this juncture, petitioner's allegation is purely

27   speculative.  Additionally, petitioner makes absolutely no showing that an internal memo or

28   other evidence of internal decision-making prepared by a court prior to its public decision on

**United States District Court**

For the Northern District of California

1    the merits would be admissible in a habeas proceeding.  Court employees are typically

2    precluded from discussing internal court deliberations, and the Court is concerned that this

3    requirement of confidentiality may have been betrayed.

4           Petitioner also argues that the justices rendering the final decision in his case found error

5    (but not prejudice requiring reversal) in several circumstances, but did not, according to

6    petitioner, engage in "meaningful" harmful-error analysis regarding these violations.  He also

7    points out that there was a dissent in his case finding prejudicial error, in opposition to the

8    decision of the majority.  The fact that reasonable jurists disagreed as to whether an error was

9    prejudicial does not, in any way, suggest that those jurists ruling against petitioner were

10   motivated by bias or improper agenda.  Neither dissenting opinions, nor analyses that a non-

11   prevailing party finds unconvincing, support petitioner's argument that the California Supreme

12   Court's review is constitutionally inadequate.  Petitioner cannot demonstrate that the justices

13   who actually rendered the decision in his case were in any way motivated by bias, political

14   pressure and improper agendas, and not by the merits of his particular case.

15          Petitioner has also filed motions to expand the record to include, *inter alia*, documents

16   and testimony from *Ashmus v. Martel*, C 93-594 TEH (N.D. Cal.) and *Webster v. Ornoski*, CV-

17   93-00306 LKK-DAD (E.D. Cal.), cases which address similar claims regarding the

18   constitutionality of the California Supreme Court's review of death penalty cases.  Petitioner

19   relies on these documents and testimony to support his argument that the California Supreme

20   Court's review system in capital cases is unconstitutional. Neither the *Ashmus* Court nor the

21   *Webster* Court have issued a decision on the merits, however, and thus neither case currently

22   calls into question the controlling caselaw cited *supra*.  Petitioner has not established that he is

23   entitled to have these materials, developed in evidentiary hearings in different pending cases,

24   considered by the Court.  Accordingly, this Court DENIES petitioner's motion to expand the

25   record (Docket Nos. 667 and 698).[13]

26

27          [13] Petitioner again invites the Court to defer ruling on this claim until decisions have been rendered in

28   *Ashmus* and/or *Webster*.  Because this order finds that this claim is currently suitable for disposition on the
     merits, it declines petitioner's invitation to defer ruling.

24

## CONCLUSION

For the foregoing reasons, Claims 10, 11, 17, 19, 20, 23, 24 and 29 are **DENIED** on the merits. In addition, petitioner's motions to expand the record are **DENIED.**

Within 28 calendar days of the date of this Order, the parties are **ORDERED** to meet and confer and submit a joint statement addressing the following:

(1) In accordance with the Court's earlier orders, a joint plan for addressing the continuing issue of petitioner's competency;

(2) An update on the status of the settlement procedures with Magistrate Beeler. The parties are again strongly urged to consider settlement as a reasonable resolution to this case, and both parties are expected to continue negotiating in good faith;

(3) Whether there are other claims in the petition that may be potentially resolved on the merits without input from petitioner.

**IT IS SO ORDERED.**

Dated: April ___2___, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California