IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSCAR GATES, | No. C 88-2779 WHA |
| Petitioner, | **ORDER RE CLAIMS 13, 15, 25, 26 AND 28 AND RE RESPONDENT'S MOTION TO STRIKE** |
| v. | |
| RON DAVIS, Acting Warden, | |
| Respondent. | |

**INTRODUCTION**

Petitioner Oscar Gates was convicted in 1981 of, *inter alia*, murder (Cal. Penal Code 187(a)), accompanied by the robbery-murder special circumstance (Section 190.2 (a)(17)(A)), two counts of robbery (Section 211), assault with a deadly weapon (Section 245(a)), possession of a firearm by an ex-felon (Section 12021), and escape (Section 4532(b)). He now seeks a writ of habeas corpus under 28 U.S.C. Section 2254, and the parties have briefed five claims in the petition. In addition, respondent has moved to strike the declaration of investigator Russell Stetler, which petitioner submitted with his reply brief. For the following reasons, Claims 15 and 28 are **DENIED**. Claims 13 and 26 are **DEFERRED**. Claim 25 is **DENIED** in part and **DEFERRED** in part. Respondent's motion to strike is **GRANTED.**

**FACTUAL BACKGROUND**

On December 10, 1979, Maurice Stevenson and his uncle, Lonnie Stevenson, were

waxing his car in front of his grandfather's house in Oakland at about 3:30 p.m. Petitioner appeared, holding a gun with the hammer cocked. Petitioner herded Maurice and Lonnie to the side of the house and ordered them to put their hands on the wall, empty their pockets, and remove their jewelry. After Maurice and Lonnie complied with petitioner's directives, petitioner frisked them and asked Maurice as to the whereabouts of Maurice's father, James Stevenson. Maurice replied that he did not know and petitioner told them that he was going to kill them. Petitioner first shot Lonnie, who yelled for his father and started running toward the back of the house, then shot Maurice, picked up the money and some of the jewelry, and fled. Lonnie died but Maurice survived. Some time after the shooting, petitioner called Jimmy Stevenson, Maurice's grandfather, and said that he had killed Lonnie and shot Maurice, that he was going to Los Angeles to kill members of another family, and that when he returned he would finish killing off the Stevenson family. On December 29, 1979, petitioner was arrested in Vallejo, and the gun later determined to be the one that killed Lonnie Stevenson was found on

him. *See People v. Gates,* 43 Cal.3d 1168, 1176-78 (1987).

On January 4, 1980, an indictment was filed in Alameda County. It charged petitioner with murder (Cal. Penal Code § 187(a)), accompanied by the robbery-murder special circumstance (§ 190.2 (a)(17)(A)), two counts of robbery (§ 211), assault with a deadly weapon (§ 245(a)), possession of a firearm by an ex-felon (§ 12021), and escape (§ 4532(b)), among other things. Petitioner pled not guilty to all charges. The trial began on March 16, 1981. At trial, petitioner asserted a claim-of-right defense. He testified about a so-called "Stevenson family forgery ring," purportedly headed by James Stevenson and Donald "Duck" Taylor, and of which, Lonnie and Maurice Stevenson, Melvin Hines and petitioner were all members. A dispute arose when petitioner did not receive his "big cut" of $25,000 allegedly promised to him.

Trial testimony also revealed that, in September 1979, a heated argument between petitioner and other members of the forgery ring led to petitioner being fired upon by Maurice and James Stevenson, which resulted in a gunshot wound to petitioner's leg. Thereafter,

2

petitioner learned through intermediaries that he would have to give up his claim to the money or he would be shot.

On December 10, 1979, petitioner allegedly spoke with Lonnie Stevenson by phone and made arrangements to pick up the money at Jimmy Stevenson's house at about 3:00 p.m. Petitioner went to Jimmy Stevenson's house as had been arranged. Petitioner saw Maurice and Lonnie outside waxing a car. Petitioner allegedly told Maurice and Lonnie that he was there to pick up his money and did not want any trouble, but that he had a gun and could take care of himself. As the three men made their way around the side of the house, petitioner's suspicion was allegedly aroused by some of Maurice and Lonnie's actions, so he patted them down for weapons. After finding none, the three men continued toward the back of the house when petitioner saw Jimmy Stevenson holding a gun. Gunfire erupted. Lonnie and Maurice were shot, and petitioner fled. On May 6, 1981, the jury convicted petitioner of all charges and found the special circumstance allegation to be true.

At the penalty phase, the prosecution presented, as evidence in aggravation, evidence of petitioner's convictions for robbery and for two assaults in connection with a 1978 robbery of a McDonald's restaurant, a 1973 conviction for rape, and a 1973 conviction for kidnapping. The prosecution also presented evidence that petitioner was involved in a 1978 assault and robbery of two women at a Los Angeles mortuary, which had resulted in the death of one of the women. Petitioner was later convicted of the Los Angeles mortuary crimes in a separate trial.

The case in mitigation consisted of testimony by several of petitioner's family members, several apartment neighbors, and a clinical psychologist. Petitioner's family members described the racially-segregated environment in which petitioner grew up in Belzoni, Mississippi. They testified that petitioner was never in any trouble until an incident at a Western Auto Store when he was approximately 14 to 16 years old; the incident, which apparently involved petitioner, an African-American, striking a white woman who had struck him first, resulted in petitioner spending six months in jail and becoming a target of police harassment and suspicion for any problem that arose thereafter. Petitioner's mother also testified that she visited petitioner in California in 1973 at a jail hospital after he had been beaten by the police. Petitioner's

3

1 neighbors described petitioner as a friendly, sweet, considerate, good-hearted, good-natured
2 person who never got angry and got along well with people.  Dr. Paul Berg, a clinical
3 psychologist, testified that petitioner was "an unusually well-adjusted prisoner" and most likely
4 would not present a problem in prison.  *See Gates,* 43 Ca1.3d at 1193-97.  On May 28, 1981, the
5 jury returned with a verdict of death for petitioner.

## PROCEDURAL BACKGROUND

The California Supreme Court affirmed petitioner's conviction and sentence on direct appeal on October 15, 1987.  *People v. Gates,* 43 Ca1.3d 1168 (1987).  On May 23, 1988, the United States Supreme Court denied a petition for certiorari.  *Gates v. California,* 486 U.S. 1027 (1988).

Subsequent state and federal habeas proceedings ensued, with a focus on, *inter alia*, petitioner's competency.[1]  After much litigation, this matter was stayed in 2004 following an adjudication of petitioner's mental incompetency, as required by *Rohan ex. rel. Gates v. Woodford ("Gates")*, 334 F.3d 803 (9th Cir. 2003).[2]  At that time, attorneys for petitioner and respondent agreed that petitioner was incompetent to assist counsel.  On January 8, 2013, the Supreme Court decided *Ryan v. Gonzales*, abrogating *Gates* and holding that an incompetent capital prisoner has no right to an indefinite stay of habeas proceedings.  133 S. Ct. 696, 706-709.  The Supreme Court further held that while the decision to grant a temporary stay is within the discretion of the district court, an indefinite stay is inappropriate if there is no reasonable hope the petitioner will regain competence in the foreseeable future.  *Ibid*.

Pursuant to *Ryan*, this Court lifted the stay.  The parties were referred to settlement proceedings with Magistrate Judge Beeler; the settlement proceedings were inconclusive.  In addition, the Court ordered proceedings on the merits of petitioner's federal habeas proceedings to re-commence, and subsequently addressed numerous claims on the merits (Dkt. No. 715).

---

[1] For a detailed description of the state habeas proceedings, *see* Order Re Motion For Summary Judgment on Claim 1 and 1292(b) Certification, filed August 23, 2001.

[2] Petitioner was also adjudicated to be mentally incompetent in 1994, as part of the proceedings in this habeas matter, and in 1973, in a prior state criminal matter.

4

Recognizing that petitioner's competency was still at issue, the Court appointed independent expert Dr. Jessica Ferranti to examine petitioner (Dkt. No. 740). Dr. Ferranti concluded that, as the result of mental disorder, petitioner is incompetent, *i.e.* that he does not have the capacity to make rational choices with respect to his Court proceedings or to communicate rationally with his attorneys (Ferranti Report at 16-18). Both sides agreed that petitioner is incompetent. Under *Gonzales*, 133 S. Ct. at 706-09, however, that is no longer grounds to stay the matter indefinitely. Petitioner subsequently filed a motion to stay pending compulsory restoration proceedings; the Court denied petitioner's motion and ordered consideration of petitioner's claims on the merits to continue (Dkt. No. 775).

## LEGAL STANDARD

The habeas statute authorizes this Court to review a state court criminal conviction "on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).[3] The purpose of the writ of habeas corpus is to "protect[] individuals from unconstitutional convictions and . . . to guarantee the integrity of the criminal process by assuring that trials are fundamentally fair." *O'Neal v. McAninch*, 513 U.S. 432, 441 (1995); *see also Brecht v. Abrahmson*, 507 U.S. 619, 632-33 (1993). Because federal habeas review delays finality and burdens state-federal relations, habeas doctrines must balance the protection from unlawful custody the writ offers against the "presumption of finality and legality" that attaches to a state-court conviction after direct review. *See Brecht*, 507 U.S. at 635-38; *McCleskey v. Zant*, 499 U.S. 467, 490-91 (1991). Accordingly, a federal habeas court must in most cases presume that state court findings of fact are correct. 28 U.S.C. § 2254(d). In contrast, purely legal questions and mixed questions of law and fact are reviewed *de novo*. *See Swan v. Peterson*, 6 F.3d 1373, 1379 (9th Cir. 1993), *cert. denied*, 513 U.S. 985 (1994). In such circumstances, and when the state court has made no factual findings regarding the claim at issue, petitioner bears the burden of proving, by a preponderance of the evidence, the facts necessary to support his claims. *See, e.g.*, *Garlotte v. Fordice*, 515 U.S. 39, 46-47 (1995).

---

[3] This case predates the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and thus AEDPA's standard of review does not apply.

5

Even if a petitioner meets the requirements of Section 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at 638. Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)).

## ANALYSIS

**1. CLAIM 13**

In Claim 13, petitioner alleges that his trial counsel was ineffective, at both the guilt phase and penalty phase of trial.

The Sixth Amendment guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, petitioner must show both that counsel's performance was deficient and that the deficient performance prejudiced petitioner's defense. *Id.* at 688. To prove deficient performance, petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Ibid.; see also Bobby v. Van Hook*, 558 U.S. 4, 9-10 (2009) (*per curiam*) (noting that guidelines, such as those promulgated by the American Bar Association, purporting to establish what reasonable attorneys would do may be helpful but are not the test for determining whether counsel's choices are objectively reasonable). This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *See Strickland*, 466 U.S. at 687-88.

To prove counsel's performance was prejudicial, petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A petitioner must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* at 688. The test for prejudice is not outcome-determinative, *i.e.*, defendant need not show

6

that the deficient conduct more likely than not altered the outcome of the case; however, a simple showing that the defense was impaired is also not sufficient. *Id.* at 693.

The *Strickland* prejudice analysis is complete in itself. Therefore, there is no need for additional harmless error review pursuant to *Brecht*. *See Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009); *Avila v. Galaza*, 297 F.3d 911, 918 n.7 (9th Cir. 2002).

With regards to the guilt phase, petitioner primarily argues that his trial counsel failed to investigate, present evidence, or seek relevant jury instructions regarding petitioner's mental state at the time of the crimes. In addition, petitioner argues that his counsel was ineffective in attempting to present a "claim of right" defense. With regards to the penalty phase, petitioner primarily argues that his trial counsel failed to investigate and present at the penalty phase extensive mitigation evidence, including evidence pertaining to petitioner's educational, psychological, medical, institutional, cultural and social histories. In capital cases, the Supreme Court has confirmed that counsel has a duty to conduct a "thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

Petitioner requests that resolution of this claim be deferred for two reasons. First, petitioner argues that Claim 13 should be deferred until petitioner regains competency. Because this Court has already denied petitioner's motion for a stay pending compulsory restoration proceedings, the request for deferral on this ground is denied.

Second, petitioner requests deferral because Claim 13 specifically refers to and relies on previous claims in the petition, in particular Claim 2, which alleges that petitioner was denied access to and assistance of competent mental health examiners (Second Amd. Pet. at 31). Petitioner has also stated that he plans to move for an evidentiary hearing on this and other claims. While this Court will not opine at this juncture as to whether petitioner will be able to demonstrate that he is entitled to an evidentiary hearing, the Court does recognize that because this is a pre-AEDPA action, the factual and legal issues must generally be decided *de novo*, and without the evidentiary restrictions imposed on post-AEDPA matters by decisions such as *Cullen v. Pinholster*, where the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388,

1398 (2011).

Accordingly, the Court acknowledges, as it must, that petitioner is entitled to at least bring a motion for an evidentiary hearing prior to this Court's resolution of certain claims on the merits. Additionally, the Court agrees with petitioner that even if the Court does not grant relief or hold an evidentiary hearing on this or the preceding claims in the petition, it must defer decision on this claim until the earlier claims upon which this claim specifically relies are litigated. Therefore, resolution of Claim 13 is **DEFERRED**.

**2.    CLAIM 15**

In Claim 15, petitioner maintains that the trial court erred in refusing to re-voir dire the jury after the guilt phase of his trial. According to petitioner, failure to do so deprived him of his rights to, *inter alia*, a fair trial, trial by an impartial jury, due process and cruel and unusual punishment, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

**A.    FACTUAL BACKGROUND**

After the jury returned its verdict at the guilt phase of the trial on May 6, 1981, and before the penalty phase was scheduled to begin, petitioner's trial counsel moved the court to *re-voir dire* the jury. This request was based on trial counsel's belief that the jury was biased against petitioner because of several unusually high profile events generating ample media attention concerning the death penalty, that occurred during the guilt phase of petitioner's trial.

On May 14, 1981, the trial court conducted a hearing regarding trial counsel's request to *re-voir dire* the jury (RT 994-1000). Petitioner's counsel referred to several newsworthy events in support of his motion to *re-voir dire* the jury. The day before this hearing, on May 13, 1981, there was an assassination attempt on Pope John Paul II. A few months prior to the hearing, on March 30, 1981, there was an assassination attempt on President Ronald Reagan. The prosecution of the "Hillside Strangler," the serial killer duo responsible for the murders of several women in Southern California , also occurred in 1981 (RT 995). In addition, petitioner's trial counsel submitted several then-current newspaper articles regarding the death penalty: (1) an article on a murder conviction which was reduced to manslaughter by a judge on the Alameda County Superior Court bench; (2) an article in which then-Chief Justice Burger "blasts" death

8

penalty delays; and (3) an article referring to a dissent by Justice Rehnquist with the headline "Quicker Death Penalty Urged by Rehnquist" (RT 996). Trial counsel argued that this blitz of media attention surrounding the death penalty could be causing jurors to more readily impose the death penalty on petitioner. To support this claim, trial counsel pointed to a juror, who at the close of the guilt phase of the trial, asked the bailiff: "Do we start the penalty phase?" (RT 990). Trial counsel argued that the juror's statement demonstrated that the jurors had pre-judged the case, thus necessitating additional *voir dire*. *Id*. The trial court denied trial counsel's request to *re-voir dire* the jury, finding that it was unnecessary (RT 991). The same jury then proceeded to the penalty phase of the trial, where it sentenced petitioner to death.

### B. ANALYSIS

Petitioner claims his constitutional rights were violated when the trial court did not allow him to *re-voir dire* the jury after media attention regarding the death penalty occurred between the guilt phase and penalty phase of his trial. Petitioner argues that the trial court's denial of his request resulted in Fifth, Sixth, and Eighth Amendment violations.[4]

As an initial matter, federal review in interpreting the constitutional provisions as they apply to *voir dire* proceedings in state court is limited. *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991). The Supreme Court has explained "the adequacy of *voir dire* is not easily subject to appellate review." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Therefore, "the trial court retains great latitude in deciding what questions should be asked on *voir dire*." *Mu'Min*, 500 U.S. at 424. Nonetheless, two main topics during *voir dire* of prospective jurors are well-established Fourteenth Amendment concerns: racial prejudice and opinions on capital punishment. *See Aldridge v. United States,* 283 U.S. 308 (1931); *Morgan v. Illinois*, 504 U.S.

---

[4] To the extent that petitioner is challenging the practice of using the same jury for the guilt phase and penalty phase of his trial, there is no merit to that claim. The Supreme Court has emphasized that there is not one right way for a State to set up its capital sentencing scheme. *Morgan v. Illinois*, 504 U.S. 719 (1992) *(citing Spaziano v. Florida*, 468 U.S. 447, 464, (1984)). In addition, the practice of using the same jury for the guilt phase and the penalty phase of the trial is a well-accepted practice, instituted in California by legislative preference. Cal. Penal Code § 190.4(c).

9

719 (1992).[5]  Respondent argues that these are the only two inquires that are constitutionally compelled.  Although these are the two most prevalent claims, the Supreme Court has not held that these are the only available constitutional challenges to *voir dire* proceedings in the federal courts.  See *Mu'Min*, 500 U.S. at 424.  Claims challenging a state trial court's *voir dire* for other reasons have also been raised and evaluated in federal courts.  See *Mu'Min*, 500 U.S. at 415; *Skilling v. United States*, 561 U.S. 358 (2010).

Despite the variety of claims regarding *voir dire* procedures, there is no established federal precedent for the specific issue raised by petitioner, namely, a request to *re-voir dire* a jury panel between the guilt phase and penalty phase of the trial based on current events. Therefore, previous cases dealing with constitutional challenges to other *voir dire* issues are instructive in this situation.  Petitioner's claim is most analogous to claims regarding pretrial publicity causing an unfair trial.  Although pretrial publicity cases typically concern media attention about that particular case, petitioner is essentially raising the same argument: media attention potentially caused the jury to be biased.

The Supreme Court analyzed a similar challenge regarding a state court's refusal to ask specific questions at *voir dire* about pretrial publicity.  In *Mu'Min v. Virginia,* the Supreme Court rejected a defendant's claim that the trial judge erred by not allowing specific questions to potential jurors about the pretrial publicity surrounding his murder trial.  There, the petitioner was an inmate serving time for first-degree murder who committed another murder while out of prison on work detail.  *Mu'Min,* 500 U.S. at 415.  The case engendered substantial publicity in the local news media but the trial judge denied Mu'Min's motion for individual *voir dire* and refused to ask any questions relating to the content of news items that potential jurors might have seen or read. *Id.*  Mu'Min argued that the trial court's failure to ask specific questions about the content of what pretrial publicity potential jurors were exposed to regarding the case violated his Fourteenth

---

[5]In *Aldridge*, the Supreme Court held that it was reversible error for a court not to have asked whether any jurors might be prejudiced against a defendant because of his race. *Aldridge*, 238 U.S. at 311.
Additionally, in *Morgan*, the Supreme Court held that the impartiality required in the Due Process Clause of the Fourteenth Amendment allowed a capital defendant to challenge for cause any prospective juror who would automatically vote for the death penalty in every case in which a defendant is found guilty. *Morgan*, 504 U.S. at 729.

Amendment rights. *Id.* The Supreme Court disagreed, and held that to constitute a due process violation, the trial court's failure to ask these questions must have rendered the defendant's trial fundamentally unfair. *Id.* at 425-26. The Supreme Court further explained that "our own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Id.* at 427. Therefore, the essential question at issue here, keeping in mind the wide discretion a reviewing court must accord to a trial court, is whether the *voir dire* process made petitioner's trial fundamentally unfair such that it violated petitioner's Sixth Amendment right to an impartial jury, and his Fourteenth Amendment right to due process.

The trial court's decision to decline trial counsel's request to *re-voir dire* the jury did not violate petitioner's Sixth or Fourteenth Amendment rights. As explained above, the Supreme Court has held that defendants are entitled to inquire into potential juror's views on the death penalty; otherwise, there is a due process violation. *See Morgan*, 504 U.S. at 729. This requirement was thoroughly satisfied at the initial *voir dire*, a fact that petitioner does not dispute (Dkt. 742 at 21). Both the trial judge and petitioner's defense counsel questioned prospective jurors about their attitude toward the death penalty during the first *voir dire*. In particular, the court asked all of the prospective jurors whether they had read books, magazine articles, pamphlets, or newspaper articles that affected their opinion of the death penalty. Additionally, the court specifically asked the potential jurors if they had heard current media publicity about the death penalty. This extensive questioning allowed the parties a chance to determine whether prospective jurors would be impartial and objectively evaluate the evidence. *See Rosales-Lopez*, 451 U.S. at 188.

Nonetheless, petitioner argues that the "sensational and inflammatory events" that occurred after this initial *voir dire* required the judge to grant defense counsel's request to inquire into the jury's opinions for a second time. Petitioner argues that the trial judge's denial of this request violated petitioner's right to a fair and impartial jury. This argument is unpersuasive. Although the attempted assassinations and news coverage regarding the death penalty were certainly noteworthy events, there is no direct evidence that this media environment had an effect

11

on any of the jurors. In fact, there appears to have already been substantial media controversy over the death penalty at the beginning of the trial, because the trial judge asked potential jurors about the subject at the initial *voir dire*. Specifically, the trial judge asked one juror: "Obviously in the media now there is a lot of publicity about crime and in particular the death penalty, in fact the Steven Judy execution fairly recently. Have you paid any attention or done any serious reading in that area?" (15 RT A-195). Many jurors had not paid attention to the media controversy surrounding the death penalty and any jurors that had reservations about their ability to be fair were discharged from the panel (15 RT A-235).

The only specific evidence that petitioner brings forward to show bias is one juror's question: "Do we start the penalty phase?" (RT 990). This is neither direct evidence that the jurors were impartial, nor that petitioner received an unfair trial. Importantly, the trial judge did not seem to think this comment indicated any bias in the jury. The trial judge explained "I think it is not indicative of anything other than just to ascertain the calendering" (RT 990). Therefore, at the hearing for trial counsel's request, the trial judge decided a second *voir dire* was unnecessary, specifically noting: "I don't see what there is to *voir dire*. Obviously there is no impropriety. Your motion is denied as well as your motion for a second jury" (RT 991).

This ruling is entitled to a great deal of deference by this Court. The Supreme Court has found that a trial judge is in the best position to evaluate jurors because he or she has the best opportunity to observe their demeanor and response to questions. *Rosales-Lopez*, 451 U.S. at 188. For this reason, the Supreme Court has explained that an appellate court cannot easily second-guess the conclusions of the decision-maker who observed the jury. *Id*. And absent substantial indications of bias, when ruling on a defendant's request to examine the jury about a specific subject, "the Constitution leaves it to the trial court, and the judicial system within which that court operates, to determine the need for such questions." *Id*. at 190. Without direct and specific evidence of a biased jury, which petitioner cannot establish, we must defer to the trial judge's evaluation that a second *voir dire* was unnecessary. Accordingly, Claim 15 must be **DENIED**.

**3.     CLAIM 25**

In Claim 25, petitioner maintains that he is factually innocent of the crimes for which he was convicted. In addition, Claim 25 contains what appears to be a "cumulative error" claim, alleging that his conviction was obtained in violation of various rights that are the subject of other claims in the petition.

To the extent that petitioner is bringing a cumulative error claim, it must be deferred. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Here, however, no trial error has been found in the claims considered thus far by the Court. Petitioner's claim for cumulative error will therefore be addressed after consideration of the other claims in the petition.

As to his claim of factual innocence, petitioner maintains both that he did not commit the crimes alleged and that, as a result of mental disease or defect, he could not form the requisite intent to kill. The Supreme Court, however, has never held that a freestanding claim of actual innocence may serve as a basis for a grant of habeas relief, even in capital cases. *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Rather, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Ibid.*

In addition, even if the Supreme Court had established that freestanding claims of actual innocence are cognizable on federal habeas, petitioner has not made any compelling allegations, or cited to any meaningful evidence, in support of the claim that he was not actually the perpetrator of the crimes, particularly as petitioner himself testified at trial that he was the shooter, but maintained that he was acting in self-defense and in an attempt to retake property. Petitioner's counsel suggests that such evidence may be available from petitioner, if he is returned to competency and can communicate with his attorneys. As this Court has already held, however, there is no reasonable likelihood that petitioner will be returned to competency, and thus litigation of his habeas petition must continue. *Ryan v. Gonzales,* 133 S. Ct. 696, 709 (2013). Accordingly,

this portion of petitioner's claim is **DENIED**.

4.     **CLAIM 26**

In Claim 26, petitioner maintains that the death verdict against him is constitutionally unreliable and deprived him of his rights to due process, heightened capital case due process, and heightened capital case reliability in fact-finding and sentencing. Specifically, petitioner alleges that the death sentence was not imposed based on an individualized determination of whether he should be put to death, but rather was based on inaccurate, incomplete and unreliable evidence.

Petitioner requests that resolution of this claim be deferred for two reasons. First, petitioner argues that Claim 26 should be deferred until petitioner regains competency. Because this Court has already denied petitioner's motion for a stay pending compulsory restoration proceedings, the request for deferral on this ground is denied.

Second, petitioner points out that this claim specifically references and relies on previous claims in the petition. Specifically, Claim 26 states that:

> The facts supporting this claim are set forth, *ante*, and incorporated by reference, in all of the foregoing claims, including but not limited to, *inter alia*, the claims concerning mental illness and incompetency, the *Brady* violations, prosecutorial misconduct, trial counsel's ineffective assistance, the mental health experts' failures, etc.

(Second Amd. Pet. at 296). Petitioner has also stated that he plans to move for an evidentiary hearing on this claim. As discussed *supra*, the Court acknowledges, as it must, that petitioner is at entitled at least to bring a motion for an evidentiary hearing prior to this Court's resolution of certain claims on the merits. Additionally, the Court agrees with petitioner that even if the Court does not grant relief or hold an evidentiary hearing on this or the preceding claims in the petition, it must defer decision on this claim until the earlier claims upon which this claim specifically relies are litigated. Therefore, resolution of Claim 26 is **DEFERRED**.

5.     **CLAIM 28**

In Claim 28, petitioner claims that his death sentence is constitutionally disproportionate to the crimes for which he was convicted, and must be reduced to life without parole. According

to petitioner, this violates his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

Petitioner makes several arguments in support of this claim. Each will be considered in turn.

To begin with, petitioner argues that his crime was "a murder involving a single crime partner murder victim, who died quickly from a single gun shot wound inflicted during a struggle over crime proceeds." According to petitioner, such a crime should not subject him to capital punishment. Petitioner was convicted, however, of murder (Cal. Penal Code § 187(a)), accompanied by the robbery-murder special circumstance (§ 190.2 (a)(17)(A)), two counts of robbery (§ 211), assault with a deadly weapon (§ 245(a)), possession of a firearm by an ex-felon (§ 12021), and escape (§ 4532(b)). He does not allege that those crimes do not make him eligible for the death penalty under state or federal law. Rather, he maintains that if a proportionality review is conducted by this Court, with an evidentiary hearing where he proposes to submit factual data regarding other California capital cases, he will be able to demonstrate that similarly-situated defendants did not receive a sentence of death.

This argument may be quickly dismissed, as there is no case or statutory law entitling petitioner to a "comparative evaluation of the facts." Petitioner relies primarily on *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008), where the Supreme Court stated that "capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." In *Kennedy*, however, the Court considered whether the death penalty could be imposed for non-homicide crime of child rape. *Id.* at 417-418. In holding that it was unconstitutional for child rape to be a capital offense, the Court emphasized that the Eighth Amendment generally limited the death penalty as a potential punishment for crimes resulting in death. *Id.* at 446-47. Nothing in the Court's holding suggested that it is appropriate or necessary for a district court to conduct a proportionality review when, as here, the petitioner does not allege that the crimes for which he was convicted are not capital offenses, but rather argues that other defendants in California who committed comparable crimes did not receive a death sentence. The Supreme Court has previously held that there is no constitutional requirement for a comparative proportionality review when "the defendant requests

15

it." *Pulley v. Harris*, 465 U.S. 37, 50-53 (1984) (upholding California's death penalty statute and finding that it properly "limits the death sentence to a small sub-class of capital eligible cases"). Furthermore, the Ninth Circuit has repeatedly held that "there is no federal constitutional requirement of inter-case proportionality analysis of death sentences." *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1308 (9th Cir. 1996) (citing *Pulley v. Harris,* 465 U.S. 37, 43, 50-51 (1984)); *Allen v. Woodford*, 395 F.3d 979, 1018-1019 (9th Cir. 2005) (holding that neither due process, the Eighth Amendment nor equal protection mandate proportionality review).

Petitioner also maintains that his mental impairments entitle him to a reduction in his sentence to life without parole. Once more, petitioner's argument is without merit. Petitioner essentially urges this Court to extend the Supreme Court's holding that mentally retarded people cannot be executed (*Atkins v. Virginia*, 536 U.S. 304, 315-321 (2002)) and find that people with chronic mental illness, such as petitioner, also are exempt from execution. This Court declines to do so.

Finally, petitioner argues that the jury received faulty instructions and was not presented with significant mitigation evidence. According to petitioner, if the jury was properly instructed and/or presented with additional mitigation evidence, it would have imposed a sentence of life without parole. As petitioner implicitly acknowledges, these are claims of instructional error and ineffective assistance of counsel, not of "constitutionally disproportionate punishment," and are properly addressed via other claims in the petition. Accordingly, Claim 28 is **DENIED**.

### 6.    MOTION TO STRIKE

In support of his reply brief, petitioner submitted a declaration from investigator Russell Stetler. Mr. Stetler's testimony is submitted as expert opinion regarding prevailing professional norms in capital investigations, and whether or not the actions of petitioner's trial counsel were adequate under *Strickland*. Although Mr. Stetler is not an attorney, petitioner is presenting his testimony as that of a "*Strickland* expert." Mr. Stetler has previously been accepted as an expert on prevailing professional norms by numerous courts, including the Northern District. Respondent has moved to strike Mr. Stetler's declaration.

A *Strickland* expert may properly testify regarding the relevant standard of care among

16

competent practicioners in capital cases at a given time and place. *See, e.g., Mak v. Blodgett*, 754 F. Supp. 1490, 1493 (W.D. Wash. 1991) (district court properly considered attorney expert declarations as to standard of practice among competent practicioners in capital cases), *aff'd*, 970 F. 2d 614 (9th Cir. 1992); *see also*, *Strickland*, 466 U.S. at 688 (prevailing norms of practice . . . are guides to determining what is reasonable" in a given case).  Such testimony, however, is not required.  While Rule 702 of the Federal Rules of Evidence states that an expert "may" testify if his or her specialized knowledge will aid the trier of fact in determining a specific issue, there are no provisions mandating expert testimony.  The Ninth Circuit has confirmed that in ineffective assistance cases, expert testimony on the standard of care is not required. *La Grand v. Stewart*, 133 F. 3d 1253, 1270-71 & n.8 (9th Cir. 1998); *see also Bonin v. Calderon*, 59 F. 3d 815, 838 (9th Cir. 1995) (district court has discretion to exclude expert testimony if it will not assist the court in understanding the evidence).

Here, the Court finds that a *Strickland* expert is not necessary.  While the Court has deferred ruling on petitioner's ineffective assistance of counsel claim, petitioner has not demonstrated at this juncture that Mr. Stetler's testimony will be necessary to assist the Court in understanding the evidence or determining any fact in issue.  As the Supreme Court has recognized, "prevailing norms of practice are guides" to determining reasonableness, "but they are only guides." *Strickland*, 466 U.S. at 688.  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the wide variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688-89.  Accordingly, the Court is satisfied that it can determine whether petitioner's counsel strategy was reasonable without the need for expert testimony, and respondent's motion to strike is therefore **GRANTED.**

## CONCLUSION

For the foregoing reasons, Claims 15 and 28 are **DENIED**.  Claims 13 and 26 are **DEFERRED**.  Claim 25 is **DENIED** in part and **DEFERRED** in part.  Respondent's motion to strike is **GRANTED**.  Within fifteen days of the date of this Order, the parties are **ORDERED** to meet and confer, and to submit a proposed briefing schedule for petitioner's remaining **record-based**

17

claims. In other words, these should be claims that can be resolved on the record as it stands, and claims that will not be the subject of petitioner's anticipated motion for evidentiary hearing. For the purposes of efficiency, and in order to avoid the need for oversized briefs, the parties should limit the next round of briefing to no more than ten claims, and to the extent possible, choose claims that have similar factual or legal predicates.

**IT IS SO ORDERED.**

Dated: March __9__, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE