1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10
11

OSCAR GATES,                                     No. C 88-2779 WHA

12
            Petitioner,                          **ORDER RE CLAIMS 8 AND 9**

13
    v.

14
RONALD DAVIS, Acting Warden,

15
            Respondent.

16
    _____/

17

**INTRODUCTION**

18

Petitioner Oscar Gates was convicted in 1981 of, *inter alia*, murder (Cal. Penal Code

19
187(a)), accompanied by the robbery-murder special circumstance (Section 190.2 (a)(17)(A)),

20
two counts of robbery (Section 211), assault with a deadly weapon (Section 245(a)), possession

21
of a firearm by an ex-felon (Section 12021), and escape (Section 4532(b)).  He now seeks a writ

22
of habeas corpus under 28 U.S.C. Section 2254.  Numerous claims have been addressed on the

23
merits; now before the Court are petitioner's Claims 8 and 9.  For the following reasons, Claims

24
8A, 8B, 8C and 9 are DENIED.  Claim 8D is DEFERRED.

25

**FACTUAL BACKGROUND**

26

On December 10, 1979, Maurice Stevenson and his uncle, Lonnie Stevenson, were

27
waxing his car in front of his grandfather's house in Oakland at about 3:30 p.m.  Petitioner

28
appeared, holding a gun with the hammer cocked.  Petitioner herded Maurice and Lonnie to the

side of the house and ordered them to put their hands on the wall, empty their pockets, and remove their jewelry. After Maurice and Lonnie complied with petitioner's directives, petitioner frisked them and asked Maurice as to the whereabouts of Maurice's father, James Stevenson. Maurice replied that he did not know and petitioner told them that he was going to kill them. Petitioner first shot Lonnie, who yelled for his father and started running toward the back of the house, then shot Maurice, picked up the money and some of the jewelry, and fled. Lonnie died but Maurice survived. Some time after the shooting, petitioner called Jimmy Stevenson, Maurice's grandfather, and said that he had killed Lonnie and shot Maurice, that he was going to Los Angeles to kill members of another family, and that when he returned he would finish killing off the Stevenson family. On December 29, 1979, petitioner was arrested in Vallejo, and the gun later determined to be the one that killed Lonnie Stevenson was found on him. *See People v. Gates,* 43 Cal.3d 1168, 1176-78 (1987).

On January 4, 1980, an indictment was filed in Alameda County. It charged petitioner with murder (Cal. Penal Code 187(a)), accompanied by the robbery-murder special circumstance (Section 190.2 (a)(17)(A)), two counts of robbery (Section 211), assault with a deadly weapon (Section 245(a)), possession of a firearm by an ex-felon (Section 12021), and escape (Section 4532(b)), among other things. Petitioner pled not guilty to all charges. The trial began on March 16, 1981. At trial, petitioner asserted a claim-of-right defense. He testified about a so-called "Stevenson family forgery ring," purportedly headed by James Stevenson and Donald "Duck" Taylor, and of which, Lonnie and Maurice Stevenson, Melvin Hines and petitioner were all members. The defense alleged that a dispute arose when petitioner did not receive his "big cut" of $25,000 allegedly promised to him, leading to the events of December 10, 1979.

Trial testimony also revealed that, in September 1979, a heated argument between petitioner and other members of the forgery ring led to petitioner being fired upon by Maurice and James Stevenson, which resulted in a gunshot wound to petitioner's leg. Thereafter, petitioner learned through intermediaries that he would have to give up his claim to the money or he would be shot.

1    At the penalty phase, the prosecution presented, as evidence in aggravation, evidence of
2    petitioner's convictions for robbery and for two assaults in connection with a 1978 robbery of a
3    McDonald's restaurant, a 1973 conviction for rape, and a 1973 conviction for kidnapping.  The
4    prosecution also presented evidence that petitioner was involved in a 1978 assault and robbery
5    of two women at a Los Angeles mortuary, which had resulted in the death of one of the women.
6    Petitioner was later convicted of the Los Angeles mortuary crimes in a separate trial.

7    The case in mitigation consisted of testimony by several of petitioner's family members,
8    several apartment neighbors, and a clinical psychologist.  Petitioner's family members described
9    the racially-segregated environment in which petitioner grew up in Belzoni, Mississippi. They
10   testified that petitioner was never in any trouble until an incident at a Western Auto Store when
11   he was approximately 14 to 16 years old; the incident, which apparently involved petitioner, an
12   African-American, striking a white woman who had struck him first, resulted in petitioner
13   spending six months in jail and becoming a target of police harassment and suspicion for any
14   problem that arose thereafter.  Petitioner's mother also testified that she visited petitioner in
15   California in 1973 at a jail hospital after he had been beaten by the police.  Petitioner's
16   neighbors described petitioner as a friendly, sweet, considerate, good-hearted, good-natured
17   person who never got angry and got along well with people.  Dr. Paul Berg, a clinical
18   psychologist, testified that petitioner was "an unusually well-adjusted prisoner" and most likely
19   would not present a problem in prison.  *See Gates,* 43 Ca1.3d at 1193-97.  On May 28, 1981, the
20   jury returned with a verdict of death for petitioner.

21   ## PROCEDURAL BACKGROUND

22   The California Supreme Court affirmed petitioner's conviction and sentence on direct
23   appeal on October 15, 1987.  *People v. Gates,* 43 Ca1.3d 1168 (1987).  On May 23, 1988, the
24   United States Supreme Court denied a petition for certiorari.  *Gates v. California,* 486 U.S.
25   1027 (1988).

26   Subsequent state and federal habeas proceedings ensued, with a focus on, *inter alia,*

3

petitioner's competency.[1]  After much litigation, this matter was stayed in 2004 following an

adjudication of petitioner's mental incompetency, as required by *Rohan ex. rel. Gates v.*

*Woodford ("Gates")*, 334 F.3d 803 (9th Cir. 2003).[2]  At that time, attorneys for petitioner and

respondent agreed that petitioner was incompetent to assist counsel.  On January 8, 2013, the

Supreme Court decided *Ryan v. Gonzales*, abrogating *Gates* and holding that an incompetent

capital prisoner has no right to an indefinite stay of habeas proceedings.  133 S. Ct. 696, 706-

709.  The Supreme Court further held that while the decision to grant a temporary stay is within

the discretion of the district court, an indefinite stay is inappropriate if there is no reasonable

hope the petitioner will regain competence in the foreseeable future.  *Ibid*.

Pursuant to *Ryan*, this Court lifted the stay.  The parties were referred to settlement

proceedings with Magistrate Judge Beeler; the settlement proceedings were inconclusive.  In

addition, the Court ordered proceedings on the merits of petitioner's federal habeas proceedings

to re-commence, and subsequently addressed numerous claims on the merits (Dkt. No. 715).

Recognizing that petitioner's competency was still at issue, the Court appointed independent

expert Dr. Jessica Ferranti to examine petitioner (Dkt. No. 740).  Dr. Ferranti concluded that, as

the result of mental disorder, petitioner is incompetent, *i.e.* that he does not have the capacity to

make rational choices with respect to his Court proceedings or to communicate rationally with

his attorneys (Ferranti Report 16-18).  Both sides agreed that petitioner is incompetent.  Under

*Gonzales*, 133 S. Ct. at 706-09, however, that is no longer grounds to stay the matter

indefinitely.  Petitioner subsequently filed a motion to stay pending compulsory restoration

proceedings; the Court denied petitioner's motion and ordered consideration of petitioner's

claims on the merits to continue.

## LEGAL STANDARD

The habeas statute authorizes this Court to review a state court criminal conviction "on

the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of

---

[1] For a detailed description of the state habeas proceedings, *see* Order Re Motion For Summary Judgment on Claim 1 and 1292(b) Certification, filed August 23, 2001.

[2] Petitioner was also adjudicated to be mentally incompetent in 1994, as part of the proceedings in this habeas matter, and in 1973, in a prior state criminal matter.

the United States." 28 U.S.C. 2254(a).[3]  The purpose of the writ of habeas corpus is to "protect[] individuals from unconstitutional convictions and . . . to guarantee the integrity of the criminal process by assuring that trials are fundamentally fair." *O'Neal v. McAninch*, 513 U.S. 432, 442 (1995); *see also Brecht v. Abrahmson*, 507 U.S. 619, 632-33 (1993).  Because federal habeas review delays finality and burdens state-federal relations, habeas doctrines must balance the protection from unlawful custody the writ offers against the "presumption of finality and legality" that attaches to a state-court conviction after direct review.  *See Brecht*, 507 U.S. at 635-38; *McCleskey v. Zant*, 499 U.S. 467, 490-91 (1991).  Accordingly, a federal habeas court must in most cases presume that state court findings of fact are correct.  28 U.S.C. 2254(d).  In contrast, purely legal questions and mixed questions of law and fact are reviewed *de novo*.  *See Swan v. Peterson*, 6 F.3d 1373, 1379 (9th Cir. 1993), *cert. denied*, 513 U.S. 985 (1994).  In such circumstances, and when the state court has made no factual findings regarding the claim at issue, petitioner bears the burden of proving, by a preponderance of the evidence, the facts necessary to support his claims.  *See, e.g.*, *Garlotte v. Fordice*, 515 U.S. 39, 46-47 (1995).

Even if a petitioner meets the requirements of Section 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict.  *Brecht*, 507 U.S. at 638.  Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)).

## ANALYSIS

### 1.    CLAIM 8

In Claim 8, petitioner alleges generally that the prosecution's failure to disclose impeaching evidence favorable to petitioner deprived petitioner of his rights to a fair trial and to effective assistance of counsel.  Here, the parties address subclaims 8A, 8B, 8C and 8D, each of which the Court will consider.

---

[3]  This case predates the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and thus AEDPA's standard of review does not apply.

1

### A.   CLAIM 8A

In Claim 8A, petitioner alleges that the prosecution failed to disclose exculpatory and impeaching evidence to petitioner, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). To prove a *Brady* violation, three elements must be shown. "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citations omitted).

Here, petitioner maintains that the prosecutor failed to disclose evidence regarding a forgery ring led by the Stevensons. According to petitioner, this evidence, which consisted largely of arrests and convictions for various forgery-related crimes, could have been used to impeach prosecution witnesses.

Prior to trial, the trial court ruled that no prior convictions could be used to impeach witnesses. RT 147-148. The trial court based its ruling on California law applicable at the time, specifically *People v. Beagle*, 6 Cal. 3d 441, 451 (1971) and *People v. Rist*, 16 Cal. 3d 211, 219 (1976). This caselaw was superceded after petitioner's trial by the addition of section 28(f)(4) to the California Constitution in 1982. Contrary to the law (Cal. Evid. Code 352) that governed this issue at the time of petitioner's trial, which allowed judicial discretion in determining whether prior convictions could be used for impeachment purposes, Section 28(f)(4) permits virtually unlimited use of prior convictions to impeach a witness.

Petitioner argues that the trial court's pre-trial decision that no prior convictions could be used for impeachment purposes was incorrect under California law. Specifically, petitioner maintains that the trial court in petitioner's capital trial "globally and prospectively" denied the use of prior convictions, while the law in place at the time of petitioner's trial required the trial court to balance any probative value of prior convictions with the potential prejudicial impact. *See* Cal. Evid. Code 352, which states that:

> The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

6

1    Petitioner argues that the record is unclear as to whether the trial court conducted a

2  meaningful balancing test of probative value versus prejudicial impact, in violation of section

3  352 and *People v. Burgener*, 41 Cal. 3d 505, 524-526 (denying defendant's challenge to trial

4  court's decision to exclude evidence of prior criminal activity of key prosecution witness in

5  death penalty case).  Petitioner, however, does not demonstrate that any violation of state law

6  occurred.  To begin with, the trial court was not – as petitioner argues – required to balance the

7  probative value of the prior convictions with the possibility of prejudice.  As the statute makes

8  clear – and as *Burgener* confirmed – relevant evidence may also be excluded if it will, for

9  example, "necessitate undue consumption of time."  *Id*. at 525-26.  Petitioner cannot

10  demonstrate that it was unreasonable for the trial court to conclude in its discretion to exclude

11  the evidence of prior convictions.  Furthermore, under the applicable state law at the time,

12  decisions under Section 352 were reversible on appeal only upon "a clear showing of abuse,"

13  and petitioner can show no abuse here.  *Burgener*, 41 Cal. 3d at 526.

14    Respondent maintains that when, as here, a trial court has rendered certain evidence

15  inadmissible, failure to disclose that evidence does not result in a *Brady* violation.  Respondent

16  is correct.  For example, the Supreme Court has held that there was no *Brady* error where the

17  prosecutor did not disclose polygraph results that would have been inadmissible, even as

18  impeachment.  *Wood v. Bartholomew*, 516 U.S. 1, 5-6 (1995) (reversing the Ninth Circuit's

19  decision holding otherwise because defendant "could have made no mention of [the polygraph

20  results] either during argument or while questioning witnesses").  More recently, the Ninth

21  Circuit has found the alleged suppression of a co-defendant's notes did not constitute a *Brady*

22  violation in part because the notes were likely inadmissible hearsay.  *Henry v. Ryan,* 720 F.3d

23  1073*,* 1080-81 (9th Cir. 2013).  Pursuant to this caselaw, any failure by the prosecution to

24  disclose the prior convictions of witnesses did not result in a *Brady* violation.

25    Petitioner also argues in Claim 8A that it was a *Brady* violation for the prosecution to

26  not turn over, pursuant to defense request, a report by the State Justice Department about a "Bay

27  Area Forgery Group."  This investigative report listed many members of the Stevenson Family

28  (Pet. State Habeas Exh. 26).  The trial court, however, reviewed the report *in camera* and

7

1   determined that it contained nothing that the trial court could give to the defense, was

2   "garbage," and contained nothing relevant (RT 313-16).  The trial court subsequently stated that

3   the report contained rank hearsay (RT 679).

4          This Court has reviewed the document, which consists primarily of materials regarding

5   fraud investigations of a number of individuals, and how those people might be associated.  The

6   document does not appear to contain anything specifically exculpatory; petitioner nonetheless

7   argues that the report was either admissible for impeachment purposes or would have led to

8   admissible impeachment evidence.  Even assuming that the report contained impeachment

9   material, given the trial court's decision *not* to turn the report over to the defense, petitioner

10  cannot show that the prosecution was still mandated to produce it to him.  Petitioner cites to no

11  cases obligating the prosecution to turn over documents in such circumstances.  Indeed, the

12  caselaw suggests the contrary.  *See*, *e.g., United States v. Galin,* 222 F.3d 1123, 1127 (9th Cir.

13  2000 (finding that even if a trial court adopts an impermissible practice, the remedy is to raise

14  the issue on appeal, rather than violate the court's instructions); *Maness v. Meyers*, 419 U.S.

15  449, 458-59 (1975).

16         Because the trial court decided, after an *in camera* review, not to turn over the report to

17  the defense, petitioner's *Brady* argument must fail.  Even if the evidence had been favorable to

18  petitioner, it was not suppressed by the state.  *See Banks*, 540 U.S. at 691.  Claim 8A must be

19  denied.

20             **B.    CLAIM 8B**

21         In Claim 8B, petitioner alleges that at the time of petitioner's trial, the Alameda County

22  District Attorney's Office and Alameda County law enforcement officers had a pattern and

23  practice of awarding pre- and post-testimonial compensation to prosecution witnesses.

24  Petitioner maintains that the prosecution failed to disclose this policy, in violation of petitioner's

25  constitutional rights.  Failure to disclose evidence of favorable treatment of a prosecution

26  witness may result in a *Brady* violation.  *See Belmontes v. Brown*, 414 F.3d 1094, 1113 (9th Cir.

27  2005) (finding that evidence that traffic violations were dismissed against prosecution witness

28  should have been disclosed to defense), *rev'd on other grounds*, 549 U.S. 7 (2007).

8

1

2          Petitioner's argument is unconvincing.  To begin with, petitioner offers no clear

3   evidence that if such a policy existed, it existed at the time of petitioner's trial.  Petitioner

4   primarily relies on testimony in an unrelated case from an Alameda County Deputy District

5   Attorney.  Defense counsel in a capital trial in Marin County had argued that a prosecution

6   witness (Bobby Evans) received undisclosed benefits for testimony, including a continuation of

7   sentencing and eventually a reduction in sentence.  *People v. Masters*, California Supreme Court

8   No. S016883, Marin County Superior Court No. 10467.  In support of his argument, petitioner

9   offers the following testimony from DDA William Denny in 1990.  After confirming that

10  Evans' sentencing had been delayed until the conclusion of the *Masters* case, the Marin trial

11  court proceeded as follows:

12                     THE COURT: [. . . ] Do you have a policy in Alameda
                County to wink when you tell defendants or their attorneys no
13              deals prior to the testimony of an informer who is also a defendant
                in your courtroom?
14
                       THE WITNESS: Can you rephrase that?
15
                       THE COURT: Is there a policy in your office, your
16              department, to make inference or implication that, we'll make a
                deal but not really word it specifically to a defendant or his
17              counsel until after the testimony, the requested testimony of that
                witness.
18
                       THE WITNESS: Oh, yes.  That's happened.
19
                       THE COURT: You have done that?
20
                       THE WITNESS: Yes.
21
                       THE COURT: You tell them, 'Later we'll make a deal?'
22
                       THE WITNESS: The better practice is not to make a deal
23              before testimony.
24                     THE COURT: The better practice is not to make a deal
                before testimony?
25
                       THE WITNESS: (Nods affirmatively).
26
    *Masters,* RT 16987-16988.
27
            This testimony does not support petitioner's claim that there was an improper and
28

9

undisclosed policy at the Alameda County District Attorney's Office to secretly compensate prosecution witnesses at the time of his capital trial.  To begin with, the testimony relied on by petitioner does not even confirm that, if there was such a policy, it was in place at the time of petitioner's trial, which took place nearly a decade before the *Masters* trial.  In addition, any policy testified to by DDA Denny suggests only that prosecutors may have refused to make deals in certain situations with prosecution witnesses before the witnesses testified.  There is nothing in the testimony relied on by petitioner that suggests that there was a set policy and practice in place at the time of petitioner's trial, nor that such a policy was actually followed by the prosecution during petitioner's capital trial.

Petitioner does not point to any evidence that the prosecution witnesses in his particular case were given any undisclosed benefits.  Instead, he argues that the testimony from DDA Denny "raise[s] an inference that the testimony of the prosecution's witnesses herein, including but not limited to Maurice, Jimmy, Hines, Miller and Bostic, was in fact secretly and improperly solicited, assisted, fabricated, motivated and compensated by the prosecution team, without disclosure of such matters to the jury" (Pet. Opening Merits Br. 10).  Mere speculation without adequate support is not sufficient to show a *Brady* violation.  *See, e.g.*, *Wood v. Bartholomew*, 516 U.S. 1, 6-8 (1995); *Edwards v. Ayers*, 542 F.3d 759, 768-72 (9th Cir. 2008).  Here, petitioner's argument is no more than speculation and does not entitle him to habeas relief.  Claim 8B must be denied on the merits.

## C.    Claim 8C

In Claim 8C, which is related to Claim 8B, petitioner claims that the District Attorney's Offices in both Los Angeles and Alameda County had a pattern and practice of giving undisclosed benefits to prisoners who testified against criminal defendants.  In addition to the testimony referred to above, petitioner relies on a 1990 Los Angeles Grand Jury Report ("Investigation of the Involvement of Jail House Informants in the Criminal Justice System in Los Angeles County", Pet. Exh. 16), which documents a secret law enforcement system of soliciting and compensating testimony against criminal defendants.

Petitioner's claims regarding Alameda County's purported undisclosed scheme to

10

1  compensate witnesses are addressed *supra*.  Petitioner's claims regarding the alleged application

2  of the Los Angeles scheme to his case are equally speculative.

3         In this claim, petitioner specifically argues that the penalty phase testimonies of Calvin

4  Miller and Evelyn Bostic, both of whom testified about the Los Angeles mortuary murder, were

5  unconstitutionally solicited, fabricated and compensated by law enforcement.  Petitioner's

6  arguments, however, are purely speculative.  He argues that Miller had been housed in the Los

7  Angeles jail adjacent to petitioner, and that Miller, like the witnesses at issue in the Los Angeles

8  Grand Jury Report, was a crime partner of the defendant against whom he was testifying.

9  Neither of these arguments, however, are evidence that Miller and Bostic were involved in the

10  Los Angeles informant scandal, nor that they were secretly compensated or encouraged to give

11  fabricated testimony in petitioner's capital trial.  Petitioner also cannot point to any evidence

12  that either Miller or Bostic were secretly compensated by law enforcement in Alameda County.

13         Petitioner also maintains that the matters at issue in the Los Angeles Grand Jury Report

14  were not disclosed to him, and that they could have been used to impeach Miller's testimony.

15  As petitioner acknowledges, however, his trial took place nine years prior to the 1990 issuance

16  of the report.  Petitioner cites to absolutely no evidence that the Alameda County District

17  Attorney's office had general knowledge of these matters at any time prior to petitioner's trial.

18  Furthermore, the jury knew that Miller had pled guilty to second degree murder in the Los

19  Angeles mortuary murder[4] in exchange for his testimony; petitioner's counsel chose not to

20  cross-examine either Miller or Bostic at petitioner's trial.  For the foregoing reasons, Claim 8C

21  is denied on the merits.

22         **C.   CLAIM 8D**

23         In Claim 8D, petitioner maintains that his counsel rendered ineffective assistance by

24  failing to properly investigate and present evidence regarding the Stevenson family forgery ring.

25  In addition, petitioner argues that his counsel should have investigated and presented evidence

26  regarding the potential biases of witnesses Miller and Bostic.

27  

28         [4] As noted *supra*, petitioner was also convicted of crimes related to the Los Angeles mortuary murder
after his capital trial.

11

The Sixth Amendment guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, petitioner must show both that counsel's performance was deficient and that the deficient performance prejudiced petitioner's defense. *Id.* at 688. To prove deficient performance, petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Ibid.; see also Bobby v. Van Hook*, 558 U.S. 4, 9-10 (2009) (*per curiam*) (noting that guidelines, such as those promulgated by the American Bar Association, purporting to establish what reasonable attorneys would do may be helpful but are not the test for determining whether counsel's choices are objectively reasonable). This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *See Strickland*, 466 U.S. at 687-88.

To prove counsel's performance was prejudicial, petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A petitioner must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* at 687-88. The test for prejudice is not outcome-determinative, *i.e.*, defendant need not show that the deficient conduct more likely than not altered the outcome of the case; however, a simple showing that the defense was impaired is also not sufficient. *Id.* at 693. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *Id.* at 697; *Williams v. Calderon,* 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (approving district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice).

The *Strickland* prejudice analysis is complete in itself. Therefore, there is no need for additional harmless error review pursuant to *Brecht*. *See Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009); *Avila v. Galaza*, 297 F.3d 911, 918 n.7 (9th Cir. 2002).

1    A defense attorney has a general duty to make reasonable investigations or to make a

2    reasonable decision that makes particular investigations unnecessary.  *See Strickland*, 466 U.S.

3    at 691.  A claim of negligence in conducting pretrial investigation can form the basis for a claim

4    of ineffective assistance.  *See United States v Tucker*, 716 F2d 576 (9th Cir. 1983); *Hines v.*

5    *Enomoto*, 658 F.2d 667, 676 (9th Cir. 1981).  Counsel must, at a minimum, conduct a

6    reasonable investigation enabling him to make informed decisions about how best to represent

7    his client.  *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 525 (2003).

8    Here, petitioner argues that the material regarding the Stevenson family forgery ring was

9    readily and publicly available in various court clerk's offices, and that his attorney, who planned

10   a defense based on a theory that the homicide resulted from a dispute over proceeds from the

11   Stevenson forgery ring, was obligated to investigate the forgery ring.  Respondent does not

12   contest petitioner's allegation that his attorney was deficient in failing to investigate, and has

13   submitted no argument asserting either that it was reasonable for petitioner's trial attorney not to

14   investigate nor that there was a sound tactical reason behind the lack of investigation.  Thus, the

15   sole issue remaining is whether any alleged errors were prejudicial.  *Williams*, 52 F.3d at 1470

16   & n.3.

17   Petitioner has requested that the Court defer its final ruling as to prejudice.   Petitioner

18   states that he will be bringing a motion for an evidentiary hearing, as well as a cumulative

19   prejudice claim based on this and any other possible instances of deficient performance

20   contained in petitioner's multiple ineffective assistance of counsel claims.[5]  This Court has

21   already acknowledged that, because this is a pre-AEDPA case where the factual and legal issues

22   must generally be decided *de novo*, it is not subject to the post-AEDPA evidentiary restrictions

23   imposed by cases such as *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  As such,

24   petitioner is entitled to bring a motion for evidentiary hearing.  Accordingly, the Court will

---

[5] In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *See, e.g.*, *Alcala v. Woodford*, 334 F.3d 862, 893-895 (9th Cir 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution).

1    **DEFER** its final ruling as to Claim 8D.

2    **2.    CLAIM 9**

3    In Claim 9, petitioner alleges that the prosecutor knowingly failed to correct false

4    testimony presented at trial, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). A *Napue*

5    violation is a type of *Brady* violation. Under *Napue* it is unconstitutional for the state to

6    knowingly use false or perjured testimony against a defendant to obtain a conviction. *Napue v.*

7    *Illinois*, 360 U.S. 264 (1959). "A conviction obtained by the knowing use of perjured testimony

8    is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false

9    testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97,

10   103 (1976) (footnote omitted). To demonstrate a *Napue* violation, petitioner must show: 1) the

11   evidence in question was false; 2) the prosecution knew or should have known it was false; and

12   3) the false evidence was material. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005).

13   Petitioner maintains that Maurice Stevenson, Jimmy Stevenson, Melvin Hines, Calvin

14   Miller and Evelyn Bostic testified falsely at trial regarding the Stevenson forgery ring, and that

15   the prosecution improperly failed to correct the testimony before or after trial. According to

16   petitioner, the prosecutor knew or should have known that the testimony in question was false.

17   **A.    MAURICE STEVENSON**

18   Petitioner alleges that Maurice repeatedly testified falsely at petitioner's trial.

19   Specifically, on direct examination, Maurice denied engaging in any forgery activities, and

20   denied knowing of any disputes between petitioner and the Stevenson family (RT 42-85). He

21   also stated that he had never had a confrontation with petitioner (RT 63). Maurice was

22   questioned repeatedly about the forgery ring on cross-examination, and admitted that he had

23   been arrested (RT 125-26). On re-direct, Maurice denied that he had had a business transaction

24   with petitioner (RT 134-35). Maurice did, however, admit that petitioner had threatened to kill

25   his family, but he still denied that he had had a confrontation with petitioner (RT 130).

26   During his closing statement, the prosecutor stated that he was unaware of the breadth of

27   the forgery ring, or that it involved Maurice, until Maurice was cross-examined (RT 973). He

28   also acknowledged that Maurice had likely lied on the stand when he denied all knowledge of

14

the forgery ring (RT 917).

Here, since the prosecutor stated before the jury that Maurice likely lied, the Court will assume both that Maurice lied under oath and that the prosecutor was aware of it. *See Hayes*, 399 F.3d at 984 (finding that petitioner must demonstrate both that the evidence in question was false and that the prosecutor knew or should have known of its falsity). Therefore, the only remaining question for this Court to consider is whether Maurice's false testimony was material. *Ibid.* Specifically, the Court must determine whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury; if so, then the conviction must be set aside." *Ibid.* (internal quotations and citation omitted). Under this standard, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Ibid.* (internal quotations and citation omitted). If a court determines that a *Napue* error is material, there is no need to conduct a separate harmless error analysis. *Id*. at 985.

Having reviewed the record, the Court finds that Maurice's false statements were not material. In other words, even given Maurice's false testimony, petitioner received a fair trial. *See id.* at 984. Maurice was impeached by petitioner's trial attorney, and the prosecutor acknowledged that Maurice had likely lied. Thus, the jury was aware that Maurice's testimony was probably false, and was able to evaluate his credibility accordingly. *See, e.g., United States v. Gudino*, 432 F.2d 433, 434 (9th Cir. 1970) (finding that matters of credibility are within the purview of the jury).

**B.    JIMMY STEVENSON**

Petitioner also argues that the prosecutor presented the false testimony of Jimmy Stevenson (Jimmy Sr.). Specifically, petitioner maintains that Jimmy Sr. lied when he denied that petitioner had told him that Jimmy Sr.'s son (James Jr.) owed petitioner money. Petitioner also alleges that Jimmy Sr. testified falsely when he denied that petitioner had called him and said that he had not meant to shoot or kill Lonnie, but that Lonnie grabbed for the gun.

15

1

2          To begin with, petitioner has not clearly demonstrated either that Jimmy Sr. lied or that

3   the prosecutor knew or should have known that he was lying.  For example, petitioner points to

4   no evidence demonstrating that Jimmy Sr. was aware that James Jr. owed money to petitioner.

5   In addition, there is no evidence confirming the content of any particular phone call between

6   petitioner and Jimmy Sr.  Without demonstrating that the evidence in question was false and

7   that the prosecution knew or should have known it was false, petitioner cannot establish a

8   *Napue* violation.  *Hayes*, 399 F.3d at 984.  This portion of petitioner's claim must be denied.

9          C.   CALVIN MILLER, EVELYN BOSTIC AND MELVIN HINES

10         Petitioner makes similar allegations against Miller, Bostic and Hines, arguing generally

11  that they "testified falsely, misleadingly, and lied about, inter alia, [their] knowledge of and the

12  extent of [their] own involvement in the mortuary homicide, various matters pertaining to Gates,

13  and about the circumstances under which [they] testified against Gates, their motives and

14  understandings of the benefits either would receive therefrom" (Pet. Opening Merits Brief  21-

15  22).  Petitioner also alleges that either the prosecutor and/or members of the prosecution team

16  knew that their testimony was false and failed to correct it.

17         Petitioner's claims as to Miller, Bostic and Hines are speculative and must be denied.

18  To begin with, petitioner does not point to exactly what portions of their testimony are false and

19  why.  Accordingly, he is unable to establish the threshold requirement under *Napue* that the

20  evidence in question was false.  *See Hayes*, 399 F.3d at 984; *United States v. Aichele*, 941 F.2d

21  761, 766 (9th Cir. 1991) (finding that "mere speculation" that testimony was false is insufficient

22  to establish a *Napue* claim).  Even if petitioner had shown that their testimony was false, he does

23  not specifically demonstrate how the prosecutor or the prosecution team knew or should have

24  known of the alleged falsity.  Contradictions in testimony do not constitute perjury, nor do they

25  create an inference that a prosecutor knowingly presented false testimony.  *Tapia v. Tansy*, 926

26  F.2d 1554, 1563 (9th Cir. 1991); *see also United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th

27  Cir. 1995 (stating that "[l]awyers in criminal cases, for prosecution and defense, sometimes

28  swim in a sea of lies, and must necessarily trust the jury to determine what is true, or whether

16

1   reasonable doubt remains about what is true.")   Here, petitioner has failed to demonstrate either

2   falsity or knowledge.

3           As he did in Claim 8C, petitioner points to the Los Angeles Grand Jury Report, and

4   suggests that it confirms that Bostic and Miller testified falsely.  As the Court concluded *supra*,

5   however, the Report (which was issued nine years after petitioner's trial) is not evidence that

6   Miller and Bostic were involved in the Los Angeles informant scandal, nor that they were

7   secretly compensated or encouraged to give fabricated testimony.  Petitioner also maintains that

8   the matters at issue in the Los Angeles Grand Jury Report were not disclosed to him, and that

9   they could have been used to impeach Miller's testimony.  As petitioner acknowledges,

10  however, his trial took place nine years prior to the 1990 issuance of the report.  Petitioner cites

11  to no evidence that the Alameda County District Attorney's office had general knowledge of

12  these matters at any time prior to petitioner's trial.  Furthermore, the jury knew that Miller had

13  pled guilty to second degree murder in the Los Angeles mortuary murder in exchange for his

14  testimony; petitioner's counsel chose not to cross-examine either Miller or Bostic at petitioner's

15  trial.

16          Finally, even if petitioner had demonstrated that the testimony was false, and that the

17  prosecutor was aware of the falsity, petitioner cannot show that the evidence was material.  He

18  makes no specific showing as to the materiality of testimony of either Miller, Bostic or Hines.

19  The evidence against petitioner – both the testimony by percipient witnesses and the forensic

20  evidence – was overwhelming.  Petitioner himself did not deny committing the killing.[6]  To the

21  extent the evidence regarding the forgery ring was relevant, it was not necessarily exculpatory

22  but instead likely to be interpreted by the jury as giving petitioner a motive to kill.  As such,

23  there was no "reasonable likelihood that the false testimony could have affected the judgment of

24

25           [6] Petitioner argues generally that any false, uncorrected testimony led the defense to call petitioner as a
26  witness, even though his defense team believed he was mentally ill (Carter Decl. ¶¶ 4-5; Iversen Decl. ¶¶ 18-24).
    According to petitioner, had the prosecution witnesses testified truthfully about the Stevenson forgery ring, he
27  would not have needed to testify. Petitioner's testimony, however, was the only way he could have attempted to
    establish that the homicide was, as he alleged, the result of a struggle when Lonnie allegedly grabbed at the gun
28  or a claim-of-right based on the proceeds he was allegedly owed by the Stevensons.  Petitioner's argument is
    unconvincing.

                                                    17

the jury." *Agurs*, 427 U.S. at 103.  This claim must be denied.

## CONCLUSION

For the foregoing reasons, Claims 8A, 8B, 8C and 9 are **DENIED** on the merits.  Claim 8D is **DEFERRED.**

Within 28 calendar days of the date of this Order, the parties are **ORDERED** to meet and confer and submit a joint statement addressing whether there are other claims in the petition that may be potentially resolved on the merits without input from petitioner.  If there are, the parties should submit a proposed briefing schedule regarding those claims.  If there are not, the parties should submit a proposal for moving forward with litigation of this matter, including a proposal for any motion for an evidentiary hearing.

**IT IS SO ORDERED.**

Dated:   Apr. 21  , 2016.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

18