UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSCAR GATES,<br><br>    Petitioner,<br><br>  v.<br><br>RON DAVIS, Warden, San Quentin State Prison<br><br>    Respondent. | No. C 88-2779 WHA<br><br>DEATH PENALTY CASE<br><br>**ORDER DENYING CLAIMS 6A, 6B, AND 7** |

## INTRODUCTION

A jury convicted petitioner, Oscar Gates, in 1981 of, *inter alia*, murder (Cal. Penal Code 187(a)), accompanied by the robbery-murder special circumstance (Section 190.2 (a)(17)(A)), two counts of robbery (Section 211), assault with a deadly weapon (Section 245(a)), possession of a firearm by an ex-felon (Section 12021), and escape (Section 4532(b)). He seeks a writ of habeas corpus under Section 2254, and the parties have now briefed three of the many claims in the petition. Petitioner requests that if relief is not granted, a ruling on the claims be deferred until he can file his motion for evidentiary hearing, which would include a request for hearing on these claims. He also argues that these claims are inextricably interwoven with Claims 8D, 12, and 13, which either have not been briefed or have been deferred pending submission of a motion for evidentiary hearing, and that such interconnection warrants a delayed ruling. Because these claims can be decided on the record before the state court, Claims 6A, 6B and 7 are **DENIED** for the following reasons.

//

**STATEMENT**

On December 10, 1979, Maurice Stevenson and his uncle, Lonnie Stevenson, waxed his car in front of Maurice's grandfather's house in Oakland at about 3:30 p.m. Petitioner appeared, holding a gun with the hammer cocked. Petitioner herded Maurice and Lonnie to the side of the house and ordered them to put their hands on the wall, empty their pockets, and remove their jewelry. After Maurice and Lonnie complied, petitioner frisked them, then asked Maurice as to the whereabouts of Maurice's father, James Stevenson. Maurice replied that he did not know. Petitioner replied that he planned to kill them. Petitioner first shot Lonnie, who yelled for his father and started running toward the back of the house, then shot Maurice, picked up the money with some of the jewelry, and fled. Lonnie died but Maurice survived. Some time after the shooting, petitioner called Jimmy Stevenson, Maurice's grandfather, to say that he had killed Lonnie and shot Maurice, that he intended to go to Los Angeles to kill members of another family, and that when he returned he would finish killing off the Stevenson family. On December 29, 1979, police arrested petitioner in Vallejo with the gun used to kill Lonnie. *See People v. Gates*, 43 Cal.3d 1168, 1176-78 (1987).

On January 4, 1980, a grand jury indicted petitioner in Alameda County. The indictment charged petitioner with murder (Cal. Penal Code § 187(a)), accompanied by the robbery-murder special circumstance (§ 190.2 (a)(17)(A)), two counts of robbery (§ 211), assault with a deadly weapon (§ 245(a)), possession of a firearm by an ex-felon (§ 12021), and escape (§ 4532(b)), among other things. Petitioner pled not guilty. The trial began on March 16, 1981. At trial, petitioner asserted a claim-of-right defense. He testified about a so-called "Stevenson family forgery ring," purportedly headed by James Stevenson and Donald "Duck" Taylor, and of which, Lonnie and Maurice Stevenson, Melvin Hines and petitioner were all members. A dispute arose when petitioner did not receive his "big cut" of $25,000 allegedly promised to him.

Trial testimony also revealed that, in September 1979, a heated argument between petitioner and other members of the forgery ring led to Maurice and James Stevenson shooting petitioner, resulting in a gunshot wound to petitioner's leg. Thereafter, petitioner learned through intermediaries that he would have to give up his claim to the money or he would be shot again.

Petitioner told a different story to the jury.

Petitioner testified that he made arrangements by phone with Lonnie to pick up the money owed to him at Jimmy's house on December 10, 1979, at about 3:00 p.m. According to petitioner, he arrived at Jimmy's house, where he saw Maurice and Lonnie outside waxing a car. Petitioner testified that he told Maurice and Lonnie that he wanted his money, that he didn't want any trouble, and that he had a gun and could take care of himself. As the three men made their way around the side of the house, petitioner became suspicious by some of Maurice and Lonnie's actions, so he patted them down for weapons. After finding none, the three men continued toward the back of the house where petitioner saw Jimmy holding a gun. Gunfire erupted. Lonnie and Maurice were shot. Petitioner fled.

On May 6, 1981, the jury convicted petitioner of all charges and found the special circumstance allegation to be true.

At the penalty phase, the prosecution presented, as evidence in aggravation, evidence of petitioner's convictions for robbery and for two assaults in connection with a 1978 robbery of a McDonald's restaurant, a 1973 conviction for rape, and a 1973 conviction for kidnapping. The prosecution also presented evidence of petitioner's involvement in a 1978 assault and robbery of two women at a Los Angeles mortuary, which had resulted in the death of one of the women. A jury later convicted petitioner of the Los Angeles mortuary crimes in a separate trial.

The case in mitigation consisted of testimony by several of petitioner's family members, several apartment neighbors, and a clinical psychologist. Petitioner's family members described the racially segregated environment in which petitioner grew up in Belzoni, Mississippi. They testified that petitioner never got into in any trouble until an incident at a Western Auto Store when he was approximately 14 to 16 years old; the incident, which apparently involved petitioner, an African-American, striking a white woman who had struck him first, resulted in petitioner spending six months in jail and becoming a target of police harassment and suspicion for any problem that arose thereafter. Petitioner's mother also testified that she visited petitioner in California in 1973 at a jail hospital after he had been beaten by the police. Petitioner's neighbors described petitioner as a friendly, sweet, considerate, good-hearted, good-natured person who

3

never got angry and got along well with people. Dr. Paul Berg, a clinical psychologist, testified that petitioner was "an unusually well-adjusted prisoner" and most likely would not present a problem in prison. *See Gates*, 43 Ca1.3d at 1193-97. On May 28, 1981, the jury returned with a verdict of death for petitioner.

* * *

The California Supreme Court affirmed petitioner's conviction and sentence on direct appeal on October 15, 1987. *Gates*, 43 Ca1.3d at 1168. On May 23, 1988, the United States Supreme Court denied a petition for certiorari. *Gates v. California*, 486 U.S. 1027 (1988).

Subsequent state and federal habeas proceedings ensued, with a primary focus on, *inter alia*, petitioner's competency. This Court decided to move forward with the case despite Petitioner's mental problems, but the Court of Appeals directed the Court to stay the matter. A 2004 order, therefore, stayed this matter, as required by *Rohan ex. rel. Gates v. Woodford* ("*Gates II*"), 334 F.3d 803 (9th Cir. 2003). At that time, all counsel agreed that petitioner was incompetent to assist counsel.

Nine years passed.

On January 8, 2013, the Supreme Court decided *Ryan v. Gonzales*, __ U.S. __, 133 S.Ct. 696, 706-709 (2013), abrogating *Gates II* and holding that an incompetent capital prisoner has no right to an indefinite stay of habeas proceedings. *Ryan* held that while the district court retains the discretion to grant a temporary stay, it should not enter an indefinite stay if the petitioner reasonably cannot be expected to regain competence in the foreseeable future. *Ibid.*

Pursuant to *Ryan*, this Court lifted the stay. The parties engaged in settlement proceedings with Magistrate Judge Beeler without success. In addition, the Court ordered proceedings on the merits of petitioner's federal habeas proceedings to re-commence, and subsequently addressed numerous claims on the merits (Dkt. No. 715). Recognizing that petitioner's competency still presented an issue, the Court appointed independent expert Dr. Jessica Ferranti to examine petitioner (Dkt. No. 740). Dr. Ferranti concluded that, as the result of mental disorder, petitioner is incompetent, *i.e.*, that he does not have the capacity to make rational choices with respect to his

4

1  Court proceedings or to communicate rationally with his attorneys (Ferranti Report at 16-18).

2  Both sides agreed that petitioner lacks competency to assist counsel. Under *Ryan*, however,

3  incompetency no longer constitutes grounds to stay the matter indefinitely. Petitioner

4  subsequently filed a motion to stay pending compulsory restoration proceedings; the Court denied

5  petitioner's motion and ordered consideration of petitioner's claims on the merits to continue (Dkt.

6  No. 775). Several claims have since been denied or deferred pending the filing of a motion for an

7  evidentiary hearing (Dkt. Nos. 777, 794).

## ANALYSIS

Because petitioner filed his initial federal habeas petition before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, pre-AEDPA standards apply to all of petitioner's claims, even those added by amendment after AEDPA's effective date. *See Thomas v. Chappell*, 678 F.3d 1086, 1100-01 (9th Cir. 2012). Under those standards, we must "presume that the state court's findings of historical fact are correct and defer to those findings in the absence of convincing evidence to the contrary or a demonstrated lack of fair support in the record." *Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001) (internal quotation marks omitted) (citing 28 U.S.C. 2254(d) (1994)). State court determinations with respect to mixed questions of law and fact are reviewed *de novo*. *Ibid.* Pure questions of law are reviewed *de novo*. *Ibid.* Ultimately, petitioner holds the burden to prove a constitutional error by a preponderance of the evidence. *McKenzie v. McCormick*, 27 F.3d 1415, 1418-19 (9th Cir. 1994) (*abrogation on other grounds recognized by Sivak v. Hardison*, 658 F.3d 898, 922 (9th Cir. 2011).

**1.    REQUEST FOR DEFERRED RULING**

In his briefing, petitioner requests relief on Claims 6A, 6B, and 7, or a postponement on these claims for further factual development. And, counsel says these claims are interwoven with claims for prosecutorial misconduct and ineffective assistance of counsel (Br. on Merits at 1-3). Where issues can be resolved by reference to the state court record, an evidentiary hearing is not required. *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998). Claims 6A, 6B, and 7 are straightforward evidentiary and jury instruction claims. They can be resolved based on the state court record.

Additionally, the claims are not so interwoven with the prosecutorial misconduct and ineffective assistance of counsel claims that a decision on them must be delayed pending a decision on claims 8D, 12, and 13.

**2.    CLAIM 6A**

Claim 6A argues that the trial court's exclusion of crucial defense testimony in the guilt phase violated his rights to testify, to receive a fair trial, to present a defense, to a jury trial, to due process, and to heightened capital case due process in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Specifically, petitioner challenges the trial court's refusal to allow him or defense witness Joseph Lombard, a neighbor of petitioner, to testify that petitioner believed that the Stevensons owed him money, that the Stevensons acknowledged this fact in front of both petitioner and Mr. Lombard, and that the Stevensons put out a contract on petitioner's life and intended to set up petitioner on false criminal charges. This evidence, Claim 6A concludes, would have supported both of his defenses: self-defense and claim-of-right.

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration in original) (internal quotation marks omitted). "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 325-26; *see Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding that the exclusion of evidence does not violate due process unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental"). A petitioner, not the state, bears the burden to demonstrate that the principle violated by the evidentiary rule "is so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Egelhoff*, 518 U.S. at 47 (internal quotation marks omitted).

//

//

### A. Claim-of-Right Defense

Petitioner predicates his subclaim on his belief that California law entitled him to present a claim-of-right defense to the robbery charge under *People v. Butler*, 65 Cal.2d 569, 573 (1967) ("bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent"). On appeal, the California Supreme Court held that petitioner did not fall within the ambit of *Butler* because petitioner's belief that the victims owed him money stemmed from their mutual participation in a forgery ring and, "[a]s a matter of law, one cannot have a good faith belief that he has a right to property when that 'right' is rooted in a notoriously illegal transaction." *Gates*, 43 Cal.3d at 1182. That determination binds this Court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court on habeas review). Petitioner provides no authority to show that he would be entitled to present a claim-of-right defense or that the exclusion of this evidence violated his constitutional rights. Additionally, petitioner cannot have been prejudiced by the exclusion of any evidence supporting a claim-of-right defense because state law did not entitle petitioner to present such a defense. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Thus, this portion of Claim 6A is **DENIED**.

### B. Self-Defense

Petitioner also asserts that the excluded evidence comprised an essential component of proving self-defense or imperfect self-defense. Specifically, petitioner challenges (1) the exclusion of Mr. Lombard's testimony regarding an argument he overheard between petitioner and members of the forgery ring that occurred four to five days prior to the September argument wherein the Stevensons shot petitioner; (2) Mr. Lombard's testimony that, following the overheard argument, petitioner stated he believed the Stevensons owed him money and they intended to cheat him of his portion; and (3) petitioner's own testimony that before he went to see the Stevensons about the money he believed they owed, friends in Vallejo told petitioner that the Stevensons had taken a contract out on his life. Petitioner argues that this testimony would have shown that he acted in self-defense when shooting Lonnie and Maurice.

Before the jury, however, Lombard did testify that he overheard an argument between

1    petitioner and members of the forgery ring less than one week prior to the argument that resulted
2    in petitioner's shooting (RT 515-16).  The trial court merely precluded as hearsay Lombard's
3    testimony as to the substance of what he overheard and what petitioner said to him following the
4    confrontation (RT 515-16).

5          Petitioner's trial counsel later argued to the court that the evidence regarding what Mr.
6    Lombard overheard and petitioner's statement to Lombard that he felt the Stevensons were
7    cheating him went to petitioner's state of mind for self-defense (RT 525-26).   The trial court
8    excluded the evidence as hearsay (RT 525-26), and held that the financial transaction did not show
9    the requisite state of mind for self-defense (RT 527).  Neither counsel nor the court mentioned
10   imperfect self-defense.  The trial court excluded petitioner's testimony that friends of his had told
11   him that the Stevensons had taken out a contract on petitioner's life.  The trial court found the
12   testimony speculative and hearsay twice removed (RT 676).

13         In deciding on habeas if the exclusion of evidence violates the due process right to a fair
14   trial or the right to present a defense, courts balance the following five factors are balanced: (1) the
15   probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is
16   capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely
17   cumulative; and (5) whether it constitutes a major part of the attempted defense.  *Chia v. Cambra*,
18   360 F.3d 997, 1004 (9th Cir. 2004) (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)).
19   Due weight also must be given to the state interests underlying the state evidentiary rules on that
20   formed the basis for the exclusion.  *See Chia*, 360 F.3d at 1006.

21         As noted by respondent, petitioner presented other, more credible evidence regarding
22   petitioner's belief that the Stevensons owed him money and regarding the violent nature of the
23   relationship between them.  Rico Maximo, a janitor who worked in petitioner's apartment
24   building, testified to an argument he observed the September argument between petitioner and
25   some men, including Lonnie and Maurice, whom petitioner believed owed him money, but who
26   refused to pay (RT 473-75).

27         Mr. Lombard testified before the jury that a maintenance man alerted him to the altercation
28   (RT 515).  Mr. Lombard went a balcony overlooking the street and saw the Stevensons and their

1  associate Melvin Hines, whom Mr. Lombard knew and identified, standing in one place while
2  petitioner fled (RT 517). Both Mr. Maximo and Mr. Lombard stated that the altercation ended
3  with the men shooting petitioner (RT 478, 517). Mr. Lombard stated that he saw the wound on
4  petitioner's leg from where he had been shot and Mr. Maximo testified that petitioner later said to
5  him, "I got hit" (RT 523, 480). The doctor who treated petitioner for the gunshot wound also
6  testified (RT 450-471). Melvin Hines testified that the Stevensons shot petitioner at the end of the
7  altercation (RT 777). Furthermore, petitioner himself testified at length regarding the forgery ring
8  and his claim to proceeds the Stevensons refused to pay (RT 565-591), and to the September
9  altercation wherein the Stevensons shot him (RT 592-599).

This testimony constitutes far more credible and reliable evidence showing the danger the Stevensons posed to petitioner than the hearsay statements petitioner sought to introduce, which lacked sufficient indicia of reliability. "The court must give due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable or prejudicial evidence." *Stagner*, 757 F.2d at 995, citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983).

Moreover, as noted by the trial court, it is not clear how hearsay statements regarding the money petitioner believed the Stevensons owed him supported a defense of self-defense. These statements would support a claim-of-right defense if California law entitled petitioner to such; however, as discussed above, the California Supreme Court held that petitioner could not assert a claim-of-right defense because he and the Stevensons obtained the money he sought to recover through an illegal enterprise. Regardless, neither the claim-of-right defense nor self-defense permits petitioner to show up armed to collect the funds he believed the Stevensons owed him. Rather, the claim-of-right defense would negate the felonious intent in taking property from the Stevensons if the law supported such a defense in these circumstances and self-defense would lessen petitioner's degree of culpability in shooting Lonnie and Maurice Stevenson.

Under California law,

> [a] homicide is justifiable '2. When committed in defense of * * * person, against one who manifestly intends or endeavors, by

9

> violence or surprise, to commit a felony * * * or, 3. When committed in the lawful defense of such person * * * when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed.' Pen.Code, § 197. 'A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of the preceding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.' Pen.Code, § 198.

*People v. McAuliffe*, 154 Cal.App.2d 332, 339-340 (Cal. App. Div. 2 1957). A homicide, however, is not justifiable when the person who committed it arrives on the scene armed. *Id.* at 340, quoting *People v. Holt*, 25 Cal.2d 59, 66 (1944) ("If the defendant in any way challenged the fight, and went to it armed, he cannot afterward maintain that in taking his assailant's life he acted in self defense.")

Thus, the hearsay statements petitioner sought to introduce not only lacked sufficient indicia of reliability, they also lacked significant probative value on the asserted defense of self-defense. Additionally, as noted, other evidence supported petitioner's assertions that the Stevensons posed a significant danger to him and intended him harm. As such, only one of the *Chia* factors --- whether the evidence is capable of evaluation by the trier of fact --- weighs in petitioner's favor. Accordingly, this portion of Claim 6A also is **DENIED**.

**2.    CLAIM 6B**

Claim 6B challenges the trial court's refusal to issue two of his proposed instructions to the jury. Petitioner argues that the court's failure to issue these two instructions violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. However, state law did not entitle him to the issuance of either instruction.

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings; the error must so infect the trial that it deprived the defendant of the fair trial guaranteed by the Fourteenth Amendment. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).

10

### A. Claim-of-Right Defense

As discussed in Claim 6A, above, petitioner asserts that California law entitled him to present a claim-of-right defense. Thus, he argues that had he been able to submit his proposed claim-of-right defense instruction to the jury, it would have countered the prosecution's charge that petitioner intended to rob the victims as part of the crime.

Petitioner acknowledges that the California Supreme Court denied the claim because it found petitioner had no legal right to assert the defense and argues that this determination "ignored and silently contradicted" *People v. Alvarado*, 133 Cal.App.3d 1003 (1982), along with other, unnamed California law. As stated above, the California Supreme Court's determination of state law binds this Court, even when the state court announces that determination on direct appeal, as it did here. *See Bradshaw*, 546 U.S. at 76. That the decision did not reference a different outcome in a lower state court does not invalidate it. Accordingly, this portion of Claim 6B is **DENIED**.

### B. Self-Defense

In this subclaim, petitioner challenges the trial court's refusal to issue an instruction based on *People v. Bush*, 84 Cal.App.3d 294 (1978), that would allow the jury could to find that if petitioner had received threats against his life or had been injured by another, that he would be justified in "acting more quickly and taking harsher measures for his own protection in the event of assault, either actual or threatened, than would be a person who had not received such threats or suffered such injury" (CT 399).

The trial court denied petitioner's requested instruction because petitioner testified at trial that Lonnie's grandfather, Jimmy, and not Lonnie or Maurice, who had been the ones involved in the September altercation, threatened petitioner at the Stevensons' house on December 10 (RT 810, 816). According to petitioner, Jimmy pointed a gun at petitioner and petitioner fired his own weapon in defense, but accidentally hit Lonnie (RT 816-17). Thus, the trial court reasoned that the threat to petitioner came from a third party and not those who had threatened him previously.

Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Therefore, a criminal defendant deserves

11

1    adequate instructions on the defense theory of the case.  *See Conde v. Henry*, 198 F.3d 734, 739

2    (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnaping where

3    evidence supported such an instruction).

4          Whether a constitutional violation has occurred will depend upon the evidence in the case

5    and the overall instructions given to the jury.  *See Duckett*, 67 F.3d at 745.  An examination of the

6    record shows precisely the instructions given and refused and whether the given instructions

7    adequately embodied the defendant's theory.  *See United States v. Tsinnijinnie*, 601 F.2d 1035,

8    1040 (9th Cir. 1979), *cert. denied*, 445 U.S. 966 (1980).

9          The omission of a proposed instruction carries less prejudice than a misstatement of the

10   law.  *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155).

11   Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an

12   "'especially heavy burden.'"  *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting

13   *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).  The significance of the omission of such an

14   instruction may be evaluated by comparison with the instructions that were given.  *Murtishaw v.*

15   *Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156); *see id.* at 972

16   (due process violation found in capital case where petitioner demonstrated that application of the

17   wrong statute at his sentencing infected the proceeding with the jury's potential confusion

18   regarding its discretion to impose a life or death sentence).

19         Petitioner testified that shortly after arriving at the Stevensons, he showed Lonnie and

20   Maurice his gun to let them know he could "take of [him]self" (RT 619).  He then patted both

21   Lonnie and Maurice down and confirmed neither possessed any weapons and walked with them

22   into their backyard (RT 620-22).  While walking toward the backyard and still on the side of the

23   house, petitioner testified that Jimmy Stevenson came at them with a gun (RT 622-23).  Petitioner

24   stated that he dropped down, pushed Maurice toward the house, and began shooting at the "old

25   man," which was how petitioner referred to the eldest Stevenson (RT 624).  He then said he

26   pushed Maurice against the chimney and shot him in the back because petitioner felt trapped

27   (*ibid.*).  On cross-examination, petitioner clarified that when Jimmy came down from the

28   driveway, Maurice reached for petitioner's gun, petitioner pushed him back against the house, then

12

shot him (RT 634-35).

*Bush* holds that where:

> there is evidence tending to show the making of threats of death or great bodily harm by deceased against the defendant, which are relied on as influencing or justifying defendant's act, instruction on the law of this subject is proper.

84 Cal.App.3d at 304. The defendant in *Bush* killed her abusive husband while actively beat her, after he said he would "send her to her grave." She testified that during two prior beatings, her husband "threatened to put her in her grave." *Id.* at 301, 304.

*Bush* does not permit petitioner to invite trouble by going to the Stevensons' house and bringing a gun with him to collect money to which he was not legally entitled. Petitioner's trial counsel had requested the *Bush* instruction, in part, to allow the jury to find permissible petitioner's bringing a weapon with him. The trial court said such actions did not fall within the scope of *Bush*. As noted above, there is no state law that permits this. The trial court did, however, instruct generally as to self-defense and imperfect self-defense (RT 952).

The trial court denied the requested instruction on the additional basis that petitioner testified that the threat came from Jimmy Stevenson, the grandfather, not Lonnie or Maurice who had been involved in the violent altercation three months prior. Petitioner's trial counsel then argued that petitioner became concerned about a possible ambush or surprise attack when he entered the Stevensons' driveway because Lonnie and Maurice headed to the backyard instead of through the front door. According to the defense theory, *Bush* entitled petitioner to react quickly to feeling ambushed because of the September shooting (RT 817). Petitioner's testimony, however, did not support his assertion that he fired on Lonnie and Maurice because he believed they intended to ambush him. Petitioner said that he showed his weapon to Lonnie and Maurice, patted them down to confirm they were unarmed, followed them toward the back yard, and then Jimmy came toward him with a gun drawn. Only then did petitioner fire. The trial court concluded correctly that petitioner did not fall within the ambit of *Bush*.

Petitioner could not have been prejudiced by the trial court's failure to issue an instruction on an element of a defense to which California law did not entitle him. *Brecht*, 507 U.S. at 638.

13

1   Accordingly, the trial court's failure to include petitioner's requested instruction did not violate his
2   due process rights and this subclaim is **DENIED**.

**3.   CLAIM 7**

Claim 7 challenges the prosecution's introduction of Melvin Hines as a rebuttal witness violated petitioner's rights to a fair trial, due process, and heightened capital due process in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Petitioner argues that the prosecution theorized in the case-in-chief that petitioner, a casual acquaintance of the Stevensons, intended to rob the family, and shot Maurice and Lonnie in the course of the robbery. He states that the prosecution said that they did not know the importance and scope of the forgery ring activities until petitioner testified in detail about it, which led to their decision to call Melvin Hines as a rebuttal witness and thereby change the theory of its case. Petitioner also notes in his opening brief that the prosecutor acknowledged in his closing that he did know about the forgery ring before petitioner's testimony.

Mr. Hines testified that petitioner believed the Stevensons owed him a larger cut of the proceeds than what the parties had already agreed upon and that petitioner had threatened the members of the forgery ring for refusing to pay him. Petitioner argues that Mr. Hines's testimony held no rebuttal value and the prosecution only offered it to paint petitioner as a "bad person" who would kill over money.

Petitioner relies on *People v. Carter*, 48 Cal.2d 737 (1957), to support his argument. In *Carter*, the California Supreme Court found that the prosecution in that case had entered a red cap into evidence on rebuttal improperly because the item constituted "crucial" evidence showing that the defendant had been present at the location where the robbery and attack for which he stood trial had occurred. *Id.* at 754. The prosecution in *Carter* offered no reason for withholding the evidence until rebuttal. The court held that Section 1094(3) of the Penal Code required that evidence relevant to a material part of the case and tending to establish a defendant's guilt must be presented in the prosecution's case-in-chief, barring good reason. *Id.* at 753.

Here, the prosecution asserted that it had not known about the forgery ring until defense counsel's cross-examination of Maurice Stevenson. *Gates*, 43 Cal.3d at 1184. The trial court

accepted this explanation as to why the prosecution could not have presented Mr. Hines's testimony in its case-in-chief and allowed it.

During his closing, the prosecutor did tell the jury that he could not have introduced Mr. Hines in the case-in-chief because the law did not permit him to reveal petitioner's criminal actions unless petitioner himself opened the door to such testimony. Because petitioner opened the door by discussing the forgery ring in great detail, the prosecution could then impeach petitioner's testimony about how much money the Stevenson's owed him and the fact petitioner had made threats against the Stevensons (RT 915-16).

The admission of evidence comes under federal habeas review only when it violates a specific constitutional guarantee or the error is of such magnitude that the result denies the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), cert. denied, 479 U.S. 839 (1986). The due process inquiry in federal habeas review is whether the trial court admitted evidence so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

Petitioner has not shown that the trial court's admission of Mr. Hines's testimony violated his due process rights. The jury could draw a proper inference from the testimony, specifically rebuttal to petitioner's own statements regarding money he believed he had been owed and the nature of the relationship between petitioner and the Stevensons. Thus, this claim also is **DENIED**.

//
//
//
//
//
//

**CONCLUSION**

For the foregoing reasons, claims 6A, 6B, and 7 are **DENIED**. Within 21 calendar days of the date of this Order, the parties are **ORDERED** to meet and confer and submit a joint statement addressing whether there are other claims in the petition that may be potentially resolved on the merits without input from petitioner. If there are, the parties should submit a proposed briefing schedule for those claims. If there are not, the parties should submit a proposal for moving forward with the litigation of this matter.

**IT IS SO ORDERED.**

**Dated:** March 27, 2017

_____
WILLIAM ALSUP
United States District Judge