1
2
3
4
5
6  IN THE UNITED STATES DISTRICT COURT

7  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10  OSCAR GATES,

No. C 88-02779 WHA

11         Petitioner,

DEATH PENALTY CASE

12    v.

13  RON DAVIS, Warden, San Quentin
State Prison,

**ORDER DENYING
CLAIMS 12, 16A, 21, AND 22**

14         Respondent.

15  _____/

16

17                    **INTRODUCTION**

18         A jury convicted petitioner, Oscar Gates, in 1981 of, *inter alia*, murder (Cal. Penal Code

19  187(a)), accompanied by the robbery-murder special circumstance (Section 190.2 (a)(17)(A)),

20  two counts of robbery (Section 211), assault with a deadly weapon (Section 245(a)), possession

21  of a firearm by an ex-felon (Section 12021), and escape (Section 4532(b)).  He seeks a writ of

22  habeas corpus under Section 2254, and the parties have now briefed four of the many claims in

23  the petition.  Petitioner requests that if relief is not granted, a ruling on the claims be deferred

24  until he can file his motion for evidentiary hearing, which would include a request for hearing on

25  these claims.  He also argues that the claims are inextricably interwoven with claims 8D and 13,

26  which either have not been briefed or have been deferred pending submission of a motion for

27  evidentiary hearing, and that such interconnection warrants a delayed ruling.  Because these

28  claims, with the exception of one subclaim of claim 12, can be decided on the record before the

state court, Claims 12, 16A, 21, and 22 are **DENIED** for the following reasons.

**STATEMENT**

On December 10, 1979, Maurice Stevenson and his uncle, Lonnie Stevenson, waxed his car in front of Maurice's grandfather's house in Oakland at about 3:30 p.m. Petitioner appeared, holding a gun with the hammer cocked. Petitioner herded Maurice and Lonnie to the side of the house and ordered them to put their hands on the wall, empty their pockets, and remove their jewelry. After Maurice and Lonnie complied, petitioner frisked them, then asked Maurice as to the whereabouts of Maurice's father, James Stevenson. Maurice replied that he did not know. Petitioner answered that he planned to kill them. Petitioner first shot Lonnie, who yelled for his father and started running toward the back of the house, then shot Maurice, picked up the money with some of the jewelry, and fled. Lonnie died but Maurice survived. Some time after the shooting, petitioner called Jimmy Stevenson, Maurice's grandfather, to say that he had killed Lonnie and shot Maurice, that he intended to go to Los Angeles to kill members of another family, and that when he returned he would finish killing off the Stevenson family. On December 29, 1979, police arrested petitioner in Vallejo with the gun used to kill Lonnie. *See People v. Gates*, 43 Cal.3d 1168, 1176-78 (1987).

On January 4, 1980, a grand jury indicted petitioner in Alameda County. The indictment charged petitioner with murder (Cal. Penal Code § 187(a)), accompanied by the robbery-murder special circumstance (§ 190.2 (a)(17)(A)), two counts of robbery (§ 211), assault with a deadly weapon (§ 245(a)), possession of a firearm by an ex-felon (§ 12021), and escape (§ 4532(b)), among other things. Petitioner pled not guilty. The trial began on March 16, 1981. At trial, petitioner asserted a claim-of-right defense. He testified about a so-called "Stevenson family forgery ring," purportedly headed by James Stevenson and Donald "Duck" Taylor, and of which, Lonnie and Maurice Stevenson, Melvin Hines and petitioner were all members. A dispute arose when petitioner did not receive his "big cut" of $25,000 allegedly promised to him.

Trial testimony also revealed that, in September 1979, a heated argument between petitioner and other members of the forgery ring led to Maurice and James Stevenson shooting petitioner, resulting in a gunshot wound to petitioner's leg. Thereafter, petitioner learned

through intermediaries that he would have to give up his claim to the money or he would be shot again.

Petitioner told a different story to the jury.

Petitioner testified that he made arrangements by phone with Lonnie to pick up the money owed to him at Jimmy's house on December 10, 1979, at about 3:00 p.m. According to petitioner, he arrived at Jimmy's house, where he saw Maurice and Lonnie outside waxing a car. Petitioner testified that he told Maurice and Lonnie that he wanted his money, that he didn't want any trouble, and that he had a gun and could take care of himself. As the three men made their way around the side of the house, petitioner became suspicious by some of Maurice and Lonnie's actions, so he patted them down for weapons. After finding none, the three men continued toward the back of the house where petitioner saw Jimmy holding a gun. Gunfire erupted. Lonnie and Maurice were shot. Petitioner fled.

On May 6, 1981, the jury convicted petitioner of all charges and found the special circumstance allegation to be true.

At the penalty phase, the prosecution presented, as evidence in aggravation, evidence of petitioner's convictions for robbery and for two assaults in connection with a 1978 robbery of a McDonald's restaurant, a 1973 conviction for rape, and a 1973 conviction for kidnapping. The prosecution also presented evidence of petitioner's involvement in a 1978 assault and robbery of two women at a Los Angeles mortuary, which had resulted in the death of one of the women. A jury later convicted petitioner of the Los Angeles mortuary crimes in a separate trial.

The case in mitigation consisted of testimony by several of petitioner's family members, several apartment neighbors, and a clinical psychologist. Petitioner's family members described the racially segregated environment in which petitioner grew up in Belzoni, Mississippi. They testified that petitioner never got into in any trouble until an incident at a Western Auto Store when he was approximately 14 to 16 years old; the incident, which apparently involved petitioner, an African-American, striking a white woman who had struck him first, resulted in petitioner spending six months in jail and becoming a target of police harassment and suspicion for any problem that arose thereafter. Petitioner's mother also testified that she visited petitioner

3

in California in 1973 at a jail hospital after he had been beaten by the police. Petitioner's neighbors described petitioner as a friendly, sweet, considerate, good-hearted, good-natured person who never got angry and got along well with people. Dr. Paul Berg, a clinical psychologist, testified that petitioner was "an unusually well-adjusted prisoner" and most likely would not present a problem in prison. *See Gates*, 43 Ca1.3d at 1193-97. On May 28, 1981, the jury returned with a verdict of death for petitioner.

*      *      *

The California Supreme Court affirmed petitioner's conviction and sentence on direct appeal on October 15, 1987. *Gates*, 43 Ca1.3d at 1168. On May 23, 1988, the United States Supreme Court denied a petition for certiorari. *Gates v. California*, 486 U.S. 1027 (1988).

Subsequent state and federal habeas proceedings ensued, with a primary focus on, *inter alia*, petitioner's competency. This Court decided to move forward with the case despite Petitioner's mental problems, but the Court of Appeals directed the Court to stay the matter. A 2004 order, therefore, stayed this matter, as required by *Rohan ex. rel. Gates v. Woodford* ("*Gates II*"), 334 F.3d 803 (9th Cir. 2003). At that time, all counsel agreed that petitioner lacked competency to assist counsel.

Nine years passed.

On January 8, 2013, the Supreme Court decided *Ryan v. Gonzales*, 568 U.S. 57, 71–77 (2013), abrogating *Gates II* and holding that an incompetent capital prisoner has no right to an indefinite stay of habeas proceedings. *Ryan* held that while the district court retains the discretion to grant a temporary stay, it should not enter an indefinite stay if the petitioner reasonably cannot be expected to regain competence in the foreseeable future. *Ibid.*

Pursuant to *Ryan*, this Court lifted the stay. The parties engaged in settlement proceedings with Magistrate Judge Beeler without success. In addition, the Court ordered proceedings on the merits of petitioner's federal habeas proceedings to re-commence, and subsequently addressed numerous claims on the merits (Dkt. No. 715). Recognizing that petitioner's competency still presented an issue, the Court appointed independent expert

4

Dr. Jessica Ferranti to examine petitioner (Dkt. No. 740). Dr. Ferranti concluded that, as the result of mental disorder, petitioner is incompetent, *i.e.*, that he does not have the capacity to make rational choices with respect to his Court proceedings or to communicate rationally with his attorneys (Ferranti Report at 16-18). Both sides agreed that petitioner lacks competency to assist counsel. Under *Ryan*, however, incompetency no longer constitutes grounds to stay the matter indefinitely. Petitioner subsequently filed a motion to stay pending compulsory restoration proceedings; the Court denied petitioner's motion and ordered consideration of petitioner's claims on the merits to continue (Dkt. No. 775). Several claims have since been denied or deferred pending the filing of a motion for an evidentiary hearing (Dkt. Nos. 777, 794).

**ANALYSIS**

Because petitioner filed his initial federal habeas petition before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, pre-AEDPA standards apply to all of petitioner's claims, even those added by amendment after AEDPA's effective date. *See Thomas v. Chappell*, 678 F.3d 1086, 1100-01 (9th Cir. 2012). Under those standards, we must "presume that the state court's findings of historical fact are correct and defer to those findings in the absence of convincing evidence to the contrary or a demonstrated lack of fair support in the record." *Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001) (internal quotation marks omitted) (citing 28 U.S.C. 2254(d) (1994)). State court determinations with respect to mixed questions of law and fact are reviewed de novo. *Ibid.* Pure questions of law are reviewed de novo. *Ibid.* Ultimately, petitioner holds the burden to prove a constitutional error by a preponderance of the evidence. *McKenzie v. McCormick*, 27 F.3d 1415, 1418-19 (9th Cir. 1994) (abrogation on other grounds recognized by *Sivak v. Hardison*, 658 F.3d 898, 922 (9th Cir. 2011).

1. **REQUEST FOR DEFERRED RULING.**

In his briefing, petitioner requests relief on Claims 12, 16A, 21 and 22, or a postponement on these claims for further factual development. And, counsel says these claims are interwoven with claims for ineffective assistance of counsel (Merits Br. at 32, n 14). Where issues can be resolved by reference to the state court record, an evidentiary hearing is not

required.  *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998).  Claims 12, 16A, 21 and 22 are straightforward claims that can be resolved on the current record.  The exception to this is the failure to disclose subclaim of claim 12, which is so interwoven with claims 8A-8D, that it would be inefficient to resolve the claim now.  Accordingly, a ruling on that subclaim is **DEFERRED**.  All others are addressed below.

### 2. CLAIM 12.

Claim 12 alleges that the prosecutor committed numerous incidences of misconduct in both the guilt and penalty phases.  These actions, petitioner argues, deprived him of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  Petitioner also argues that if any particular error does not entitle him to relief, the cumulative impact of the error should (Reply at 1).  A cumulative error claim must be presented separately.  *Wooten v. Kirkland*, 540 F.3d 1019, 1025 (9th Cir. 2008) ("Briefing a number of isolated errors that turn out to be insufficient to warrant reversal does not automatically require the court to consider whether the cumulative effect of the alleged errors prejudiced the petitioner.") The cumulative impact of any prosecutorial misconduct errors will be considered when petitioner proceeds to briefing on claim 27, his cumulative error claim.

### A. Guilt Phase.

Petitioner specifically challenges as misconduct the following actions by the prosecutor: failure to disclose impeaching or exculpatory information regarding several witnesses; injecting his personal belief into the closing argument and vouching for witnesses; eliciting perjury from five witnesses or allowing them to commit perjury and failing to correct their testimony; lying to the jury regarding his prior knowledge of the Stevenson family's criminal activities; asking improper questions regarding petitioner's other criminal activity; commenting on evidence not in the record; and shifting the burden of proof to petitioner (Merits Br. at 4–9).

#### (i) *Failure to Disclose Impeaching/Exculpatory Information.*

The facts of this subclaim are inextricably interwoven with claims 8A–8D, for which a ruling has been deferred.  Accordingly, a ruling on this claim is **DEFERRED** pending resolution of claims 8A–8D.

### (ii) *Prosecutorial vouching.*

Petitioner next challenges three separate instances that he contends amount to misconduct because the prosecutor improperly vouched for evidence and witnesses. Specifically, he cites as misconduct vouching for Maurice Stevenson's testimony by putting himself in the place of Maurice; vouching for the police officer's investigation of the December 1979 shooting; and the prosecutor's statement to the jury that he mailed a copy of Melvin Hines's testimony, which detailed the Stevenson forgery ring, to the FBI. Petitioner also argues that the statement regarding sending Hines's testimony to the FBI referenced evidence outside the record and that the prosecutor acted particularly offensively in saying this when the prosecution had promised favors for Hines and Maurice and Jimmy Stevenson in exchange for their testimony (Sec. Am. Pet. at 212[1]).

### (a) *Statement About Sending Hines's Testimony to the FBI.*

This claim challenges the prosecutor's statement in closing argument that he had sent a copy of prosecution rebuttal witness Melvin Hines's testimony to the FBI. The complete statement reads, "He said: Yeah, I'm a part of the forgery ring and have been for nine years. All of that under oath. It's transcribed. Where do you think the transcript is going to go? Do you think it's just going to be filed someplace? It's already been mailed to the FBI. It's already been filed" (8 RT 916–917).

---

[1] The Court alternates between referencing petitioner's merits brief and the Second Amended Petition for claim 12 because the two documents, at least for this claim, are nearly identical. Petitioners are given an opportunity to conduct merits briefing because the Rules Governing Section 2254 Cases in the United States District Courts do not require that every item of relevant evidence or every relevant legal authority be catalogued in the pleading. In fact, no statute or rule requires that a petition identify a legal theory or include citations to legal authority. *See, e.g., Jones v. Jerrison*, 20 F. 3d 849, 853 (8th Cir. 1994). Thus, petitioners have been allowed to file additional briefs that flesh out the merits of their claims and provide updated relevant legal authority. Merits briefing should not consist of copying and pasting the claims as presented in the petition into a new brief. Had petitioner used the merits brief for its proper purpose, he would have been able to adhere to the page limits and provide a helpful elaboration of his claims for entitlement to relief. As noted throughout this order, many of petitioner's claims under the umbrella of claim 12 are nothing more than a conclusory statement with a page citation, if that. Petitioner bears the burden of showing his entitlement to relief and merits briefing provides a final opportunity to do so.

1    Petitioner's attorney objected on the ground that it addressed evidence outside the record

2    because he, defense counsel, had not mailed the transcript yet. The prosecutor stated that he had.

3    The court said, "All right," and the prosecutor continued his argument (8 RT 917).

4    To show prosecutorial misconduct due to a prosecutor's remarks at trial, petitioner must

5    establish first, that the prosecutor's comments were improper; and if so, second, that the remarks

6    infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).

7    Regardless of whether petitioner can show that the prosecutor's remarks were improper, he is not

8    able to establish a prosecutorial misconduct claim because he cannot prove prejudice by showing

9    that the prosecutor's comments infected the trial with unfairness.

10   When the prosecutor began his argument regarding James Stevenson's notoriety as a

11   criminal, the court reminded the jury of its earlier instruction that "the opinions and the

12   statements of the attorneys is (sic) not evidence" (8 RT 913). The Supreme Court has held that

13   when a curative instruction is issued a court presumes that the jury has disregarded inadmissible

14   evidence and that no due process violation occurred. *See Greer v. Miller*, 438 U.S. 756, 766 n.8

15   (1987); *Tan*, 413 F.3d at 1115 ("we presume jurors follow the court's instructions absent

16   extraordinary circumstances"). Because petitioner has not attempted to show nor has he shown

17   prejudice, the prosecutor's comments, even if deemed to be improper, do not result in a denial of

18   petitioner's due process rights.

19   Petitioner also argues that this statement vouched for the credibility of Hines's testimony

20   and that such a statement was particularly egregious in light of the later-discovered prosecution

21   promises for Hines and Maurice and Jimmy Stevenson. As a general rule, "a prosecutor may not

22   express his opinion of the defendant's guilt or his belief in the credibility of [government]

23   witnesses." *United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985). Improper vouching

24   for the credibility of a witness occurs when the prosecutor places the prestige of the government

25   behind the witness or suggests that information not presented to the jury supports the witness's

26   testimony. *United States v. Young*, 470 U.S. 1, 7 n.3, 11-12 (1985).

27   To warrant habeas relief, prosecutorial vouching must so infect the trial with unfairness

28   as to make the resulting conviction a denial of due process. *Davis v. Woodford*, 384 F.3d 628,

8

644 (9th Cir. 2004). Other factors for determining when reversal is required include: "the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall." *Parker*, 241 F.3d at 1120.

      The prosecutor's complete statement read:

> Once [petitioner places the forgery ring in issue], then I'm going to tell you, call any witnesses that I believe will tell the truth. You saw Melvin Hines on the stand. Do you think he was lying about anything. He exposed himself completely, put a gun in his hands. He knows it's against the law to have that gun . . . . He said: Yeah, I'm a part of the forgery ring and have been for nine years. All of that under oath. It's transcribed. Where do you think that transcript is going to go? Do you think it's just going to be filed someplace? It's already been mailed to the FBI. It's already been filed

(8 RT 916–17). Assuming that the comment constituted improper vouching, petitioner has failed to show that it rose to the level of a due process violation. Neither the prosecutor nor the trial court indicated that it intended to continue monitoring Hines in any way for truthfulness. Nor could they, as state courts do not share jurisdiction with federal law-enforcement agencies. Even if the prosecutor intended to advocate on Hines's behalf with the FBI, he could not ensure that the agency would not prosecute Hines for his involvement in the forgery ring.

      The prosecutor's vouching for Hines, if his statements constituted such, extended solely to pointing out the criminal liability to which Hines exposed himself by testifying. The comments constituted a very brief portion of the prosecutor's lengthy closing argument and were succeeded by a much more detailed discussion of independent witnesses and the physical evidence. Moreover, the entire discussion of Hines's testimony focused on why the prosecutor did not address the forgery ring in the case-in-chief and why the jury heard untruthful testimony from the Stevensons. Petitioner has not shown that the statements prejudiced him. For these reasons, this claim is **DENIED**.

### *(b)* *Vouching for Maurice Stevenson.*

The entirety of this claim reads, "The prosecutor put himself in the place of Maurice Stevenson, vouching for Maurice's credibility, and put the imprimatur of the prosecutor's office on Maurice's testimony. RT 829-830" (Sec. Am. Pet. at 211). Petitioner provides nothing else to show an entitlement to relief.

The pages he cites contain the following passages:

> Now it's significant to me and that's the reason I asked the question: When you heard Gates say, "Now I'm going to kill you, what did you do? What was your reaction? And Maurice said, "I started shaking." Now, that to me would be the kind of reaction I would expect from a person who realizes he's about to die.
>
> I tried putting myself in the same position. If I had my hands up against the building, I had just been pat searched by a man that I knew was capable of threatening to kill —

(8 RT 829). Defense counsel objected. The trial court overruled the objection and instructed the jury that "statements of the attorneys [are] not evidence." The prosecutor continued, saying, "What would my response be? How would I feel? What would I do? And I think like Maurice or like anyone else in that position, I'd start shaking. I couldn't control my body or muscles" (8 RT 829–830).

"Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993). The prosecutor here moved on to more specifically guide the jury in how to determine for themselves Maurice Stevenson's credibility. He said, "Now, we start determining how we can determine the credibility of the person. This is how you check. The veracity of what they tell you" (8 RT 830). His statements do not constitute an assurance to the jury that Maurice Stevenson told them the truth.

The prosecutor should not have inserted himself into the narrative. However, this situation does not rise to the level of those found to be prejudicial. For example, our Court of Appeals has granted relief when the prosecutor said not only that he believed various witnesses had been candid and truthful, but also suggested "in his closing remarks that the district court,

10

in accepting the plea agreements of the witnesses, had been satisfied as to the truthfulness of their proposed testimony." *United States v. Kerr*, 921 F.2d 1050, 1053 (9th Cir. 1992), where our Court of Appeals found prejudicial misconduct. The *Kerr* court also noted the closeness of the case in determining the nature of the prejudice resulting from the misconduct. There, the four witnesses for whom the prosecutor vouched provided "crucial" testimony in a case based primarily on indirect evidence. *Id.* at 1054.

The same cannot be said here. As noted in previous orders, petitioner admitted shooting the Stevensons. He challenged not the act itself at trial but the motivation for it. California law, however, does not permit someone to show up armed and claim justifiable homicide. *See* March 20, 2017 Order Denying Claims 6A, 6B, and 7 at 10. As such, Maurice Stevenson's testimony did not provide the same evidentiary underpinning that the vouched-for witnesses did in *Kerr*. Accordingly, even if the prosecutor committed error in making the statements, petitioner has failed to show that such error denied him due process. Accordingly, the claim is **DENIED**.

### *(c)*      *Vouching for Police Investigation.*

Similar to the claim above, petitioner provides no argument, as well as no specific statements, to support his assertion that the prosecutor violated his constitutional rights by vouching for the police investigation into the December 1979 shooting (Sec. Am. Pet. at 211). Looking at the pages petitioner cites reveals one statement that could be challenged reasonably as misconduct. When describing the various accounts of events that petitioner gave to the police, the prosecutor said, "Now, I put myself in the position of Gates and in the position of Sitterud. I know Sergeant Sitterud personally. I've had him in many murder cases. And I started thinking that must have been —" (8 RT 843). At this point, defense counsel objected and the court directed the prosecutor to move on, noting, "Whether you knew him or not does not make any difference" (8 RT 843). The prosecutor never completed his thought so he did not say anything definitive about his knowledge of Sitterud. The trial court made clear to the jury heard that the prosecutor's personal knowledge of the officer was irrelevant to their determination. As

such, petitioner has failed to show that the comment constituted actual vouching or that it prejudiced him. Accordingly, this claim is **DENIED**.

*(iii)*      ***Statements to the Jury Regarding the Stevensons'
Criminal Activity.***

This claim challenges the prosecutor's statement in closing argument that he knew James Stevenson ran a forgery ring and that the Stevensons had never conned him into believing otherwise (8 RT 913–914). Petitioner argues that if the prosecutor knew about the Stevenson forgery ring, he committed misconduct by failing to correct testimony of Maurice Stevenson and Jimmy Stevenson that no such forgery ring existed. Petitioner also alleges as misconduct the prosecutor's statement to the trial court that he did not know until during the trial that the Stevensons ran a forgery ring because the prosecutor did in fact know or should have known (Sec. Am. Pet. at 208–209).

During his closing rebuttal, the prosecutor said that defense counsel had told the jury that he, the prosecutor, had "tried to con [the jury] . . . because the Stevensons had conned [him] . . . ." (8 RT 913). The prosecutor further argued to the jury, "I've been a prosecutor for almost nine years. You think I have not heard of James Stevenson? James Stevenson in Oakland is not an unfamous man" (*ibid.*). These statements responded to defense counsel's statement in closing, "I'm not challenging [Melvin Hines's] honesty because I think he's probably honest. I think he was probably conned by the Stevensons just as they tried to con us" (8 RT 851).

After objection and a curative instruction by the court regarding the nature of argument, the prosecutor said, "It is no secret either in the DA's office or in any police department in this state or in any FBI's office that James Stevenson runs a forgery ring. He's been doing it for ten years and very successfully" (8 RT 913–914). The prosecutor concluded by telling the jury that the various agencies had been trying to prove the existence of the Stevenson forgery ring for ten years but had been unable to do so because of James Stevenson's extreme caution (8 RT 914). In its own way, this comment aided petitioner's story that he had been part of the Stevenson forgery ring.

Petitioner's attorney made a motion for mistrial on the grounds of a *Brady* violation for failure to disclose evidence of the forgery ring and for misconduct based on improper argument (8 RT 930, citing *Brady v. Maryland*, 373 U.S. 83 (1963)). The trial court denied the motion as to misconduct and took the *Brady* component under advisement (8 RT 930).

Out of the presence of the jury, the court held a hearing on the mistrial motion. The prosecutor explained to the trial court that he had believed the conflict between the Stevensons and petitioner centered on drugs, not forgery. He claimed he knew about the Stevensons' involvement in a forgery ring, but had not believed that petitioner had been involved until Melvin Hines called him following the defense's cross-examination of Maurice Stevenson and detailed the operation, including petitioner's involvement in it (8 RT 972–977).

The prosecutor stated that he discovered the Stevensons' involvement in forgery when he ran background checks on them and all other witnesses. Though he also noted that James Stevenson lied to him about the operation. Based on these representations, the trial court denied the mistrial motion (8 RT 975–977).

As an initial matter, the statement about which petitioner complains helped him. It removed any doubt regarding whether the Stevensons ran a forgery ring, which had been central to petitioner's asserted defenses. Regardless, he has failed to show an entitlement to relief.

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). Such claim will succeed when (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known that the testimony or evidence was actually false, and (3) the false testimony or evidence was material. *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013).

The prosecutor indicated during the motion for mistrial that he did not know of petitioner's involvement in the forgery ring or even what petitioner's defense was until defense counsel cross-examined Maurice Stevenson (8 RT 976). This defeats petitioner's claim on the

second prong. While petitioner argues that the prosecutor should have known because he is responsible for the knowledge of his office, the prosecutor maintained that he believed until Maurice's cross-examination that the entire dispute centered around drugs. And it was not until that moment that petitioner's counsel revealed their defense.

At that point, the prosecutor directed James Stevenson to have Melvin Hines call the prosecutor and, through Hines, the prosecutor learned the details of the operation and petitioner's involvement in it. Once he knew the full story, the prosecutor called Hines to the stand to describe the operation for the jury (8 RT 977). This corrected the false testimony the Stevensons had given regarding the forgery ring. *See United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) (a prosecutor has a constitutional duty to correct the false impression of the facts after a witness has lied).

Additionally, the prosecutor admitted during his closing that the Stevensons ran a forgery ring, that they lied about it, and that petitioner was a part of it. Specifically, he said:

> Oscar Gates says he was in the ring, and I don't deny that. I know that that's true. . . . Now, Mr. Braverman says . . . if Mr. Cummings knew about the forgery ring, why didn't he prove it in his case in chief? The law says I can't. . . . I'm stuck with the percipient witnesses and the physical evidence. I can't prove other criminal activity on his part until he opens it. Once he makes it part of the defense, now he's made it relevant, and now I can go into it. . . . I'm stuck with the date 10 December, 1979, who was there, and what happened, and what the physical evidence is. . . .

> Now we talked about the credibility of witnesses. He said Maurice and Jimmy had a reason to lie to you . . . . Well, Maurice definitely did. I agree. If you ask Maurice anything about the forgery ring, he is not going to cough up his father. There is no way that Maurice Stevenson is going to get himself in a position where he's going to turn on his own father

(8 RT 914–917).

Throughout his closing argument, the prosecutor admitted the existence of the Stevenson forgery ring, the efforts of the family to conceal the activities, and the fact they had lied on the stand. The prosecutor then proceeded through the evidence and physical testimony and explained why he believed the prosecution had carried its burden. Petitioner has failed to show that Melvin Hines's testimony and the prosecutorial closing argument did not correct the juror's impression regarding the Stevensons' untruthful testimony about the forgery ring.

14

To the extent petitioner argues that James Stevenson, a perjurer, selected Hines as a witness and the prosecutor was obligated to share that information with the jury, this claim lacks merit. The prosecutor detailed the process he went through in questioning Hines and calling him to the stand. No federal law requires a prosecutor to explain his selection process to the jury. For all of these reasons, this claim is **DENIED**.

### *(iv)    Switching Burden of Proof.*

The next prosecutorial misconduct claim argues that the prosecutor switched the burden of proof to petitioner by referencing the defense's attempts to prove the existence of a forgery ring (Sec. Am. Pet. at 212). Nothing in the prosecutor's statements indicated that the state did not bear the burden of proving the charged crimes. Rather, the prosecutor indicated that he could not present evidence on the forgery ring until petitioner made it an issue in the case by virtue of his defense. This statement did not give rise to an inference that petitioner needed to prove anything. It simply addressed when the forgery ring became relevant in the proceedings. Additionally, the court properly instructed the jury on the prosecution's burden of proof. Petitioner has not shown that this comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. Thus, this claim is **DENIED**.

### *(v)    Questions That Petitioner Argues Implied Criminal Conduct on His Part.*

Petitioner also challenges as misconduct several questions the prosecutor asked various witnesses during the trial because, he argues, the questions implied other criminal conduct on petitioner's part. Specifically, petitioner challenges the following questions: asking petitioner during his cross-examination whether he acted as an "enforcer" or whether Donald Taylor hired petitioner to pressure James Stevenson; whether petitioner had threatened the Stevenson family if not given "a piece of the operation"; and asking petitioner why he used a false name at the hospital after being shot and whether petitioner could not use his real name (Merits Br. at 6).

### *(a)    Question About "Enforcer."*

Petitioner argues that the prosecutor committed misconduct by asking him "several times whether . . . Taylor had recruited him for the purpose of pressuring James Stevenson, Jr., and

15

acting as an enforcer" (Merits Br. at 6). In addition, he challenges the prosecutor's question about whether petitioner threatened James Stevenson's family if Stevenson did not give petitioner "a piece of the operation" (*ibid.*).

This claim was found to be procedurally defaulted. August 23, 2001 Order Granting in Part Motion for Summary Judgment at 9. Under the doctrine of procedural default, federal courts will not review "a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Thus, if a petitioner failed to comply with state procedural rules and was barred from litigating a constitutional claim in state court, the claim may be considered on federal habeas only if the petitioner shows "cause" for the default and "actual prejudice" from failure to raise the claim, or demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice. *See id.* at 750. However, "courts need not address procedural default before reaching the merits." *Johnson v. Lee*, __ U.S. __, 136 S.Ct. 1802, 1806 (2016). Thus a merits-based analysis follows.

Right before the contested question, the prosecutor asked petitioner about the terms "creeper," "walker," and "worker," which petitioner had referenced earlier in his testimony (7 RT 645). Then, he moved on and the following exchange took place:

> Prosecutor: You were Donald Taylor's friend?
>
> Petitioner: Yes, that is right. I was a friend of his.
>
> Prosecutor: Now, the use of all these terms, Mr. Gates, did you ever use the term "enforcer"?
>
> Petitioner: Enforcer?
>
> Prosecutor: Muscle, hit man.
>
> Petitioner: No, I haven't — yes, I have heard the term

(7 RT 646). The prosecutor moved on to a different topic and then asked petitioner whether he and Taylor agreed to "ease James Stevenson out" of the forgery ring (7 RT 647–648). Petitioner denied such an intention. The prosecutor subsequently asked petitioner if he threatened to kill the Stevensons if James did not give him a piece of the operation (7 RT 662).

As discussed in prior orders, petitioner presented two defenses at trial: claim-of-right and imperfect self-defense. Essentially, he argued that he had a right to the money the Stevensons owed him from the forgery ring and that when he went to retrieve it at the Stevensons' invitation, Jimmy Stevenson pulled a gun and forced petitioner to defend himself.

Through these defenses, petitioner himself placed in controversy the nature of his role in the forgery ring, whether the Stevensons actually owed him any money, and which party initiated the violence that led to petitioner's convictions. Contrary to petitioner's bare assertion in his petition and briefing, the questions do not indicate an attempt by the prosecutor to get at "other criminal conduct." They appear to be directed at what role the petitioner played in the forgery ring, what role he wanted to play, and what means he was willing to use to achieve that goal. Other witnesses provided testimony that petitioner threatened to kill them in an effort to secure a larger portion of the forgery proceeds for himself (*see*, *e.g.*, 7 RT 762, 765). In light of the testimony as a whole, such questions were reasonable. Petitioner has failed to show, let alone argue, how they prejudiced him. Accordingly, this claim is **DENIED**.

### *(b)* *Question About Use of False Name.*

This claim argues that the prosecutor committed misconduct by questioning petitioner about the name he used when checking into the hospital after being shot by the Stevensons. The following exchange occurred:

> Prosecutor: When you went into the hospital on the 14th of September you used the name Alford Fields or Filds?
>
> Petitioner: Filds, yes.
>
> Prosecutor: And you explained in your testimony yesterday that you didn't want the police involved? That is why you didn't tell them what actually happened?
>
> Petitioner: That is right.
>
> Prosecutor: There were other reasons why you didn't want the police involved; isn't that true?

**United States District Court**

For the Northern District of California

(7 RT 646). Defense counsel objected. The trial court overruled the objection and directed petitioner to answer the question. Questioning resumed:

> Prosecutor: You couldn't use your name, Oscar Gates, could you?
>
> Petitioner: Yes.
>
> Prosecutor: There were other reasons?
>
> Petitioner: Yes.
>
> Prosecutor: For not getting people involved?
>
> Petitioner: Yes.
>
> Prosecutor: And those other reasons were involved with you, weren't they?

(7 RT 646–647). Again defense counsel objected. The trial court overruled the objection and directed petitioner to answer, to which he said yes. The prosecutor moved on.

Petitioner offers no meaningful argument to explain how this line of questioning prejudiced him. He notes that the questions concerned defense counsel because they believed the prosecutor had engaged in an improper attempt to reference the concurrent mortuary robbery-murder proceedings in Los Angeles. However, the jury knew nothing of that at this stage in the trial. The prosecutor's questions are vague, particularly in light of the testimony petitioner gave earlier about using a variety of names (7 RT 587) and about not wanting to go to the hospital and end up in jail (7 RT 599). He has fallen far short of showing that such questioning prejudiced him. Accordingly, this claim is **DENIED**.

### *(vi)* *Comments on Extrinsic Evidence*.

The final prosecutorial misconduct guilt-phase challenges focus on comments the prosecutor made that petitioner argues reference evidence outside the record. Petitioner's first such challenge concerns the reasons why petitioner told Sergeant Sitterud two different stories when first arrested and other assertions that petitioner fabricated his defense. The second centers on comments around petitioner's unsuccessful escape attempt (Sec. Am. Pet. at 211).

### *(a)* *Comments About Statements to Sergeant Sitterud*.

This claim states that the prosecutor committed misconduct by speculating why petitioner told Sergeant Sitterud varying accounts of events (Sec. Am. Pet. at 211). As with other claims

1    noted above, petitioner offers no specifics, only a page range.  The substance of the prosecutor's

2    argument focused on the various accounts of events petitioner provided to the police.  At various

3    points, the prosecutor said such things as, "My inference.  Gates is, in effect, trying to find out

4    what they know" (8 RT 843).   The prosecutor went on to explain how each statement petitioner

5    gave to the police fit with the prosecution's theory that petitioner changed his story because

6    he kept trying to suss out what the police knew and what evidence they had collected (8 RT

7    843–844).  Such statements do not constitute comments on external evidence, but rather are

8    proper inferences drawn from evidence in the record.  *See Necoechea*, 986 F.2d at 1279.

9    This claim is **DENIED**.

### *(b)    Other Comments.*

11   This claim challenges references "to other information, not present at trial, which

12   supposedly supported the prosecutor's bold, improper assertion that [p]etitioner had fabricated

13   his defense" (Sec. Am. Pet. at 211).  Petitioner first challenges the prosecutor's statement that

14   "[s]omewhere along that line, Oscar Gates made a decision how to beat the case" (8 RT 845).

15   This statement, like those regarding petitioner's accounts to Sergeant Sitterud constitutes an

16   inference and in no way represents that extrinsic evidence supported it.

17   The second challenge addresses the prosecutor's statement, "So there are many things

18   that I know about that occurred leading up to the events of the 10th of December that may or

19   may not be relevant.  Now I don't really think that they are" (8 RT 847).  Defense counsel

20   objected and asked for an admonition.  The trial court sustained the objection and said, "I think

21   the jury understands the purpose of argument" (8 RT 847).  Petitioner argues that this statement

22   implied that the prosecutor knew undisclosed "bad things" about petitioner (Sec. Am. Pet. at

23   211).  The statement does indicate the prosecutor knew of extrinsic evidence, but right before the

24   objection, the prosecutor indicated the irrelevance of such evidence.  The trial court stopped him

25   from continuing a thread that already had started to derail.  Petitioner has failed to show how this

26   statement prejudiced him.

27

28

Finally, the claim challenges the prosecutor's statement, "Whatever his mind set was at the time, I could care less" (8 RT 911). The comment followed argument regarding petitioner's state of mind, which he himself had placed in controversy:

> Now, if you think the law of the state is if a person owes you money and you go over and say can I have my money back, and he says sorry, you don't get your money, and then you can point a gun at him and you can say give me your jewelry instead and say that's not a robbery because of some theory of mind set, you're crazy. That's a robbery in this state . . . .

(8 RT 911). Within context, that statement clearly references petitioner's defense and, by its nature, the evidence petitioner introduced at trial. Thus, petitioner has failed to show that the comment referenced extrinsic evidence and constituted misconduct. For the foregoing reasons, each component of this claim is **DENIED**.

### B.    Penalty Phase.

The next set of prosecutorial misconduct claims argue that the following acts by the prosecutor in the penalty phase violated petitioner's constitutional rights: summarizing petitioner's assault of Mary B. after failing to take any testimony on the matter; referring to an additional prison stay that the prosecutor did not submit into evidence; arguing as an aggravating factor that petitioner killed David Garcia, but failing to support that argument with any evidence; arguing the nature of hollow point bullets without supporting evidence; repeatedly exceeding the scope of cross-examination during the testimony of a psychologist specializing in prisoner stress; mischaracterizing the expert's opinion in argument; and disputing petitioner's family's testimony regarding racism in petitioner's hometown of Belzoni, Mississippi (Merits Br. at 9–12).

### (i)    Comments on Extrinsic Evidence.

Most of the challenges to the prosecutor's conduct during the penalty phase pertain to comments that petitioner argues referenced evidence outside the record. The first such comments petitioner challenges summarize a prior offense for rape on Mary B., who did not

testify (Sec. Am. Pet. at 212).  Petitioner makes no specific argument as to how these comments prejudiced him.[2]

Petitioner has failed to show the contested comments prejudiced him.  The prosecutor's statements consisted of saying that petitioner encountered the victim when she "walking to her car from work. [He] approached her with a gun, forced her in the car, drove to a secluded location, raped her" (9 RT 1015).  And, in his closing, the prosecutor said, "Mary Sue Barner, April, 1973, kidnapped in her own car at gunpoint, taken to an isolated location, and raped" (10 RT 1292-A).  This summary expanded on the stipulation in two ways:  it noted that petitioner had threatened the victim with a gun and that he drove her to a secluded area.  The kidnapping charge, to which he stipulated, necessarily implied that he moved the victim from one location to another and carrying out such crimes against another person generally requires some level of seclusion as well as some threat of force.  Moreover, this description mirrors the testimony given by Dolores Jones, whom petitioner also kidnapped and raped (9 RT 1157–1159).  Petitioner has not shown prejudice from these statements.

The next challenge concerns the prosecutor's statement during both the opening and closing argument that petitioner had been "back in custody after parole" despite presenting no evidence to show why (Sec. Am. Pet. at 212).  Petitioner argues that this informed the jury that petitioner had committed even another crime.

The prosecutor's references were extremely limited.  In opening argument, he said, "On August 2nd, 1977, Oscar Gates was paroled to Los Angeles County.  On November 29th of 1977, Oscar Gates is back in custody.  May 29th, paroled back to Los Angeles County" (9 RT 1015).  During closing, he said, "Within three months he is back in custody for six months, reparoled May of 1978" (10 RT 1292-A).  Both before and after these brief statements, the prosecutor detailed the nature of petitioner's other convictions, describing petitioner's "pistol-whipping," beating victims to death, and raping and kidnapping other victims.  In light of

---

[2] This claim also was found to be procedurally defaulted.  Regardless, it is analyzed for its merit. *Johnson v. Lee*, __ U.S. __, 136 S.Ct. at 1806.

21

the brief and vague nature of the statements, and the severity of the other crimes for which evidence had been presented, petitioner cannot show that such references prejudiced him.

The third challenge in this claim addresses statements made during closing argument that, petitioner argues, imply that petitioner was responsible for the death of David Garcia.[3] Petitioner does not cite any particular passages, only page numbers (Merits Br. at 10). The first page petitioner cites as misconduct did not come from the prosecutor, but rather Calvin Miller, a friend of petitioner's who participated in the mortuary robbery-murder. Miller testified that following the crime the two went to Garcia's house. Petitioner told Garcia that he had to kill one of the women because she kept screaming and then advised Garcia that if he told anyone about the murder, petitioner would "do something bad" to him (9 RT 1175).

During closing argument, the prosecutor said, "You heard testimony of Calvin Miller who was there and described what happened. You heard the testimony of David Garcia. He's now dead" (10 RT 1293). Petitioner argues that the prosecutor should not have made such an insinuation since Garcia's death certificate indicates that he died of an "undetermined natural cause involving an acute subarachnoid hemorrhage" (Sec. Am. Pet. at 213).

The comment in and of itself does not indicate a clear implication that petitioner murdered Garcia or otherwise contributed to his death. While witnesses testified that petitioner had made threats of harm should anyone who knew of the mortuary murder reveal the information to the police, two of the three people who knew about it appeared to testify and they both cooperated with police in Los Angeles. Moreover, the judge advised the jury previously that Garcia had died and that someone else would need to read Garcia's preliminary hearing testimony into the record as a result. Given the totality of the record and the vagueness of the comment itself, which could have just referred back to the reason for Garcia's unavailability, petitioner has not shown the statement to amount to prejudicial misconduct. *See Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (a prosecutorial misconduct claim is decided "on the

---

[3] This claim also was found to be procedurally defaulted. Regardless, is analyzed for its merit. *Johnson v. Lee*, __ U.S. __, 136 S.Ct. at 1806.

United States District Court

For the Northern District of California

merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process").

Finally, the claim challenges the prosecution's discussion in closing argument of the nature of hollow point bullets after failing to produce any evidence on it during the penalty phase (Merits Br. at 10). Petitioner fails to provide any additional argument or even a page citation for this claim (Sec. Am. Pet. at 213). Nonetheless, the Court found the following comment during the prosecutor's closing:

> And what kind of weapon does he use — a .357 magnum, hollow point bullets. Some of you men might know the significance of the hollow point bullet, what it is capable of doing and why you use it. You use that ammunition and that high-powered —

(10 RT 1294). Defense counsel objected and the trial court ordered the prosecutor to move on. At that point, the prosecutor detailed the nature of the injuries sustained by those whom petitioner had shot with the hollow point bullets (10 RT 1294).

The trial court stopped the prosecutor from reaching any final conclusion on his thought about the purpose of hollow-point bullets. The physical evidence of injuries, which had been admitted at trial, proved the point the prosecutor had referenced before the objection. Petitioner has not attempted to show, nor could he, that the comment unduly prejudiced him. For all of the reasons state above, each component of the claim regarding comments on extrinsic evidence is DENIED.

### (ii) *Exceeding the Scope of Direct Examination.*

The next claim argues that the prosecutor committed misconduct by asking several questions of the defense's expert psychologist that exceeded the scope of the witness's direct examination (Sec. Am. Pet. at 213–214). While petitioner provides a list of the questions he claims violated his due process rights, he provides no argument as to how they did so (Merits Br. at 10–12). A review of the entirety of Dr. Berg's testimony does not reveal anything that would have prejudiced petitioner. Dr. Berg consistently testified that based on petitioner's prior good behavior in prison, it seemed likely that petitioner would do well in prison again, regardless of

the nature of the crimes he had committed in the interim (9 RT 1254, 1255, 1256, 1257, 1258, 1260, 1261–62). Dr. Berg explained his rationale by saying:

> My experience is that certain individuals live very differently within the special kinds of conditions that prevail in prisons. Unfortunately, he seems to live much better from society's point of view. From the point of view of controlling themselves, etc., they live much better in prison. I suspect Oscar Gates is that kind of individual

(9 RT 1258). Dr. Berg further illuminated his theory when he answered, "The things that happen to him on the outside, with all of the other things that happen in the outside world, are less important in predicting how he'll be in prison than what we know about how he was in prison. It's comparing apples and apples (9 RT 1261).

The doctor's repeated assertions that petitioner's criminal activity outside of prison did not indicate how he would perform inside prison and that relevant evidence pointed to petitioner's likely positive adjustment to prison life echoed his testimony on direct. Petitioner has not argued or shown how in light of the record any improper questions during Dr. Berg's cross-examination prejudiced him.

Petitioner also asserts that "the prosecutor introduced his own inflammatory mischaracterizations and opinions regarding the psychiatrist's testimony in argument"[4] (Sec. Am. Pet. at 215). Petitioner offers a page citation, but does not challenge any particular statement. Nor does he offer any law to support his claim for an entitlement to relief. A review of the page cited does not show any improper argument. "Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996). This wide latitude afforded to prosecutors in arguing reasonable inferences from the evidence extends to attacks on a witness's credibility. *See Turner v. Marshall*, 63 F.3d 807, 818 (9th Cir. 1995) (stating that a prosecutor is permitted to go so far as to "label a witness's testimony as lies or fabrication"). For the above reasons, this claim is **DENIED**.

---

[4] Despite petitioner's characterization of his expert witness as a psychiatrist, Dr. Berg identified himself as a psychologist.

### *(iii)* ***Comments on Petitioner's Upbringing.***

The final challenge to the prosecutor's conduct asserts that the prosecutor behaved improperly during his closing argument because he expressed his personal belief in disagreeing with petitioner's family members' testimony regarding the racism in petitioner's hometown of Belzoni, Mississippi; that petitioner did not turn out the way he did because of racism; and that the Belzoni Police Department pursued petitioner not because of racism but because of suspected criminal activity. Petitioner argues that the commentary unduly prejudiced him because it misrepresented the state of evidence, was unduly inflammatory, and implied that the prosecutor had knowledge outside the record (Sec. Am. Pet. at 215).

As with several other prosecutorial misconduct claims, petitioner does not identify specific comments to which he objects. Rather, he provides a page range.

At the beginning of his discussion about this mitigation evidence, the prosecutor said:

> You heard a lot of talk by Geoff Carter, the defense attorney, when he developed the family, about Belzoni, Mississippi, racism in American society, police harassment. I don't deny that that's a fact in American society. There always was and there probably always be racism in this society. I don't think that that is the cause of why Oscar Gates turned out the way he did

(10 RT 1289). The prosecutor went on to discuss petitioner's brother's testimony that he and petitioner's other brothers had never been harassed by the police or arrested. Then he said, "I have a feeling that — And I don't know all of the reasons. But I have a feeling that the police in Belzoni, Mississippi, are like the police —" (10 RT 1290). Defense counsel objected to the argument as improper and requested an admonition. The trial court overruled the objection. The prosecutor added, "That it was a more a case of the police suspecting Oscar Gates of criminal activities than it was racial harassment" (10 RT 1290.). He then proceeded to review petitioner's siblings' testimony that petitioner had been arrested by two black officers. The prosecutor contrasted petitioner's life with that of his siblings, who obtained masters degrees and went on to have solid careers.

In the context of the argument, it is clear the prosecutor's statements were not intended to dispute the evidence presented or to imply that the prosecutor had extrinsic knowledge of petitioner's life in Belzoni. Rather, the prosecutor drew inferences adverse to petitioner based

25

on a comparison of petitioner's outcome with that of his siblings.  Petitioner has not shown that these statements were improper or that they prejudiced him.  Accordingly, the claim is **DENIED**.

### 3. CLAIM 16A.

Claim 16A challenges the trial court's exclusion of mitigation evidence, which petitioner argues deprived him of his rights to present a defense, due process, and heightened capital case due process and reliability in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments (Merits Br. at 14).  Specifically, petitioner sought to introduce the testimony of his brother, Abraham Gates, regarding an incident that precipitated police harassment of petitioner; prior criminal felony records of members of the Stevenson family; and evidence of prosecution witness Calvin Miller's prior second-degree murder conviction (Merits Br. at 14–15).

### A. Exclusion of Abraham Gates Testimony.

This claim challenges the trial court's refusal to allow petitioner's brother, Abraham Gates, to testify to an altercation petitioner had back in Belzoni with a white woman at Western Auto Store and the ensuing impact on petitioner.  Petitioner argues that the trial court should have allowed the testimony because Abraham Gates's credibility was not in question and because the hearsay doctrine should not be applied mechanically in capital cases.

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984).  In deciding if the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the court balances the following five factors:  (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.  *Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004) (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)).

Nowhere does petitioner indicate what Abraham Gates would have said if he had been allowed to testify.  His declaration makes no mention of the incident, nor does it discuss the

26

1  fallout from it.  Petitioner's claim of a due process violation cannot be evaluated without a

2  specific indication of what testimony the court excluded.

3      Moreover, his citations to *Green v. Georgia*, 442 U.S. 95, 97 (1979), and *Chambers v.*

4  *Mississippi*, 410 U.S. 284, 285 (1973), are unavailing.  In *Green*, the testimony excluded as

5  hearsay would have come from a witness who had been told directly by the petitioner's

6  co-defendant that he alone had committed the crime.  The Supreme Court noted that "under the

7  facts of this case" the exclusion constituted a due process violation.  *Green*, 442 U.S. at 97.

8  Chambers had been denied the opportunity to cross-examine a witness who previously had

9  confessed to the shooting for which Chambers had been convicted, as well as to examine

10  witnesses to whom the shooter also had confessed.  *Chambers*, 410 U.S. at 291–293.

11  In explaining why the hearsay evidence should have been admitted at trial, the Supreme Court

12  relied heavily on the facts of that case, noting that the confessions had been made

13  "spontaneously to a close acquaintance shortly after the murder had occurred;" "each one was

14  corroborated by some other evidence in the case;" and "whatever may be the parameters of the

15  penal-interest rationale, each confession here was in a very real sense self-incriminatory and

16  unquestionably against interest."  *Id.* at 301.  Finally, the court noted that "if there was any

17  question about the truthfulness of the extrajudicial statements, McDonald was present in the

18  courtroom and was under oath. He could have been cross-examined by the State, and his

19  demeanor and responses weighed by the jury."  *Ibid.*

20      Petitioner has not come anywhere close to presenting such facts.  His brother admitted

21  that at the time of the altercation he did not live in Belzoni because he was serving in the Army

22  (9 RT 1265, 1267).  He also did not lay a foundation for how he would have known the

23  immediate impacts of the incident on petitioner.

24      Petitioner's sister, Carrie Gates, who lived at home at the time of the Western Auto Store

25  incident testified that following the incident:

26          the police would carry him — any time anyone would do anything
            in Belzoni, they would come on questioning him, and they would
27          carry him out to the rural area and shoot all around him, and they
            tried to make him say someone else committed the crime.  And he

28

United States District Court

For the Northern District of California

> would say he didn't know anything about it, so he wouldn't tell no one about it

(9 RT 1240).

Petitioner has not identified what other evidence he wished to submit or why such testimony had to come from Abraham as opposed to Carrie. Petitioner, thus, has failed to show a due process violation. *Pulley*, 465 U.S. at 41. This claim is **DENIED**.

### B.        Exclusion of Stevenson Family Criminal Histories.

The next claim focuses on the trial court's refusal to allow petitioner to submit in the penalty phase prior felony records for Jimmy, James, and Lonnie Stevenson. Such records, petitioner argues, would have given the jury "a total picture of the defendant, and circumstances surrounding the case, and the relationship of the Stevensons in this particular case" (Merits Br. at 14).

The trial court denied admission of the records because the Stevensons did not testify in the penalty phase (9 RT 1282). Trial counsel argued the application of *Green*, *supra*. As discussed above, the Supreme Court made clear that the facts presented in *Green* warranted relief. Petitioner has presented no such facts here. The guilt phase of the trial and the challenged prosecutor's closing argument made the jury well aware of the Stevensons' criminal backgrounds. Petitioner has not shown prejudice from this denial. Thus, the claim is **DENIED**.

### C.        Exclusion of Calvin Miller's Prior Conviction For Second-Degree Murder.

This claim challenges the trial court's exclusion of evidence that Calvin Miller was serving a term for second-degree murder when he met petitioner. He argues that the introduction of such evidence would have allowed the jury to hear evidence that Miller "was perhaps more likely to have been the party responsible for Wright's death than Gates" (Merits Br. at 18). The exclusion, he argues, "deprived the jury of evidence material to an evaluation of Miller's credibility" (*ibid.*). Petitioner does not provide a legal theory to show that such evidence was admissible, aside from the blanket citations to *Green* and *Chambers*. For the reasons stated above, those cases are inapposite. Moreover, a jury convicted petitioner of Wright's murder.

The jury did hear Miller himself say that he met petitioner at San Quentin where he was serving time (9 RT 1168). Petitioner has not shown a due process violation. This claim is **DENIED.**

### 4. CLAIMS 21 AND 22.

Claim 21 and 22 both argue that the admission and use at the penalty phase of evidence of petitioner's previous criminal activity violated his rights to be free of double jeopardy and self-incrimination, a fair and speedy trial, effective assistance of counsel, due process, heightened capital case due process and case reliability, an individualized penalty determination, and to be free from cruel and unusual punishment pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments (Merits Br. At 19, 28). Claim 21 also incorporates by reference elements from Claim 20. Claim 20 was denied in part on the merits and in part because it would require new rules of constitutional criminal procedure on federal habeas in violation of *Teague v. Lane*, 489 U.S. 288 (1989) (plurality). *See* April 2, 2014 Order at 16–19. Those determinations will not be revisited. Thus, to the extent Claim 21 rehashes arguments presented in Claim 20 that have been rejected, it is **DENIED.**

Petitioner's complaints regarding the admission of prior bad acts can be grouped into two categories: claims regarding prior convictions and claims regarding the as-then unadjudicated mortuary robbery-murder, for which he was later convicted. Respondent argues that the arguments are forfeited for failure to object in the trial court, are *Teague*-barred, and are not legally supportable (Opp. at 13).

### A. Use of Prior Convictions.

California Penal Code section 190.3 permits prosecutors to introduce "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat of use of force or violence." Cal. Pen. Code 190.3(b). It also permits the introduction of prior felony convictions as part of the sentence calculus. *Id.* at 190.3(c). To this end, the prosecutor introduced evidence regarding and a stipulation between the parties attesting to petitioner's prior convictions for robbery, two assaults, rape and kidnap.

Petitioner argues that the trial court violated various constitutional rights by failing to instruct jurors regarding the standard of proof to be applied to the determination of whether petitioner committed the acts, by failing to define the crimes allegedly committed, by failing to require written findings from the jury, and by allowing the prosecutor to present evidence regarding crimes to which petitioner had already stipulated the fact of his conviction. Petitioner also alleges that trial counsel rendered deficient performance by failing to present the trial court with appropriate instructions and by failing to cross-examine the witnesses who testified regarding the underlying incidents for petitioner's prior convictions.

The California Supreme Court denied this claim on appeal noting that to the extent petitioner challenged the trial court's failure to instruct the jury regarding its inability to consider other crimes evidence unless it had been proven beyond a reasonable doubt, that claim fails where petitioner suffered actual convictions. It also held that the presentation of testimony regarding the events underlying petitioner's conviction did not violate petitioner's rights because "it is not the fact of conviction which is probative in the penalty phase, but rather the conduct of the [petitioner] which gave rise to the offense." *Gates*, 43 Cal.3d 1168, 1202–03.

Petitioner has failed to present any authority that requires a jury to find the existence of a prior conviction beyond a reasonable doubt. Petitioner cites as support *Hurst v. Arizona*, 136 S. Ct. 616, 619 (2016); *Cunningham v. California*, 549 U.S. 270 (2007); *Blakely v. Washington*, 542 U.S. 296, 303–05 (2004); *Ring v. Arizona*, 536 U.S. 584, 609 (2002); and *Apprendi v. New Jersey*, 530 U.S. 466, 478 (2000). These cases are unavailing. *Apprendi* requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 500 U.S. at 490. However, no clearly established federal law holds that an aggravating factor in a California death penalty sentencing determination is a fact that increases the penalty for the crime. As the Ninth Circuit explained, the expansion of a first-degree murder to capital murder comes from the special circumstance, which must be found beyond a reasonable doubt. *Webster v. Woodford*, 369 F.3d 1062, 1068 (9th Cir. 2004) ("Special circumstances that make

1    a criminal defendant eligible for the death penalty operate as 'the functional equivalent of an

2    element of a greater offense,'" citing *Ring*, 536 U.S. at 609).

3        *Ring* and *Hurst* overruled a practice that allowed a judge, as opposed to a jury, to find

4    elements in aggravation. The finding of any aggravating elements here was within the sole

5    province of the jury.  *Cunningham* and *Blakely*, applying *Apprendi*, found unconstitutional a trial

6    judge, as opposed to a jury, finding an aggravating circumstance in a non-capital crime that

7    raised the sentence above the middle term.  None of these cases presents the issue here.  In the

8    present case, at the guilt phase, the jury determined beyond a reasonable doubt that petitioner

9    could be sentenced to death based on the special circumstance of committing the murder for

10   financial gain.

11       Even if *Ring* and *Apprendi* did dictate that aggravating circumstances must be found by a

12   jury beyond a reasonable doubt, they do not entitle petitioner to relief because it would be barred

13   by *Teague v. Lane*, 489 U.S. 288 (1989) (prohibiting a federal court from granting habeas relief

14   to a state prisoner based on a constitutional rule of criminal procedure announced after his

15   conviction and sentence became final unless he meets certain exceptions), as *Ring*, *Apprendi*,

16   and *Jones* were decided after his conviction became final.  *See Schriro v. Summerlin*, 542 U.S.

17   348, 358 (2004) (*Teague* bars retroactive application of *Ring* on federal habeas review); *Jones v.

18   Smith*, 231 F.3d 1227, 1238 (9th Cir. 2000) (*Teague* bars retroactive application of *Apprendi* on

19   federal habeas review).

20       Petitioner also argues that *Hurst* rendered California's death penalty scheme

21   unconstitutional (Merits Br. at 23, n. 8).  Petitioner fails to see the distinction between the two

22   statutory schemes.

23       In Florida, all first-degree murders are capital felonies.  *Hurst*, 136 S.Ct. at 620.

24   To determine whether a defendant should receive life in prison or the death penalty, the case

25   proceeds to a penalty phase.  The jury reviews several factors, including whether defendant

26   committed the murder in an "especially "heinous, atrocious, or cruel" manner.  The jury then

27   makes a recommendation to the judge, who makes the final determination.  *Ibid.*  As noted, in

28   California, a jury determines the difference between a capital first-degree murder from one

1  warranting a life sentence by finding a petitioner guilty of the special circumstance.

2  Accordingly, this claim is **DENIED**.

3  **B.    Use of Mortuary Murder Evidence.**

4  At the penalty phase, the prosecution introduced evidence regarding petitioner's

5  then-pending capital retrial for a robbery-murder in a Los Angeles mortuary, including testimony

6  that the jury could have interpreted as petitioner also intending to kill mortuary employee David

7  Garcia.  Petitioner argues that this testimony prevented him from exercising his rights to

8  allocution and testifying in the penalty phase (Merits Br. at 30).  In a footnote, petitioner adds

9  that the trial court exacerbated these errors by failing to legally define the crimes presented as

10  evidence in aggravation or the burden of proof associated with them,

11  The California Supreme Court found that the trial court had failed to instruct jurors that

12  they had to determine petitioner had committed the mortuary robbery and murder beyond a

13  reasonable doubt as required by state law.  *Gates*, 43, Cal.3d at 1202.  The state court, however,

14  determined that no prejudice occurred as a result because overwhelming evidence showed that

15  petitioner committed the crimes.  Indeed, a jury subsequently convicted him of such.  Again,

16  though, petitioner has failed to identify any Ninth Circuit or Supreme Court precedent requiring

17  such an instruction within this context.  "[F]ederal habeas corpus relief does not lie for errors of

18  state law."  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  Moreover, the Ninth Circuit has also

19  held that "the failure of the statute to require a specific finding that death is beyond a reasonable

20  doubt the appropriate penalty does not render it unconstitutional."  *Williams v. Calderon*, 52

21  F.3d 1465, 1485 (9th Cir. 1995).  This claim is **DENIED**.

22  **CONCLUSION**

23  For the foregoing reasons, claims 12, 16A, 21, and 22 are **DENIED**, with the exception of

24  the failure to disclose subclaim of claim 12, for which ruling is **DEFERRED** pending resolution of

25  claims 8A–8D.  Sixteen claims remain for which petitioner intends to seek an evidentiary

26

27

28

hearing or for which ruling was deferred. Petitioner shall brief his right to an evidentiary hearing on those claims in two rounds.

    1.    Within 28 days of the date of this Order, petitioner's counsel shall submit a proposed CJA budget for the next round of briefing;

    2.    Within 56 days of the date of this Order, petitioner shall submit a motion for evidentiary hearing covering half of the remaining claims;

    3.    Within 28 days of the date of petitioner's opening brief, respondent shall submit an opposing brief;

    4.    Within 14 days of the date of respondent's opposition, petitioner shall submit a reply brief;

    5.    A hearing will be scheduled if deemed necessary;

    6.    Any citations to the record should be included in an appendix to the parties' pleadings.

**IT IS SO ORDERED.**

Dated: January 4, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE