UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COLLEEN MARY ROHAN, *ex rel.*
OSCAR GATES,

        Petitioner,

   v.

RON BROOMFIELD, Acting Warden, San
Quentin State Prison,

        Respondent.

Case No. 88-cv-02779-WHA

<u>DEATH PENALTY CASE</u>

ORDER GRANTING-IN-PART AND
DENYING-IN-PART FIRST MOTION
FOR EVIDENTIARY HEARING

## INTRODUCTION

In 1981, Oscar Gates was convicted, *inter alia*, of first-degree murder accompanied by the robbery-murder special circumstance and received a death sentence, all affirmed on appeal. *People v. Gates*, 43 Cal.3d 1168, 1176 (1987). He now seeks a writ of habeas corpus and, in support of that effort, requests an evidentiary hearing on several claims presented in his petition. This order grants an evidentiary hearing on some of those claims.

## STATEMENT

The pertinent facts underlying petitioner's conviction and sentence have been previously summarized and are repeated here as follows:

> On December 10, 1979, Maurice Stevenson and his uncle, Lonnie Stevenson, waxed his car in front of Maurice's grandfather's house in Oakland at about 3:30 p.m. Petitioner appeared, holding a gun with the hammer cocked. Petitioner herded Maurice and Lonnie to the side of the house and ordered them to put their hands on the wall, empty their pockets, and remove their jewelry. After Maurice and Lonnie complied, petitioner frisked them, then asked Maurice as to the whereabouts of Maurice's father, James Stevenson. Maurice replied that he did not know. Petitioner answered that he planned to kill them. Petitioner first shot Lonnie, who yelled for his father and started running toward the back of the house, then shot Maurice, picked up the money with some of the jewelry, and fled. Lonnie died but Maurice survived.

United States District Court
Northern District of California

Some time after the shooting, petitioner called Jimmy Stevenson, Maurice's grandfather, to say that he had killed Lonnie and shot Maurice, that he intended to go to Los Angeles to kill members of another family, and that when he returned he would finish killing off the Stevenson family. On December 29, 1979, police arrested petitioner in Vallejo with the gun used to kill Lonnie.

. . .

        At trial, petitioner asserted a claim-of-right defense. He testified about a so-called "Stevenson family forgery ring," purportedly headed by James Stevenson and Donald "Duck" Taylor, and of which, Lonnie and Maurice Stevenson, Melvin Hines and petitioner were all members. A dispute arose when petitioner did not receive his "big cut" of $25,000 allegedly promised to him.

        Trial testimony also revealed that, in September 1979, a heated argument between petitioner and other members of the forgery ring led to Maurice and James Stevenson shooting petitioner, resulting in a gunshot wound to petitioner's leg. Thereafter, petitioner learned through intermediaries that he would have to give up his claim to the money or he would be shot again.

. . .

        Petitioner testified that he made arrangements by phone with Lonnie to pick up the money owed to him at Jimmy's house on December 10, 1979, at about 3:00 p.m. According to petitioner, he arrived at Jimmy's house, where he saw Maurice and Lonnie outside waxing a car. Petitioner testified that he told Maurice and Lonnie that he wanted his money, that he didn't want any trouble, and that he had a gun and could take care of himself. As the three men made their way around the side of the house, petitioner became suspicious by some of Maurice and Lonnie's actions, so he patted them down for weapons. After finding none, the three men continued toward the back of the house where petitioner saw Jimmy holding a gun. Gunfire erupted. Lonnie and Maurice were shot. Petitioner fled.

        On May 6, 1981, the jury convicted petitioner of all charges and found the special circumstance allegation to be true.

Dkt. No. 848 at 2–3 (citations omitted).

        Following direct appellate review of petitioner's conviction and sentence, state and federal habeas proceedings commenced. After entry of several orders denying claims presented in the operative Second Amended Petition, there remain sixteen claims which have been deferred for ruling or for which petitioner requests an evidentiary hearing. The instant motion concerns petitioner's request for an evidentiary hearing on Claims 2A, 2B, 3A, 3B, 4A, 4B, 8D, and 34.

        Much of the focus of the more than thirty years of collateral review of petitioner's conviction and sentence, in state and federal court, has been petitioner's competency. That issue is at the core of most of the claims that are the subject of the instant motion: Claim 2A alleges that

the mental health experts petitioner's counsel retained prior to trial failed to competently examine and evaluate his mental illnesses, depriving him of the opportunity to present evidence related to his incompetency, among other "fundamental issues arising throughout the trial process" (Sec. Amd. Pet. (hereafter "Pet.") 32); Claim 2B alleges that petitioner's trial counsel were ineffective because they failed to provide adequate information to his mental health experts, failed to recognize the inadequacy of the evaluations they received from the mental health experts, and failed to "raise petitioner's incompetency or assert other mental health related defenses" (*id.* at 121); Claim 3A alleges that petitioner was tried while he was incompetent (*id.* at 126–27); Claim 3B alleges that petitioner's counsel were ineffective because they failed to adequately investigate his competency and failed to request that the trial court inquire into his competency (*id.* at 128); Claim 4A alleges that petitioner's decision to waive his privilege against self-incrimination and testify during the guilt phase of his trial was not knowing, intelligent, and voluntary because he was tried while incompetent (*id.* at 132); and Claim 4B alleges that petitioner's counsel were ineffective in permitting him to testify during the guilt phase of his trial without having adequately investigated his competency to stand trial or waive his privilege against self-incrimination (*id.* at 135).  Apart from these competency-related claims, petitioner requests an evidentiary hearing on Claim 8D, his claim that counsel were ineffective in failing to adequately investigate and present information relating to the "Stevenson family crime ring" and other prosecution witnesses (*id.* at 185).  Finally, petitioner requests an evidentiary hearing on Claim 34, his claim that his death sentence must be vacated because he is presently insane (*id.* at 329).

## ANALYSIS

Petitioner filed his petition before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996.  Accordingly, pre-AEDPA standards apply to all of petitioner's claims, even those added by amendment after AEDPA's effective date.  *See Thomas v. Chappell*, 678 F.3d 1086, 1100-01 (9th Cir. 2012).  This circumstance is especially consequential when considering whether to grant an evidentiary hearing because the AEDPA's deferential standard of review for claims decided on their merits in the state courts severely curtails a habeas petitioner's ability to expand the record through federal court processes such as discovery and evidentiary hearings.  *See*

1   *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011) (holding that, in cases subject to the AEDPA,

2   "the record under review is limited to the record in existence at the same time [the state court

3   resolved the claim], *i.e.*, the record before the state court").

4           Federal courts are not similarly encumbered in adjudicating pre-AEDPA habeas petitions.

5   In such cases, "both questions of law and mixed questions of law and fact are subject to de novo

6   review, which means that a federal habeas court owes no deference to a state court's resolution of

7   such legal questions[.]"  *Clark v. Chappell*, 936 F.3d 944, 953–54 (9th Cir. 2019).  Freed from

8   AEDPA's deference to state court decisions and its corresponding circumscription of the record to

9   that which existed before the state court, it follows that the standard for granting an evidentiary

10  hearing in pre-AEDPA cases is significantly broader.  Recently, in *Clark*, our court of appeals

11  articulated this standard as follows:

12          Under pre-AEDPA standards, a petitioner is entitled to an evidentiary hearing
        if he can show: (1) the allegations, if proven, would entitle him to relief, and (2) the
13      state court trier of fact had not reliably found the relevant facts after a full and fair
        hearing. We have found that the first prong requires that a petitioner establish a
14      colorable claim for relief, based on allegations of specific facts which, if true, would
        entitle him to relief.  And, for the second prong, we have held that the petitioner must
15      show that he has never been afforded a state or federal hearing on this claim.

16  *Id.* at 967 (internal quotations and citations omitted).  Although this has been described as a "low

17  bar," *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005), it is still a bar.  Thus, "an evidentiary

18  hearing is not required on allegations that are conclusory and wholly devoid of specifics or on

19  issues that can be resolved by reference to the state court record.  Nor is an evidentiary hearing

20  required if there are no disputed facts and the claim presents a purely legal question."  *Clark*, 936

21  F.3d at 967 (internal quotations and citations omitted).

22          The scope and form of any evidentiary hearing or additional fact development permitted in

23  a federal habeas corpus proceeding is at the discretion of the district court.  *Williams v. Woodford*,

24  384 F.3d 567, 590–91 (9th Cir. 2004).  For example, the "district court in a habeas proceeding

25  'need not conduct a full evidentiary hearing,' but may instead 'expand the record . . . with

26  discovery and documentary evidence.'"  *Id.* at 590 (quoting *Watts v. United States*, 841 F.2d 275,

27  277 (9th Cir. 1988) (per curiam)).  So long as the petitioner is provided a "full opportunity for

28  presentation of the relevant facts[,]" the district court may chart its own path toward the most

United States District Court
Northern District of California

4

efficient and prudentially sound resolution of the petition. *Ibid.*

### 1. COMPETENCY-RELATED CLAIMS.

Most claims relevant to the instant motion concern, at their core, petitioner's claim that he was incompetent to stand trial. Claim 3A raises a due process challenge based on petitioner's alleged incompetence to stand trial while Claim 4A challenges petitioner's waiver of his privilege against self-incrimination based upon his alleged incompetence. Claims 2B, 3B, and 4B allege that trial counsel were ineffective in various acts or omissions that were based upon their failure to adequately investigate and present evidence of petitioner's incompetence. Because petitioner's competence at the time of trial is central to these claims, the analysis begins with Claim 3A, the substantive claim challenging petitioner's competence to stand trial.[1]

Due process forbids subjecting a defendant to a criminal trial when he is incompetent. *Sully v. Ayers*, 725 F.3d 1057, 1070 (9th Cir. 2013) (citing *Drope v. Missouri*, 420 U.S. 162, 171 (1975)). "An individual is competent to stand trial if 'he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . he has a rational as well as factual understanding of the proceedings against him.'" *Boyde v. Brown*, 404 F.3d 1159, 1165 (9th Cir. 2005) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)). In pre-AEDPA cases, our court of appeals has long recognized that the "petitioner is entitled to an evidentiary hearing on the issue of competency to stand trial if he presents sufficient facts to create a real and substantial doubt as to his competency, even if those facts were not presented to the trial court." *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985). "A 'good faith' or 'substantial doubt' exists 'when there is substantial evidence of incompetence.'" *Deere v. Woodford*, 339 F.3d 1084, 1086 (9th Cir. 2003) (quoting *Cuffle v. Goldsmith*, 906 F.2d 385, 392 (9th Cir. 1990)).

Because, in general, "retrospective determinations of incompetence" are disfavored on

---

[1] Petitioner acknowledges in his motion that Claim 2A, alleging that his mental health experts performed deficiently, was previously found barred by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Mot. 9–10. Petitioner "defers" to that ruling while maintaining that his related ineffective assistance of counsel claim, Claim 2B, remains viable and is properly the subject of the pending motion for evidentiary hearing. *See ibid.* Accordingly, petitioner is not entitled to an evidentiary hearing on Claim 2A.

United States District Court
Northern District of California

habeas review, *Sully*, 725 F.3d at 1071, the character of the evidence of incompetence offered by a habeas petitioner is important in determining whether to proceed with additional fact development in federal court.  To illustrate, a retrospective determination of competence is "permissible when it is possible to make an accurate retrospective evaluation, for example, by consulting contemporaneous medical reports[,]" but "little weight" is accorded to retrospective competency assessments by experts which are based upon witness statements and psychological testing produced years after trial.  *Williams*, 384 F.3d at 609–10.  Additionally, our court of appeals has shown considerable deference to the statements of attorneys who represented the habeas petitioner at the time of trial.  *See, e.g., id.* at 608 ("We find especially relevant defense counsel's opinion that Williams was competent to stand trial."); s*ee also Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003) (concluding that the habeas petitioner failed to adduce sufficient evidence of his incompetence to warrant an evidentiary hearing because, *inter alia*, his "trial attorney testified he spent a considerable amount of time with [the petitioner] preparing for trial and that he had absolutely no doubt that [the petitioner] understood the charges against him and was able to assist in his defense").

### A.  Petitioner's Evidence of Incompetence.

The evidence petitioner submits in support of his claim that he was incompetent at the time of trial is extensively detailed in the petition, the motion for evidentiary hearing, and in petitioner's offer of proof.  This order will not recount all such evidence, but will instead broadly discuss evidence forming the pillars of petitioner's argument:  historical social, medical, and legal evidence probative of petitioner's incompetence at the time of trial and the observations and accounts of his attorneys during the relevant period.

In the course of petitioner's post-conviction proceedings, his attorneys retained a clinical psychologist, Dr. Gretchen White, to examine petitioner's social history and "identify social, psychological, cultural, economic, neurological and other factors which influenced and shaped [petitioner's] psychological development and level of adult functioning" (Dr. White Decl. (Dkt. No. 880-7) ¶ 7).  In order to render her opinion, Dr. White "reviewed extensive documentation relating to [petitioner] and members of his extended family, as well as information which

chronicled social, cultural and political conditions of [petitioner's] environment during his formative childhood, adolescent years, and young adulthood" (*ibid.*). "Professional standards in 1980 required counsel to investigate a capital defendant's background, family relationships and mental condition as potential sources of mitigation evidence, in order to present an individualized assessment of the appropriateness of the death penalty." *Heishman v. Ayers*, 621 F.3d 1030, 1037 (9th Cir. 2010) (internal quotation omitted).

Based upon her investigation of petitioner's social history, Dr. White opined, more than sixteen years after petitioner's trial, that petitioner may have suffered from mental illnesses, including Delusional (Paranoid) Disorder, at the time of his trial (Dr. White Decl. ¶ 252). Numerous items of evidence informed that opinion, including the circumstances of petitioner's youth and adolescence, his repeated exposures to physical trauma and environmental toxins, and evidence tending to show that, from early in his life, petitioner suffered cognitive and psychological impairments and displayed indicia of serious mental illnesses. This evidence, in pertinent part, is now summarized.

Petitioner, an African American male, was raised in Belzoni, a small town in the Delta region of Mississippi, during the height of the civil rights struggles of the 1950s and 60s (Dr. White Decl. ¶ 18). His youth and adolescence in Belzoni were characterized by extreme poverty and privation. He was raised with two half-siblings and three full siblings, and was the youngest of his mother's six children, all of whom were born within an eight-year period (*id.* at ¶ 58). Petitioner's family first lived in a two-room dwelling in Belzoni, with all six children sleeping in the same bed, before moving to a three-room dwelling in which the three girls and three boys shared two beds (*id.* at ¶ 60). The Gates family, including children once they reached four to six years of age, worked in the cotton fields to make a living (*id.* at ¶ 67). The family burned wood scraps from a local sawmill for heat in winter and used newspapers to cover holes in the children's shoes (*id.* at ¶ 60). Along with poverty, petitioner experienced emotional and physical abuse at home and was alienated from other members of his family (*id.* at ¶¶ 106–15). Petitioner suffered violence in his community as well. Due to his parents' social activism in segregated Mississippi, petitioner was often targeted for harassment and physical violence by authorities in Belzoni,

United States District Court
Northern District of California

1   including numerous arrests during which he was subjected to beatings (*id.* at ¶¶ 145–46).

2        Petitioner experienced physical traumas and sustained toxic exposures that may cause or

3   exacerbate mental and cognitive impairments.  Petitioner was sometimes beaten about his head by

4   his father and by peers, and he experienced several accidental falls in which he landed on his head

5   (Dr. White Decl. ¶ 123).  In addition to these childhood and adolescent traumatic injuries, while in

6   police custody in Los Angeles in 1973, petitioner "sustained massive head injuries, resulting in

7   extensive loss of consciousness, loss of speech, and temporary confinement to a wheelchair" (*id.*

8   at ¶ 151).  Following this arrest and purported custodial head injuries, petitioner was found insane

9   and committed to a state hospital for treatment (*id.* at ¶ 152).

10        In addition to repeated head trauma, petitioner experienced prolonged and pervasive

11   exposure to harmful chemicals and neurotoxins due to the Gates family's work in the local cotton

12   fields.  Airplanes sometimes sprayed the cotton fields while petitioner and his family worked

13   directly underneath them (Dr. White Decl. ¶ 70).  The Gates family's home was adjacent to a

14   cotton field, which caused it to often be covered in pesticides and defoliants sprayed from the air

15   (*ibid.*).  The chemical poisons pervaded the Gates family's home environment with noxious odors

16   and chemical residues (*id.* at ¶¶ 70–71).  Members of the Gates family frequently experienced

17   neurological effects from their exposure to these chemicals, including "headaches, numbness,

18   neuropathy, tremors, dizziness, seizures, and convulsions" (*id.* at ¶ 73).

19        From early in his life, petitioner displayed indicia of cognitive and psychological

20   impairments.  Multiple lay witnesses from petitioner's childhood years observed that petitioner

21   struggled to adapt to social situations and "meet the demands of basic daily living" (Dr. White

22   Decl. ¶ 117).  As a child, petitioner suffered convulsions, seizures, and blackouts, and he

23   sometimes appeared to be dazed or absent-mindedly staring into space while unresponsive to

24   external stimuli (*id.* at ¶¶ 118–20).   He sometimes spoke in unintelligible streams of jumbled

25   words and sounds (*id.* at ¶ 122).  He also displayed cognitive deficits.  He was regarded by some

26   of his siblings, peers, and teachers as cognitively limited because he struggled with learning and

27   maintaining attention (*id.* at ¶¶ 124–25).  He was held back in both the eighth and tenth grades and

28   was reading three years below grade level in the ninth grade (*id.* at ¶ 128).  He dropped out of

1    school while repeating the tenth grade (*id.* at ¶ 141).

2         Prior to his arrest and trial on the charges underlying this matter, petitioner demonstrated

3    many characteristics of severe mental illness.  Petitioner's siblings noted that, as he aged,

4    petitioner cared less for maintaining appropriate hygiene (Dr. White Decl. ¶ 153).  He also began

5    expressing delusions, including that he knew and was close to certain famous people, particularly

6    Howard Hughes (*id.* at ¶ 154).  Following his release from prison in 1977, these conditions

7    appeared to worsen (*id.* at ¶ 168).  Petitioner's hygiene was "exceedingly poor," he was

8    unpredictable, and he used psychotropic drugs "extensively" (*ibid.*; *id.* at ¶ 172).  He claimed to

9    know and/or have trained with Muhammad Ali and various Olympic athletes (*ibid.*).  He also

10   exhibited paranoid beliefs and tendencies (*ibid.*).  He continued to experience trance-like states

11   and speak incoherently at times (*id.* at ¶ 170).

12        In sum, Dr. White's declaration provides substantial evidence that, prior to his trial in this

13   matter, petitioner suffered from profound mental illnesses which may have affected his

14   competence at the time of trial.  Moreover, the declaration provides a basis for understanding why

15   such mental illnesses may have escaped recognition and treatment prior to petitioner's interactions

16   with the criminal justice system (*see* Dr. White Decl. ¶¶ 244–60).

17        No matter how compelling, were Dr. White's declaration the whole of petitioner's

18   evidence, then, pursuant to *Williams*, 384 F.3d at 609, it would perhaps be due "little weight"

19   because of its largely retrospective point of view.  But it is not the whole of petitioner's evidence.

20   Petitioner's apparent mental illnesses have been recognized, with consequential legal effect, in

21   court proceedings occurring both before and after his trial.  In June of 1973, petitioner was

22   arrested on charges of rape and kidnapping in Los Angeles (Dr. White Decl. ¶ 155).  On July 1,

23   1973, a psychiatrist examined petitioner at the request of the state criminal court and concluded

24   that he was "legally insane" (*see* Letter from Dr. A.R. Tweed (Dkt. No. 876-9) at 1-2).  Another

25   psychiatrist examined petitioner on July 24, 1973, and likewise concluded that petitioner was

26   legally insane (*see* Report of Dr. Ronald Markman (Dkt. No. 876-9) at 5-6).  Finally, a third

27   psychiatrist examined petitioner on July 24 and 27, 1973, and also found him to be legally insane

28   (*see* Reports of Dr. Blake Skrdla (Dkt. No. 876-9) at 3-4). All psychiatric examiners noted,

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1  generally, that petitioner was unable to engage in meaningful communication with them in that he

2  was not responsive to their questions and he often appeared to be speaking to himself or mumbling

3  "gibberish" during their examinations.  After a hearing on July 31, 1973, the Superior Court of

4  Los Angeles County found petitioner legally insane and committed him to Atascadero State

5  Hospital (Dkt. No. 876-9 at 7).  A little over three months after his admission to Atascadero,

6  during which time petitioner was provided various forms of therapy and administered

7  antipsychotic medications,  petitioner was released and returned to court with the finding that he

8  could then "talk plain" and "cooperate," and, therefore, was able to meaningfully and rationally

9  assist counsel with preparation of his defense (*id.* at 12-13).

10      Although the state court in 1973 found that petitioner was restored to sanity, and his

11  attorneys did not raise the issue during his trial in 1981, petitioner has repeatedly been found

12  incompetent during these federal habeas proceedings.  In a November 1994 order, the Honorable

13  Fern M. Smith found that petitioner suffers "a mental disorder that may substantially affect his

14  capacity to cooperate with counsel and proceed with his petition in this court" (Dkt. No. 282 at 7).

15  This finding was based upon "unusually consistent and compelling expert evaluations" of

16  petitioner by two separate psychiatrists, as well as Judge Smith's observations of and interactions

17  with petitioner during various hearings, including an *in camera* proceeding which excluded

18  respondent's and petitioner's counsel (*id.* at 5–7).  One of the psychiatric evaluators, Dr. Thorp,

19  advised Judge Smith that petitioner's paranoid and grandiose delusion about a conspiracy to

20  deprive him of an inheritance bequeathed by Howard Hughes "markedly interferes with a rational

21  understanding" of these proceedings and precludes his cooperation with his attorneys (*see* Letter

22  from Dr. Thorp to Judge Smith (Dkt. No. 876-5) at 2).  The other psychiatric evaluator, Dr. Satten,

23  likewise advised Judge Smith that petitioner suffers from "Delusional (Paranoid) Disorder,

24  persecutory type," which prevents him from understanding these proceedings and cooperating

25  with his counsel (*see* Letter from Dr. Satten to Judge Smith (Dkt. No. 876-6) at 9–10).  Judge

26  Smith noted that, in addition to petitioner's delusions about Howard Hughes, petitioner also

27  believes in a "racially motivated" conspiracy, involving his appointed counsel and the federal

28  court, to execute him in order to prevent him from sharing a secret cure for AIDS which he

10

United States District Court
Northern District of California

discovered and which involves yellow chili peppers (Dkt. No. 782 at 6).[2]

In 2004, this Court again ordered that petitioner's competency be determined. Petitioner was again examined by his and respondent's expert psychiatrists and, again, the experts agreed that petitioner suffers from a delusional disorder characterized by paranoia and persecutory and grandiose delusions that render him incompetent (Dkt. No. 567 at 3–4). Accordingly, these proceedings were stayed "until petitioner regains competency" (*ibid.*). In 2014, following the Supreme Court's decision in *Ryan v. Gonzales*, 568 U.S. 57 (2013), this Court once again sought to discern petitioner's competency. An independent psychiatric examiner, Dr. Jessica Ferranti, was appointed to examine petitioner's competency and assess his amenability to treatment and whether he might be restored to competency (Dkt. No. 775 at 2–3). Dr. Ferranti concluded, consistent with the opinions of previous experts, that petitioner suffers from a persecutory-type delusional disorder, as well as antisocial personality disorder, and that these disorders render him incompetent (*id.* at 3). She also opined that, given his characteristics and symptomology, petitioner is a poor candidate for successful treatment (*id.* at 3–5). No party disputed the finding that petitioner is incompetent (*id.* at 3). Thus, despite the state court's finding that petitioner was

---

[2] Because of their prominence in prior rulings finding petitioner incompetent, additional context about petitioner's Howard Hughes delusions is informative. Part of the lore surrounding Howard Hughes emerged after his death in 1976, when a Utah man named Melvin Dummar produced the so-called "Mormon Will," purporting to devise one-sixteenth of the Hughes estate to Mr. Dummar and one-sixteenth to the Church of Jesus Christ of Latter-Day Saints. *See* Emily Langer, *Melvin Dummar, Purported Heir to Howard Hughes Estate, Dies at 74*, Wash. Post, Dec. 11, 2018, *available at* https://www.washingtonpost.com/local/obituaries/melvin-dummar-purported-heir-to-howard-hughes-estate-dies-at-74/2018/12/11/3d5fd4cc-fd4d-11e8-83c0-b06139e540e5 story.html. Mr. Dummar asserted that Hughes bequeathed him a share of his estate because several years prior, in 1967, Mr. Dummar found Hughes lying alone and bloody in the Nevada desert and returned him safely to Las Vegas. *Id.* Although Nevada courts refused to recognize and enforce the "Mormon Will," Mr. Dummar's efforts drew significant international media attention in the late 1970s and were dramatized in a popular film at that time. *Id.*

There is evidence that petitioner was fascinated by this story. Rostell Springfield, an acquaintance who lived in the same apartment complex as petitioner in 1978, states that petitioner spoke often of Hughes "being lost in the desert and being saved by a stranger. [Petitioner] used to wonder how Hughes got in that situation" (Rostell Springfield Decl. (Dkt. No. 881-5) ¶ 3). There is also evidence that by 1980, prior to his trial in this matter, petitioner had incorporated himself into this part of the Hughes lore. Calvin Miller, a friend and fellow inmate at the Los Angeles County Jail in 1980, states that, while he and petitioner were in adjacent cells in "the hole," petitioner "told [Mr. Miller] that he was an heir to the Howard Hughes fortune. [Petitioner] told [Mr. Miller] how he saved a man from a car accident in the desert and how that man gave him millions of dollars" (Calvin Miller Decl. (Dkt. No. 881-5) ¶ 6).

restored to sanity in 1973 through therapy and antipsychotic treatments, he has consistently been found incompetent in these proceedings for nearly twenty-six years.

So, with compelling evidence that petitioner has exhibited indicia of serious mental illnesses and cognitive impairments throughout his life and that such mental illnesses indeed presented with cognizable effect on his legal competence during judicial proceedings bookending his trial, the question is reduced to whether petitioner has produced sufficient evidence to create a substantial doubt of his competence specifically at the time of his trial. On this point, petitioner offers the declarations of his trial and appellate attorneys. One of petitioner's trial attorneys, Geoffrey Carter, states that principal trial counsel Robert A. Braverman referred petitioner for a pre-trial psychiatric evaluation because of his documented history of mental illness and his delusional belief that the inheritance he was due from Howard Hughes "somehow figured in the murder prosecution against which [his attorneys] were defending him" (Geoffrey Carter Decl. (Docket No. 883-4) ¶ 3).

Judd C. Iversen, petitioner's direct appeal attorney, who was appointed to represent petitioner a few months after trial, immediately recognized petitioner's "obvious mental problems" — particularly his focus on delusional themes — from the first time he met with petitioner (Judd C. Iversen Decl. (Dkt. No. 880-11) ¶ 3). Petitioner's inability to focus on anything other than his delusions in his various communications with Mr. Iversen hindered his attorney's efforts to collaborate with petitioner during the appeal (*id.* at ¶¶ 3–7, 17). Petitioner's delusions were oriented around his belief that he is the beneficiary of the estate of Howard Hughes and that a conspiracy involving various law enforcement agencies and his former partners in the Stevenson fraud ring had arrayed to cause his execution and deny him his inheritance from Howard Hughes (*id.* at ¶ 8). Petitioner's delusional preoccupation with Howard Hughes was especially prevalent in his communications with Mr. Iversen (*id.* at ¶ 9). In addition, just as he would later incorporate the federal court into the conspiracy against him, petitioner accused Mr. Iversen of participating in the conspiracy when Mr. Iversen failed to validate petitioner's delusions (*id.* at ¶¶ 10, 16). Petitioner also conveyed to Mr. Iversen his belief that he "knew about a cure for AIDS" (*id.* at ¶ 11). According to Mr. Iversen, lead trial counsel Mr. Braverman had similar struggles with

United States District Court
Northern District of California

1    petitioner, as he too was aware of petitioner's delusions about Howard Hughes and an AIDS cure

2    involving chili peppers and was generally unable to obtain "rational" information from petitioner

3    and collaborate with him when making decisions regarding petitioner's defense at trial (*id.* at ¶¶

4    19–21).

### B.  Petitioner has Established "Substantial Doubt" of his Competency.

6         Considered in conjunction with the social history evidence compiled by Dr. White and

7    petitioner's history of being found incompetent in judicial proceedings occurring both before and

8    after his trial, the accounts of petitioner's trial attorney, Mr. Carter, and direct appeal attorney, Mr.

9    Iversen, create substantial doubt whether petitioner was competent at the time of his trial.  There is

10   evidence that the delusions and paranoia underlying the multiple findings of incompetency in

11   these proceedings were already present in petitioner's interactions with his attorneys around the

12   time of his trial.  While there is admittedly little direct evidence from petitioner's trial attorneys

13   probative of this point — Mr. Carter's declaration only briefly mentions petitioner's history of

14   mental illness and delusional beliefs and Mr. Braverman was deceased at the time petitioner's

15   competence was finally able to be raised during state habeas corpus proceedings — there remains

16   sufficient evidence to raise a substantial doubt about petitioner's competence at the time of trial.

17        Mr. Carter's statement that petitioner believed, prior to trial, that his inheritance from

18   Howard Hughes "somehow figured in the murder prosecution against" him (Carter Decl. ¶ 3),

19   along with Mr. Iversen's detailed account of petitioner's utter inability to cooperate with him due

20   to petitioner's delusional beliefs suggests that petitioner may have lacked the "ability to consult

21   with his lawyer with a reasonable degree of rational understanding," and that he lacked "a rational

22   as well as factual understanding of the proceedings against him."  *Boyde,* 404 F.3d at 1165

23   (internal quotation omitted).  Furthermore, petitioner's paranoid tendency to incorporate his

24   attorneys as malefactors in his delusional conspiracy, as Mr. Iversen asserts petitioner did to him,

25   suggests that he could not cooperate with his counsel to prepare a defense.  *Id.* at 1166 ("Paranoid

26   delusions may in some circumstances render an individual incompetent to stand trial: If a

27   defendant believed his counsel was out to get him, it is questionable whether he could cooperate in

28   preparing a defense.").  While Mr. Iversen's more detailed account of the extent to which

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1   petitioner's delusional beliefs foreclosed any rational understanding of his case mostly describes

2   petitioner's conduct beginning shortly after his trial concluded, Mr. Carter's account provides

3   some corroboration for Mr. Iversen's representation that Mr. Braverman had similar experiences

4   with petitioner while preparing for trial.  Furthermore, given the brief passage of time at issue —

5   Petitioner's trial commenced in March of 1981 and Mr. Iversen was appointed his appellate

6   attorney in November of 1981 — any substantial doubt about petitioner's competence at trial is

7   not markedly diminished.[3]

8       Respondent maintains that the mostly ordinary psychological opinions obtained by

9   petitioner's trial counsel, trial counsels' failure to raise petitioner's competency at trial, and the

10   character of petitioner's testimony at trial defeat his claim (Opp. 9–10).  Respondent perhaps

11   raises formidable obstacles to the ultimate proof of petitioner's claim.  However, for purposes of

12   determining merely whether petitioner is entitled to an evidentiary hearing, respondent's

13   arguments are not conclusive.  *First*, petitioner has produced evidence that the expert

14   psychologists retained by trial counsel were not adequately funded or were otherwise unable to

15   perform "full and appropriate testing" and obtain the social history information germane to a

16   comprehensive evaluation of his competency (*see* Dr. White Decl. ¶¶ 185–86).  For this reason,

17   insofar as they relate to the narrow question of petitioner's competency at trial, the reliability and

18   sufficiency of the expert opinions obtained by his trial counsel are fact issues well-suited for

19   resolution at an evidentiary hearing.  *See, e.g., Spencer v. Klauser*, 70 F.3d 1280, 1995 WL

20   710610, at *1 (9th Cir. 1995) (unpublished table opinion) (finding sufficient evidence to warrant

21   an evidentiary hearing on competence, despite the opinions of two contemporaneous

22   psychological experts that the habeas petitioner was competent at the time of his trial, because

23   such experts "had not been retained to make that specific determination").

24       *Second*, the significance of trial counsels' failure to raise petitioner's incompetency at trial

25   is blunted somewhat by the fact that petitioner is also alleging that his counsel were ineffective in

26

27   [3] In addition, as mentioned previously, there is evidence that Petitioner shared his Howard Hughes
     delusions with an inmate, Mr. Miller, at the Los Angeles County Jail in 1980 (*see* Miller Decl. ¶ 6;
28   Dr. White Decl. ¶ 179).  Thus, multiple independent sources report that petitioner's delusional
     beliefs about Howard Hughes had infected his thought processes before he went to trial in 1981.

failing to raise his incompetency.  Notwithstanding the failure to raise the issue at trial, however, petitioner has produced evidence that his trial attorneys, and especially his direct appeal attorney, who was appointed mere months after trial, apparently harbored significant doubt about his competence.

*Third*, to the extent petitioner offered coherent testimony in his own defense, our court of appeals has indeed viewed retrospective claims of incompetence in the face of such testimony with heightened skepticism.  *See, e.g., Sully*, 725 F.3d at 1071, and *Boyde*, 404 F.3d at 1167.  But this need not be dispositive of petitioner's claim of incompetence, much less his entitlement to an evidentiary hearing in order to prove his claim, for, as opined by one of the experts relied upon in the September 2004 order finding petitioner incompetent, "persons with a delusional disorder can have moments of lucidity" (Dkt. No. 567 at 3).  Whether petitioner's ostensibly cogent trial testimony militates against a finding of incompetence is thus a fact issue well-suited for resolution after adversarial testing at an evidentiary hearing.

For all of the foregoing reasons, petitioner has alleged sufficient facts and produced sufficient supporting evidence to raise a substantial doubt whether he was competent at the time of his trial.  Thus, he is entitled to an evidentiary hearing on Claim 3A, his claim that he was denied due process when he was tried despite his alleged incompetence.  This finding necessarily entails that petitioner is likewise entitled to an evidentiary hearing on Claim 4A, his claim that his waiver of his Fifth Amendment privilege against self-incrimination was not knowingly, intelligently, or voluntarily given due to his alleged incompetence to waive such privilege.  Furthermore, because petitioner is entitled to an evidentiary hearing on these claims, he is likewise entitled to an evidentiary hearing on Claims 2B, 3B, and 4B, all of which allege that he received the ineffective assistance of counsel due to his trial counsels' alleged failure to adequately investigate his mental illnesses and raise his alleged incompetence with the trial court.  With respect to these claims, petitioner has surmounted the "low bar" to obtain a hearing because he has alleged "specific facts" regarding counsels' performance that, "if true, would entitle him to relief," and he has further shown that he has not previously been afforded the opportunity to develop the facts of his competency-related ineffective assistance claims.  *Earp*, 431 F.3d at 1170.  Accordingly,

petitioner is entitled to an evidentiary hearing on claims 2B, 3A, 3B, 4A, and 4B.

### 2. PETITIONER'S INEFFECTIVE ASSISTANCE CLAIM RELATED TO THE "STEVENSON RING."

In Claim 8D, petitioner alleges that his counsel were ineffective in failing to investigate and present information establishing the existence of the Stevenson family crime ring and various prosecution witnesses' participation in it, as well as information pertaining to the "motives and biases" of other prosecution witnesses (Pet. 185). In support, petitioner cites mostly to a raft of publicly accessible court records demonstrating criminal acts, charges, and convictions of members of the Stevenson ring and other prosecution witnesses (*id.* at 166–73). Narrowing his focus to documents that supposedly were available to counsel prior to trial, petitioner specifically alleges that counsel should have discovered and presented "the pre-trial modification of Jimmy Stevenson's felony forgery conviction to a misdemeanor, the documentation of the prosecution team's pre-trial and pre-December, 1979, knowledge of the existence of the Stevenson family crime ring, and pre-trial and pre-December, 1979, arrest and prosecution of Stevenson family crime ring members for forgery and other crimes, etc." (*id.* at 186 n.85). Petitioner specifically alleges that, as a result of trial counsels' failure to obtain and present this information, counsel failed to establish the existence of the Stevenson ring, failed to impeach witnesses including Jimmy and Maurice Stevenson, Melvin Hines, and Evelyn Bostic, and failed to show that prosecutors in Alameda and Los Angeles Counties routinely made secret deals with witnesses to obtain their testimonies (*id.* at 186).

In his motion for evidentiary hearing, petitioner argues that a significant component of the prejudice he incurred due to counsels' failure is that he was required to testify at trial in order to establish elements of the defense case that could have been proven without such testimony had counsel properly investigated the Stevenson ring and all of the prosecution's witnesses (*see* Mot. 51). He argues that his testimony at trial likely hurt his defense because, in addition to displaying mannerisms and demeanor that his counsel believes were "unappealing" to the jury, he "arguably admit[ted] the underlying charges, special circumstance allegations and weapon enhancement allegation during his own testimony" (*ibid.*). In sum, petitioner alleges that, had counsel

United States District Court
Northern District of California

1    investigated and presented information about the Stevenson ring and other witnesses, there is a

2    reasonable probability that the result of both the guilt and penalty phases of his trial would have

3    been more favorable to him (Pet. 185).

4        The April 2016 Order re Claims 8 and 9 observed that respondent has not challenged

5    petitioner's claim that his trial counsel performed deficiently in their failure to investigate and

6    present evidence related to the Stevenson ring and therefore concluded that the "sole remaining

7    issue is whether any alleged errors were prejudicial" (Dkt. No. 794 at 13).  In order to show that

8    counsels' deficient performance was prejudicial, "petitioner must demonstrate a 'reasonable

9    probability that, but for counsel's unprofessional errors, the result of the proceeding would have

10   been different.  A reasonable probability is a probability sufficient to undermine confidence in the

11   outcome'" (*id.* at 12 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).  For the

12   reasons that follow, and because an evidentiary hearing need not be afforded based merely upon

13   "conclusory" allegations or where a given issue may be resolved by reference to the state court

14   record, *Campbell*, 18 F.3d at 679, petitioner is not entitled to an evidentiary hearing on his claim

15   that counsels' errors alleged in Claim 8D prejudiced the outcome of his trial.

16       Petitioner's trial counsel were aware of the Stevenson ring and its role in the events

17   precipitating the murder for which petitioner was charged (*see, e.g.,* Pet. 163 (describing counsel's

18   "'supplemental discovery request'" requesting disclosure of information concerning state and

19   federal investigations of the forgery activities of the Stevenson family); *see also* Carter Decl. ¶ 4

20   ("As trial approached, Mr. Braverman and I became convinced that the alleged victims in the case

21   . . . were participants in an extensive Stevenson family forgery ring operating in Alameda County

22   and elsewhere in the San Francisco Bay Area.")).  Hence, the petition posits that, considering

23   counsel's knowledge of the Stevenson ring, counsels' failure to collect records tending to show

24   that members of the Stevenson family were indeed involved in forgery activities rendered them

25   ineffective because they failed to impeach witnesses and to otherwise introduce evidence

26   establishing the Stevenson ring absent the purportedly harmful testimony of petitioner.  Even

27   considering counsels' alleged failures, however, numerous circumstances apparent in the state

28   court record indicate that petitioner was not prejudiced by his counsels' failure to more thoroughly

United States District Court
Northern District of California

1   investigate and present evidence of the existence of the Stevenson ring.  These circumstances

2   include the following:  the trial court made multiple evidentiary rulings which excluded evidence

3   of the sort petitioner faults counsel for failing to discover and present; allegations that petitioner's

4   testimony harmed his case are conclusory, speculative, and contrary to reasonable inferences

5   derived from the state court record; and notwithstanding counsels' alleged failures, the jury was

6   made aware of the existence of the Stevenson ring in a manner that likely burnished the credibility

7   of petitioner's testimony.  The petition fails to present specific allegations rebutting these

8   deficiencies in petitioner's claim that he suffered prejudice.

9        The trial court's evidentiary rulings substantially impair any claim that petitioner was

10   prejudiced by counsel's failure to discover and present impeaching evidence consisting of criminal

11   charges and convictions of prosecution witnesses.  The petition plainly recognizes that "the trial

12   court did not allow either prosecution witnesses or defendants to be impeached with prior

13   convictions" (Pet. 163).  The petition does not specifically allege how counsel might have

14   overcome this evidentiary ruling even if they had possessed the records petitioner faults counsel

15   for failing to discover.  In his briefing, petitioner appears to argue that counsel could have used the

16   publicly available records evidencing criminal activities of the Stevenson ring to obtain additional

17   discovery which, it is asserted, would have prevented the prosecution from presenting Maurice

18   and Jimmy Stevenson as "innocent acquaintances" of petitioner (Reply Br. 33).  He further

19   submits, without fulsome explanation, that, with this "discovery" in hand, "the prosecution's guilt

20   phase case would have necessarily been substantially different, with a reasonable probability that

21   the result would have been different" (*id.* at 33, 36).  Even if petitioner's briefing could provide

22   the requisite specific allegations of fact necessary to state a "colorable" claim, none of this

23   speculative argument provides a basis to conclude that the trial court — which was specifically

24   made aware of Jimmy Stevenson's forgery conviction yet still excluded it as impeachment

25   evidence — would have reconsidered its ruling prohibiting the use of prior convictions to impeach

26   witnesses.[4]

27   _____

28   [4] The April 2016 Order re Claims 8 and 9 rejected petitioner's argument that "it was unreasonable for the trial court to conclude in its discretion to exclude the evidence of prior convictions" (Dkt.

United States District Court
Northern District of California

United States District Court
Northern District of California

1      Petitioner's argument that, apart from available impeachment evidence, counsel should

2  have discovered and presented evidence establishing the "existence of the forgery-fraud ring" (*see*

3  Pet. 186), likewise founders against the state court record.  For instance, the petition acknowledges

4  that the trial court declined to admit into evidence a California Department of Justice report

5  documenting the Stevenson forgery ring (Pet. 164).  While petitioner faults counsel for failing to

6  conduct a robust pretrial discovery that would have enabled counsel to "document[] the existence

7  of the Stevenson Family Forgery Ring, its structure and participants" as is depicted in this report

8  (*see* Mot. 56-57), petitioner fails to plead specific allegations showing how counsel could have

9  introduced such evidence considering that the trial court specifically refused to admit the

10  California DOJ report.

11      Petitioner also argues that counsels' discovery of publicly available records and subsequent

12  discovery practice would have led counsel to subpoena law enforcement witnesses to testify about

13  the existence and operation of the Stevenson ring (Mot. 56–57).  The petition recognizes, however,

14  that counsel "made an offer of proof, proposing to call state law enforcement officers and FBI

15  agents to establish that Stevenson crime ring members had convictions . . . for forgery and fraud

16  activities [before] and after the homicide[,]" but that the trial judge "ruled the proposed testimony

17  irrelevant" (Pet. 165).  There are no specific allegations in the petition tending to show how

18  counsel might have overcome the trial court's evidentiary rulings in this regard.  The record thus

19  establishes considerable doubt that the evidence petitioner faults counsel for failing to discover

20  could have been employed as speculated in the petition.

21      Petitioner has further failed to allege a colorable claim that he was prejudiced by counsels'

22  failure to investigate and present the evidence described in Claim 8D because there is no

23  compelling evidence in the record that his trial testimony prejudiced the outcome of his trial.

24  Claim 8D provides no specific allegation that petitioner's trial testimony was the resulting

25  prejudice of counsels' failures alleged in Claim 8D (*see* Pet. 185-87).  In a separate, earlier part of

26  Claim 8, petitioner does allege that the trial court's evidentiary rulings and the prosecution's

27  _____

28  No. 794 at 7).

United States District Court
Northern District of California

1    alleged *Brady* violations prejudiced petitioner because counsel "came to believe that their only

2    avenue of proving" the existence of the Stevenson ring was to have petitioner testify (*id.* at 165

3    n.79).  Petitioner's motion for evidentiary hearing attempts to tie these allegations together,

4    arguing that counsels' decision to have petitioner testify is "part of the resulting prejudice"

5    flowing from counsels' failure to investigate the Stevenson ring and litigate related discovery

6    (Mot. 51).

7            Even crediting the petition with having presented a straightforward allegation that

8    counsels' alleged deficient performance prejudiced petitioner because it cabined counsel with the

9    tactical dilemma of having to elicit petitioner's testimony in order to present his defense, there are

10   no specific allegations tending to show such prejudice.  The petition's only allegation respecting

11   the prejudicial nature of petitioner's trial testimony is that counsel sponsored such testimony

12   despite that counsel knew or should have known that petitioner was "mentally incompetent" (Pet.

13   165 n.79).  There is no allegation within Claim 8D that petitioner's testimony, even if offered

14   while mentally incompetent, was especially damaging considering the totality of the evidence.

15   Instead, elsewhere in the petition, there is only an unremarkable summary of his trial testimony,

16   with no discernible allegation of substantial prejudice (*see id.* at 133 (citations omitted)

17   ("Petitioner testified over three days.  He described an incident where four men, all Stevenson

18   family crime ring members, shot him in the leg, to dissuade him from seeking forgery and fraud

19   proceeds which they owed him, after which Petitioner went into hiding for several months, until

20   the Stevensons agreed to make peace and pay Petitioner the money owed, if Petitioner would

21   come to the home of the Stevenson family patriarch, Jimmy Stevenson.  Petitioner also testified

22   concerning the events underlying the crimes charged.")).  Thus, the petition is devoid of specific

23   allegations establishing a colorable claim that petitioner's testimony was so injurious to his

24   defense that it is reasonably probable that the outcome of his trial would have been different had

25   counsel not been forced to sponsor petitioner's testimony due to counsels' allegedly deficient

26   investigation of the Stevenson ring.

27           Petitioner's motion for evidentiary hearing presents a more concerted, if still unpersuasive,

28   argument that his trial testimony prejudiced the outcome of his trial to a degree implicating his

Sixth Amendment rights.  He argues that his testimony "admit[ed] the underlying charges, special circumstance allegations and weapon enhancement allegation" (Mot. 51).  Of course, even if petitioner's testimony, in which he attempted to explain how his shooting of Lonnie and Maurice Stevenson was actually self-defense rather than the robbery-murder portrayed by prosecution witnesses, may fairly be characterized as having admitted the allegations against him, this ignores that petitioner's testimony was likely his best, if not only, means of answering the overwhelming evidence arrayed against him.  This damning evidence included the testimonies of the surviving victim and two neighborhood eyewitnesses, who were unaffiliated with the Stevenson ring and who saw petitioner engaged in the act of robbing Maurice and Lonnie and fleeing the scene after the shootings, as well as evidence that petitioner was in possession of the murder weapon at the time of his arrest.  *See, e.g., Gates*, 43 Cal.3d at 1176–78.  Even with the benefit of the impeachment evidence petitioner now faults counsel for failing to discover, there was little he could do to counter this evidence other than to tell his side of the story.  That is, even had the trial court allowed it, impeaching the testimony of Maurice or Jimmy Stevenson by adducing evidence of prior arrests and convictions or such witnesses' roles in a highly organized forgery ring would have done little to refute the specific testimony about petitioner's actions at Jimmy Stevenson's home on the day of the murder.

Petitioner's argument that his testimony was harmful to his defense further ignores that his testimony provided him with the best means of informing the jury about the prior incident in which he was chased and shot by members of the Stevenson ring.  *See Gates*, 43 Cal.3d at 1179. Petitioner's testimony about this incident was vital to his defense, as he cited the prior shooting to explain why he was fearful, armed, and highly vigilant on the day he approached Maurice and Lonnie to collect his proceeds of the forgery ring (RT 625-26, 649, 688).  The petition is devoid of any allegation describing how petitioner might have compellingly informed the jury of this important evidence without his own testimony.

Petitioner's motion for evidentiary hearing also appears to posit that petitioner was prejudiced by his own testimony because, although his testimony was cogent and "consistent," he was "was not an appealing witness" due to his "intense and emotional" demeanor while testifying

21

United States District Court
Northern District of California

1    (Mot. 51).  Petitioner's argument is speculative.  There are no specific allegations in the petition

2    tending to show that petitioner's demeanor somehow influenced the jury's verdict.  Moreover, to

3    the extent the jury might have questioned petitioner's veracity due to his demeanor, such concerns

4    were likely alleviated when petitioner's detailed testimony about the activities of the Stevenson

5    ring and the prior altercation where he was chased and shot by members of the Stevenson ring

6    caused prosecutors to call a rebuttal witness, Melvin Hines, who indeed implicated the Stevensons

7    and others in the forgery ring described by petitioner and also admitted the prior shooting incident

8    about which petitioner testified.  *See Gates*, 43 Cal.3d at 1181.  To the extent petitioner's

9    testimony caused prosecutors to sponsor testimony establishing that its witnesses participated in

10   an organized forgery ring, thereby corroborating much of petitioner's testimony while impeaching

11   prior prosecution witnesses, it is reasonable to surmise that, rather than prejudicing his defense, his

12   testimony was effective in establishing important points of his defense.[5]

13        This illustrates yet another reason petitioner was not prejudiced by his counsels' alleged

14   failure to more thoroughly investigate the Stevenson ring.  It is apparent that the probative value of

15   most of the evidence petitioner specifically faults counsel for failing to discover and present

16   reached the jury notwithstanding petitioner's counsels' failure to obtain and utilize the court

17   records and investigative reports described in Claim 8D.  Even if one imagines a hypothetical

18   where the trial judge would have admitted evidence of the sort described by petitioner in claim

19   8D, yet counsel still failed to use such evidence to impeach Maurice and Jimmy Stevenson or

20   otherwise prove the existence of the Stevenson ring, petitioner's testimony caused prosecutors to

21   call a rebuttal witness who impeached their own witnesses on those relevant aspects.  Thus, the

22   jury was informed about the Stevenson ring and, further, that Maurice and Jimmy Stevenson's

23   testimonies denying any organized forgery activity were likewise unreliable.  Because the jury

24   therefore was made aware of this information regardless of counsels' failure to present it outside

25   the context of petitioner's testimony, he cannot show that counsels' failure to present such

26

27   ───────────────

28   [5] The petition describes the prosecution's rebuttal evidence as marking a "complete reversal by the prosecutor of his factual theory of the case" (Pet. 157).  This evident reversal surely was not lost on the jury.

United States District Court
Northern District of California

1    information to the jury prejudiced the outcome of his trial.

2         The petition also appears to allege that counsel should have obtained information with

3    which to impeach penalty phase witnesses Calvin Miller and Evelyn Bostic (Pet. 185). Nothing

4    relating to these two witnesses is alleged in the short footnote describing the specific

5    "documentation" which "predate[d] Petitioner's conviction" and, therefore, should have been

6    discovered by counsel (*see id.* at 186 n.85). Elsewhere in the petition, as to Calvin Miller,

7    petitioner merely describes records establishing Miller's participation in a 1978 murder at a Los

8    Angeles mortuary involving petitioner and an arrest by the Oakland Police Department one week

9    before Miller testified at petitioner's trial (*id.* at 173–74). However, at petitioner's trial Miller

10   "testified that he had pleaded guilty to second degree murder in connection with the mortuary

11   killing as part of a plea bargain in which he promised to testify against [petitioner]." *Gates*, 43

12   Cal.3d at 1194. Accordingly, even if counsel were deficient, the jury was aware of the essential

13   point germane to Miller's impeachment: he was testifying against petitioner as part of a plea

14   agreement in a prosecution for murder. The petition fails to make any specific allegation

15   respecting materials or documentation counsel should have uncovered as to Bostic. When

16   respondent raised this deficiency in his briefing (*see* Opp. 20), petitioner failed to point to any

17   showing as to Bostic (*see* Reply Br. 37). Accordingly, there is no colorable claim that counsel

18   were ineffective in failing to discover and present evidence related to Miller and Bostic.

19        Petitioner also alleges in Claim 8D that counsel should have located documentation to

20   "establish that secret law enforcement deals with prosecution witnesses and secret compensation

21   for testimony were normal, albeit unconstitutional, Alameda and Los Angeles prosecution team

22   activities" (Pet. 186). Claim 8D does not specifically state what documentation counsel should

23   have discovered that would have proven such illicit deals, however. Elsewhere in the petition, it is

24   alleged that Alameda and Los Angeles Counties' prosecutors' illicit witness compensation

25   schemes were uncovered in the 1990s by, respectively, trial court proceedings in Alameda County

26   and a grand jury investigation and report in Los Angeles County (*see id.* at 176–84). There are no

27   specific allegations showing how counsel might have exposed these illicit witness compensation

28   schemes at petitioner's trial in 1981. Accordingly, there is no colorable claim that counsel were

23

1    ineffective for failing to investigate and discover evidence showing widespread secret and

2    unconstitutional law enforcement deals with witnesses in Alameda and Los Angeles Counties.

3         Finally, petitioner's briefing argues that counsel should have investigated Elvin Stevenson

4    and uncovered his statement, during a change of plea proceeding occurring less than a year before

5    petitioner's trial, that petitioner argues is "supportive" of his trial testimony and, hence, contrary to

6    the prosecution's presentation of the evidence (*see* Mot. 59–60; Offer of Proof 62–63).  Nowhere

7    in Claim 8D does petitioner allege that counsel were ineffective for failing to investigate and

8    present evidence of Elvin Stevenson's statement during his change of plea hearing.  Even excusing

9    Claim 8D's silence about Elvin Stevenson, petitioner overstates the significance of Elvin

10   Stevenson's statement and mischaracterizes the degree to which it comports with petitioner's

11   description of events.

12        There is no allegation that Elvin Stevenson witnessed the murder or even that he was

13   present at Jimmy Stevenson's home on the day of the murder.  Neither the surviving victim,

14   Maurice, nor petitioner testified that Elvin was present.  Thus, there is no basis offered upon which

15   to credit Elvin Stevenson's statement as the product of his own observation.  More importantly,

16   Elvin Stevenson's statement does not substantially corroborate petitioner's description of events

17   and does not materially conflict with the prosecution's presentation of the evidence.  Notably,

18   Elvin Stevenson's statement corroborates prosecution witnesses' testimonies that petitioner

19   confronted Maurice and Lonnie to rob them of money and jewelry (*see* Dkt. No. 791-10 at 30).

20   While Elvin Stevenson did state that his "brother turned and tried to defend himself" during the

21   course of this robbery, which caused petitioner to shoot his brother, he did not describe any actual

22   "struggle" between Maurice and petitioner (*ibid.*).  Nor does Elvin Stevenson's statement

23   corroborate petitioner's testimony that Jimmy Stevenson suddenly approached petitioner while

24   armed with a gun.  Petitioner testified that it was this conduct by Jimmy Stevenson that caused

25   him to begin firing in self-defense in the direction of Jimmy Stevenson and, in the resulting chaos,

26   also caused him to shoot Maurice in the back (RT 623).  Hence, nothing in Elvin Stevenson's brief

27   statement corroborates petitioner's assertion (*see* Mot. 59), that he inadvertently shot and killed

28   Lonnie Stevenson while he was firing in self-defense at Jimmy Stevenson.  In short, in vaguely

United States District Court
Northern District of California

24

referencing some attempt at self-defense by Maurice during armed robbery, Elvin Stevenson's statement offers only superficial corroboration of petitioner's testimony.  In other key respects — namely, petitioner's motive and actions prior to the shooting and his callous shooting of Maurice and Lonnie in the back — it is consistent with the evidence presented by the prosecution.  Accordingly, petitioner has failed to state a colorable claim that counsel were ineffective in failing to discover and utilize Elvin Stevenson's statement as impeachment or substantive evidence at trial.

Petitioner has failed to allege a colorable claim that he suffered constitutionally significant prejudice flowing from counsels' failure to investigate the Stevenson ring and prosecution witnesses' participation in it.  His assertion that counsel might have used certain publicly available records to engage in a robust discovery process is speculative and, even if indulged, does not demonstrate prejudice because, in that event, counsel would only have been in possession of the sort of evidence that the trial court repeatedly excluded.  Furthermore, his assertion that his own testimony prejudiced his defense is speculative and ignores that his testimony provided him with the best, if not only, avenue to establish key points of his defense, and moreover, caused prosecutors to effectively concede some of those points on rebuttal while simultaneously impeaching their own witnesses.  The petition does not plead specific, plausible facts showing a reasonable likelihood of a different result at petitioner's trial had counsel adequately investigated and presented evidence of the Stevenson ring.  Consequently, petitioner is not entitled to an evidentiary hearing on Claim 8D.

### 3.  PETITIONER'S CLAIM THAT HIS DEATH SENTENCE MUST BE VACATED DUE TO INSANITY.

The final claim presented in petitioner's motion is Claim 34, in which he alleges that, pursuant to the Eighth and Fourteenth Amendments, his death sentence must be vacated because he is presently insane (*see* Pet. 330-31).  Petitioner concedes that, because his execution is not imminent, Claim 34 "is not currently ripe for evidentiary proceedings or briefing or adjudication" (Mot. 70).  He further submits that, when Claim 34 is ripe, i.e., when his execution is "imminent," he will be entitled to an evidentiary hearing at that time (*id.* at 71).  Respondent argues that,

because the claim is not ripe, it must be dismissed without prejudice in order to effect a final judgment and permit appellate review of the remainder of the petition (Opp. 21). Petitioner disagrees and maintains that the Court may "stay further proceedings on claim 34 until the other claims have been resolved and then if appropriate issue a [Rule] 54(b) certification allowing a judgment to be entered in the case on all claims except claim 34" (Reply Br. 40).

As the instant motion concerns only the question whether petitioner is entitled to an evidentiary hearing at this time and the parties are in agreement that Claim 34 is not ripe for an evidentiary hearing, petitioner is not entitled to an evidentiary hearing on Claim 34 at this time. The Court will defer ruling on whether Claim 34 must be dismissed without prejudice, as argued by respondent, until final judgment on the petition is entered.

**CONCLUSION**

For all the foregoing reasons, petitioner's first motion for evidentiary hearing is GRANTED-IN-PART and DENIED-IN-PART. Petitioner is entitled to an evidentiary hearing on Claims 2B, 3A, 3B, 4A, and 4B. Petitioner is not entitled to an evidentiary hearing on Claims 2A, 8D, and 34. It is further ORDERED as follows:

a. within twenty-eight days of the date of this order, petitioner's counsel shall submit proposed budgets for both the evidentiary hearing and the briefing of petitioner's anticipated second motion for evidentiary hearing;

b. an in-person evidentiary hearing is scheduled for February 1 and 2, 2021, at 10:00 a.m.;

c. on or before December 7, 2020, the parties shall file a joint statement providing the parties' proposed witnesses and a paragraph summary of each witness's anticipated testimony;

d. within fifty-six days of the date of this order, petitioner shall file his second motion for evidentiary hearing covering the remaining claims for which he requests such hearing;

e. within twenty-eight days of the filing of petitioner's motion, respondent shall file an opposing brief; and

f. within fourteen days of respondent's opposition, petitioner shall file a reply brief.

United States District Court
Northern District of California

1    If petitioner's second motion for evidentiary hearing warrants the setting of another

2    evidentiary hearing, such hearing will be scheduled after the evidentiary hearing set by this order.

3    **IT IS SO ORDERED.**

4
     Dated:   September 30, 2020
5                                          

6                                          WILLIAM ALSUP
                                           UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28